# 19-3087(L)

Docket Nos.: 20-3415(CON), 20-3501(CON), 20-3700(CON),
20-4149(CON), 20-4150(CON), 20-4190(CON)

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

—————————————————

**United States of America,**
**Appellee,**
**v.**

**Javon Peterson, FKA Sealed Defendant #3, Davon Sullivan, FKA Sealed Defendant #4, Deshawnte Waller, FKA Sealed Defendant #6, Shaquille Breland, FKA Sealed Defendant #7, Rashawn Wynn, FKA Sealed Defendant #9, AKA Wormy, Qualik Vaughn, FKA Sealed Defendant #10, AKA Q, AKA Qualik Vaugh, Terry Linen, FKA Sealed Defendant #11, Jason Lebron, FKA Sealed Defendant #12, AKA Rilla, Damani Prince, FKA Sealed Defendant #14 Defendants,**

**Anthony Hopper, FKA Sealed Defendant #2, AKA A-Dog, Daquan Dowdell, FKA Sealed Defendant #1, AKA Cannon, Kemnorris Kinsey, FKA Sealed Defendant #13, AKA Pep, Jamar Long, FKA Sealed Defendant #5, Reddell Smith, FKA Sealed Defendant #8,**
**Defendants - Appellants.**

—————————————————

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

—————————————————

## APPELLANT ANTHONY HOPPER'S BRIEF

——————————————

**Jeffrey R. Parry, Esq.**
**Counsel for the Appellant**
**Bar Roll No.: 508023**
**7030 E. Genesee Street**
**Fayetteville, N.Y. 13066**
**(315)424-6115**
**JeffreyParry404@gmail.com**

**Federal Rules of Appellate Procedure Form 6. Certificate of Compliance With Type-Volume Limit**

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1. This document complies with [the type-volume limit of Fed. R. App. P. [*insert Rule citation; e.g., 32(a)(7)(B)*]] [the word limit of Fed. R. App. P. [*insert Rulecitation; e.g., 5(c)(1)*]] because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) [and [*insert applicable Rule citation, if any*]]:

   ☑ this document contains [*10, 850*] words, **or**

   ☐ this brief uses a monospaced typeface and contains [*state the number of*] lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

   ☑ this document has been prepared in a proportionally spaced typeface using [*Word/ Adobe*] in Times New Roman 14, **or**

   ☐ this document has been prepared in a monospaced typeface using [*state name and version of word-processing program*] with [*state number of characters per inch and name of type style*].

(s) _Jeffrey Parry_ _____

Attorney    for    Anthony    Hopper

Dated: 09/01/2021

# TABLE OF CONTENTS

I. STATEMENT OF SUBJECT MATTER AND
    APPELLATE JURISDICTION…………………………….…….……1

II. STATEMENT OF THE ISSUES PRESENTED………………….…1

III. STATEMENT OF THE CASE………………………………...…………2

    A. GENERAL HISTORY OF THE CASE………….………...3

IV. SUMMARY OF THE ARGUMENT…………………..………………..4

ARGUMENT AND AUTHORITIES………...……………….………………,,…...5

V. THE ABUSE OF DISCOVERY AND THE RESULTING
PREJUDICE THROUGHOUT TRIAL………………………………5

    A. THE PREJUDICIAL PROTECTIVE ORDER………………8

    B. STANDARDS FOR IMPLEMENTING A
    PROTECTIVE ORDER……………………………………...11

    C. TRAVEL AS A COMPOUNDING FACTOR………………17

    D. EFFECTS OF THE PROTECTIVE ORDER………………...18

    E. THE PREJUDICIAL DELAY OF DISCOVERY……………19

    F. FAILURES IN EXPERT DISCLOSURE…………………..23

VI. DOUBLE JEOPARDY AND THE INCONSISTENT VERDICT...28

    A. DOUBLE JEOPARDY……………………………………28

    B. THE INCONSISTANT VERDICT……………………………30

VII. THE WRONGFUL APPLICATION OF THE MADDUX
HOMICIDE………………………………………………….………33

**A. THE TRIAL COURT'S REVIEW OF THE EVIDENCE WAS SIMPLY WRONG UNDER THE LAW**……………………………..37

**B. REQUIREMENT OF SPECIFIC EVIDENCE**………………..38

**C. VIDEO EVIDENCE**………………………………………..39

**VIII. CONCLUSION**………………………………………………..40

# TABLE OF CITATIONS

*Alderman v. United States*, 394 U . S . 165 (1969)……………………….15

*Anderson v. Cryovac, Inc.,* 805 F.2d 1 (1986)………………....………15, 17

*Blockberger v. United States,* 284 U.S. 299 (1932)…………………...28, 29

*Chi. Tribune Co. v. Bridgestone/Firestone, Inc.,*
263 F.3d 1304 (11th Cir. 2001)………………………………………...15

Gambale v. Deutsche Bank AG, 377 F.3d 133 (2d Cir. 2004)………....16

*Green v. James,* 2021 U.S. Dist. LEXIS 32477, 2021 ……………….....33

*In re Terrorist Bombings of U.S. Embassies in E. Afr.,*
552 F.3d 93 (2d Cir. 2008)………………………………………..14, 15, 16

*Jenkins v. Unger,* 2007 U.S. Dist. LEXIS 103495……………….…….33

*McMillan v. Pennsylvania,* 477 U.S. 79……………………………….…36

*Pansy v. Borough of Stroudsburg,* 23 F.3d 772(3d Cir. 1994)…………..17

*People v. James,* 112 A.D.2d 380 (2d Dep't 1985)…………………….33

*People v. Tucker,* 55 N.Y.2d 1 (N.Y. 1981)………………………….……33

*Poliquin v. Garden Way, Inc.,* 989 F.2d 527(1st Cir. 1993)………....……17

*Public Citizen v. Liggett Group, Inc.,* 858 F.2d 775, (1988)………....……15

*Salinas v. United States,* 522 U.S. 52 (1997)…………………25, 26, 30, 31

*Shingara v. Skiles,* 420 F.3d 301(3d Cir. 2005)…………………………..16

*United States v. Adeniji,* 31 F.3d 58, 64 (2d Cir. 1994)……………..…….25

*United States v. Archer,* 672 F.3d 149 (2d Cir 2011)…………………….38

*United States v. Bulger*, 283 F.R.D. 46 (D. Mass. 2012)………..14, 15, 17

*United States v. Carriles,* 654 F. Supp. 2d 557 (W.D. Tex. 2009)..…..15, 16

*United States v, Concepcion,* 983 F.2d 369 (2d Cir. 1992)……..…35, 36

*United States v. Cruz,* 363 F.3d 187 (2d cir 2004)……………………..20

*United States v. Davis,* 809 F.2d 1194 (6th Cir. 1987)…………..………15

*United States v. Delia,* 944 F.2d 1010, (2d Cir. 1991)………………..…..14

*United States v. Dukagjini,* 326 F.3d 45 (2d Cir 2003)………....……..24

*United States v. Estrada,* 320 F.3d 173 (2d Cir. 2003)…………….…...28

*United States v. Gigante,* 94 F.3d 53 (2d Cir. 1996)………………..……35

*United States v. Giraldo,* 822 F.2d 205 (2d Cir.)……………………..…..25

*United States v. Guerra,* 888 F.2d 247……………………………………35

*United States v. Kelly,* 420 F.2d 26 (2d Cir. 1969)…………………….....5

*United States v. Kikumura,* 918 F.2d 1084…………………………………35

*United States v. Jones,* No. 06-CR-149 (2007)……………………….....16

*United States v. Lee,* 374 F.3d 637 (8th Cir. 2004)………....…14, 15, 35, 36

*United States v. Liller,* 999 F.2d 61, 63, (1993)……………....……………..29

*United States v. Lindh,* 198 F. Supp. 2d 739(E.D. Va. 2002)……..…14, 17

*United States v. Luchko,* No. 06-CR-319, 2006……………....…………16

*United States v. Miller,* 116 F.3d 641……………………………….………25

*United States v. Murgas,* 31 F. Supp. 2d 245 (1998)…………..…………39

*United States v. Percevault*, 490 F.2d 126 (2d Cir. 1974)……………..….5

*United States v. Sanchez,* 912 F.2d 18, 21 (2d Cir. 1990)………...…21, 25

*United States v. Seda*, 978 F.2d 779, 781-82 (2d Cir. 1992)………..……29

*United States v. Shonubi,* 103 F.3d 1085 (2d Cir. 1997)…………34, 35. 39

*United States v. Shonubi,* 998 F.2d 84 (2d Cir. 1993)("Shonubi II")..…..39

*United States v, Smith,* 985 F. Supp. 2d 506 (2013)………..…….13, 16, 17

*United States v. Usury*, 518 U.S. 267 (1996)…………………..……..28

**Rules**

**Fed. R. Crim. P. Rul 16**………….7,8, 11, 12, 13, 14, 15, 16, 17, 24, 25

**United States District Court NDNY Local Rules of Practice Rule 14.1**…………………………………………..………6, 8, 18, 23

**Statutes**

**NY CLS CPL § 300.30(5)**…………………………………………33

**U.S. Constitution**

**U.S. Const. amend. V**…………………………………..………….32

# I. JURISDICTIONAL STATEMENT

Anthony Hopper appeals from the final order of the District Court for the Northern District of New York as a matter of right. The Judgment was rendered on September 25, 2020 and the Notice of Appeal was filed timely on September 27, 2020.

The district court had original jurisdiction over this matter pursuant to 18 U.S.C. § 3231 as the matter concerns a violation of federal law. This Court has jurisdiction over this direct appeal from a conviction in the district court pursuant to 18 U.S.C. §3742 and 28 U.S.C. §1291.

# II. STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     Whether the Protective Order, issued without good cause by the District Court, became an unconstitutional impediment to Mr. Hopper's defense.

Answer:     Yes. Mr. Hopper was never able, because of Court interference, to view the evidence against him or participate in his defense.

2.     Whether the Government's discovery abuses rose to the level of unconstitutional impediments to Mr. Hopper's defense.

Answer:     Yes. The vast amount of material provided in discovery was available to the Government at the inception of this case but was doled out to the defense at a very late stage and in violation of Local Court Rule 14.1. As a direct result, much of the material was never even reviewed by defense counsel for lack

of time. Counsel's performance was directly affected by this as both attorneys voiced to the District Court on many occasions.

3.    Whether the Double Jeopardy clause of the United States Constitution was violated when Mr. Hopper was forced to be retried for a previous crime.

Answer:    Yes. In 2012, Mr. Hopper was tried and acquitted for one of the murders herein. The very same organizations, witnesses, investigators brought the very same evidence to federal court when their efforts in State court were for naught. This case was a reimagining of that earlier trial clothed in RICO attire.

4.    Whether the verdict was inconsistent.

Answer:    Yes. The verdict is simply illogical given the facts of the case.

5.    Whether the murder of Rodney Maddux was wrongly applied as a sentencing factor.

Answer:    Yes. The District Court, applying the preponderance of the evidence standard, wrongly included the Maddux murder in its sentencing calculations.

## III. STATEMENT OF THE CASE

*Please note: although this is not my usual practice, I will only present a brief synopsis of the case at this juncture. A more detailed chronology of events will be presented as argument proceeds. This procedure is followed in light of the chaotic nature of the case at the District Court level as well as the need to present*

*a concise, coherent description of the events to the Court. In my view, this will*
*assist the reader in understanding a very unseemly and inappropriate proceeding.*

**A. General History of the Case.**

In 2012, Anthony Hopper was tried and acquitted in a New York State Court of the killing of Rodney Maddux, one of the victims in the present matter. The Sistrunk homicide occurred in 2014. In the present matter, Anthony Hopper was accused of involvement in a RICO conspiracy along with a count of Discharging a Firearm During a Crime of Violence. The Sistrunk and Maddux murders were included as predicate acts.

As predicate acts, the two murders were included in the Verdict Form, for reasons which can be readily surmised, not because they were necessary to prove the RICO conspiracy. However, Mr. Hopper was, once again, "acquitted" of the Maddux homicide. He was found guilty of the Sistrunk murder although, once again, that was not a necessary element of proof.

Importantly, the prosecution of this matter involved a combined and sustained effort over a period of years by both Onondaga County and City of Syracuse authorities as well as Federal and State authorities at every level. As such, there is no division of entities for purposes of establishing separate avenues of litigation for a double jeopardy argument. There is but one, overall entity and it is a combination of all of the government assets at all levels. Emphatically, this is

not a case that can avoid treading on the doctrine of double jeopardy based upon a separate sovereign argument. There was but one, combined task force.

As well, and as will be depicted more specifically in Appellant's argument below, tremendous and abusive practices served to deny access to discovery material, including Brady material, to the defense. Federal Rule of Criminal Procedure and Local Rule 14.1 of the local District Court, laws and rules that were designed to facilitate the timely, organized and fair distribution of discovery material, were ignored by the Government, literally as if they didn't apply to them. As a consequence, the defense was never able to even review all of the discovery material, was unable to analyze evidence and properly prepare cross-examination and, if that were not enough, was unable to properly investigate any of the accusation facing Mr. Hopper. As Mr. Hopper himself could not be adequately prepared, he very, very reluctantly gave up his right to testify. Defense trial strategy was non-existent as well as defense counsel was forced to "wing it" because their preparation was thwarted. Emphatically, what transpired was not a trial, it was a travesty.

## IV. SUMMARY OF THE ARGUMENT

Appellant's arguments can be briefly stated.

1.) The abuse of the discovery process in this matter, both by opposing counsel and the Court below, prejudiced Mr. Hopper to a constitutionally unacceptable degree.

2.) The protective order, combined with other factors, inhibited Mr. Hoppers defense dramatically.

3.) Mr. Hopper's right to avoid double jeopardy was violated.

4.) The verdict was inconsistent and should be set aside.

5.) The sentence was excessive as it wrongly included the Maddux murder in the calculations.

**ARGUMENT AND AUTHORITIES**

**V. THE ABUSE OF DISCOVERY AND THE RESULTING PREJUDICE THROUGHOUT TRIAL.**

Spirit of discovery rules is to avoid trial by ambush. *United States v. Kelly,* 420 F.2d 26, 1969 U.S. App. LEXIS 10264 (2d Cir. 1969).

Pretrial discovery should be approached with spirit of co-operation among court and counsel in order to prevent burdensome trial recesses and also to protect government against postconviction claims of prejudicial surprise or claims of suppression of material and favorable evidence. *United States v. Percevault*, 490 F.2d 126, 1974 U.S. App. LEXIS 10678 (2d Cir. 1974).

Politely, the above stated lessons have not been learned in the Northern District of New York. Going further, this writer wishes it made known that the description that follows is emphatically not embellished for dramatic effect. Court and Counsel were both vividly aware of the protestations of the defense over

discovery abuses and deliberately ignored any attempt to right what became a

undignified travesty upon our System.

As the Court is well aware, Federal Rule of Criminal Procedure Rule 16

dictates the procedures for discovery in every criminal matter in every Federal

jurisdiction. This is augmented and "streamlined" if you will, by local rule in the

Northern District. For the Court's convenience, Rule 14.1 states as follows'

> 14.1 Discovery
> (a) It is the Court's policy to rely on the discovery procedure as set forth in this Rule as the sole means for the exchange of discovery in criminal actions except in extraordinary circumstances. This Rule is intended to promote the efficient exchange of discovery without altering the rights and obligations of the parties, while at the same time eliminating the practice of routinely filling perfunctory and duplicative discovery motions.
> (b) Fourteen (14) days after arraignment, or on a date that the Court otherwise sets for good cause shown, the government shall make available for inspection and copying to the defendant the following:
> 1. Fed. R. Crim. P. 16(a) & Fed. R. Crim. P. 12(d) information. All discoverable information within the scope of Fed. R. Crim.    P 16(a), together with a notice pursuant to Fed. R. Crim. P. 12(d) of the government's intent to use this evidence, in order   to afford the defendant an opportunity to file motions to   suppress evidence.
> 2. Brady Material. All information and material that the government knows may be favorable to the defendant on the issues of guilt or punishment within the scope of Brady v. Maryland, 373 U.S. 83 (1963).
> 3. Federal Rule of Evidence 404(b). The government shall advise the defendant of its intention to introduce evidence in its case in chief at trial, pursuant to Rule 404(b) of the Federal Rules of Evidence. This requirement shall replace the defendant's duty to demand such notice. United States District Court for the Northern District of New York Local Rules of Practice Rule 14.1 (hereinafter "NDNY Local Rule 14.1" or "14.1").

Again, this is to take place withing 14 days of arraignment and, in this case,

we are speaking of materials that were available to the Government for years.

Again, for the sake of simplicity, Rule 16 simply states in pertinent part, that

the defense will be provided with 1.) *the Defendant's Oral Statement, 2.) the*

*Defendant's Written or Recorded Statement, and 3.) the Defendant's Prior Record.*

Fed. R. Crim. P. Rule 16 (a). Also included is the following:

> (E) Documents and Objects. Upon a defendant's request, the
> government must permit the defendant to inspect and to copy or
> photograph books, papers, documents, data, photographs, tangible
> objects, buildings or places, or copies or portions of any of these
> items, if the item is within the government's possession, custody, or
> control and: (i) the item is material to preparing the defense; (ii) the
> government intends to use the item in its case-in-chief at trial; or
> (iii) the item was obtained from or belongs to the defendant.
> (F) Reports of Examinations and Tests. Upon a defendant's request,
> the government must permit a defendant to inspect and to copy or
> photograph the results or reports of any physical or mental
> examination and of any scientific
> test or experiment if:
> (i) the item is within the government's possession, custody, or control;
> (ii) the attorney for the government knows—or through due diligence
> could know—that the item exists; and
> (iii) the item is material to preparing the defense or the government
> intends to use the item in its case-in-chief at trial.
> (G) Expert Witnesses. At the defendant's request, the government
> must give to the defendant a written summary of any testimony that
> the government intends to use under Rules 702, 703, or 705 of the
> Federal Rules of Evidence during its case-in-chief at trial. If the
> government requests discovery under subdivision (b)(1)(C)(ii) and the
> defendant complies, the government must, at the defendant's request,
> give to the defendant a written summary of testimony that the
> government intends to use under Rules 702, 703, or 705 of the Federal
> Rules of Evidence as evidence at trial on the issue of the defendant's
> mental condition. The summary provided under this subparagraph

must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications. Fed. R. Crim. P. Rule 16(a)(1) §§ (E), (F) and (G).

To paraphrase. everything guaranteed to the defense under law per Rule 16 of the Federal Rules of Criminal Procedure, just about everything the defendant needs to prepare for motions *in limine,* suppression hearings and trial must, by virtue of the District Court's own Rule 14.1, must be turned over to defense counsel 14 days after arraignment or at such other time as the District Court may select *for good cause shown.* NDNY Local Rule 14.1. *Good cause shown* would necessarily involve the permission of the Court.

Emphatically, that did not happen.

### A.     The Prejudicial Protective Order

On November 6, 2018, only one week after arraignment, the Government moved for a protective order which served two functions; 1.) it prohibited defense counsel from disseminating material which, in the view of the Government, will put witnesses at risk, and 2.) it precluded defense counsel from leaving documentary materials with his client at the jail facility. From the Government's jaded perspective, this includes practically all of the tens of thousands of pages of discovery in this matter.

In that regard, the Motion for the Protective Order states as follows.

> Moreover, the Government submits that it is imperative that any defendant who is incarcerated not be permitted to maintain a copy

of any of the Protected Materials with him while incarcerated. As a practical matter, it is virtually impossible to maintain documents in secret at a correctional facility. If other inmates gained access to the Protected Materials, it would almost certainly place witnesses at risk. Dkt. 41.

Noteworthy is the fact that at this point, *no discovery has been had whatsoever.* Defense counsel had absolutely no way to know of the avalanche of evidentiary material that was yet to follow. In fact, it is entirely impossible to describe to the Court the vast amount of discovery material that would literally drown the defense in materials for review. Thousands, upon thousands of pages of documents, investigatory materials, photographs and forensic reports spanning a period in excess of ten years was imposed upon counsel in the most inefficient and obstructive way possible.

Judge Scullin, as was mentioned above, invited opposing motions that were responded to by, I believe, counsel for every defendant. Frankly, in responding for Mr. Hopper this writer took an extremely moderate position only because I had no idea how voluminous the discovery material would be. Dkt. 55. In the average criminal case a minimal amount of material is necessary for the defendants review and I based my judgment in opposing the motion upon that standard. If the volume of material was reasonable, this would present a mild inconvenience if granted. However, the volume was not remotely reasonable and, in fact, was overwhelming. Without consideration of the quantity of material involved, the Order was, of

course, signed in the form that the Government requested and matters moved forward in expectation of the armful of discovery material that usually accompanies a case of this sort.

However, on November 27, 2018, by the Government's admission, this writer received 64 gigabytes of disclosed material along with additional disks of same. Dkt 206. To put this in perspective, a kilobyte is 1000 bytes of data and a five-page paper encompasses about 100 kilobytes. A gigabyte however, is one billion bytes of data. Mathematically, this translates into billions of printed pages of data. *See* https://web.stanford.edu/class/cs101/bits-gigabytes.html. While your appellant concedes that a direct correlation is somewhat inaccurate in this regard because of the presence of photographs and other sorts of evidence in the media provided, one must inevitably conclude that that this is an overwhelming amount of material that was conceded by the government to be "voluminous". Dkt 206. In fact, one CD contained over 11,000 Facebook pages on Anthony Hopper alone. This is not what I would call voluminous, this was an impediment to justice, a constitutional nightmare.

While this was an immense amount of work, trial was still a considerable way off. Nevertheless, I cannot emphasize enough my surprise at the unimaginable amount of discovery material that remained to be delivered later. In fact, discovery

was not nearly complete and MOST was yet to come, all at a time engineered to cause the most prejudice to the defense.

I would add, in an effort to quell any question the Government might raise as to possible exaggeration or dramatic inference, this attorney has more than ample experience at complex litigation. This cannot be explained as anything other than what it is, an avalanche of material disclosed in such a way as to cause maximum inconvenience upon the defense. In fact, a cursory review of the dates of disclosure leads to the inescapable conclusion that the laws and rules were not merely neglected, they were ignored by design.

In this regard, I must remind the Court that this case was tried previously in 2012 at the State level. As the Court is aware, this formed the basis for Appellant's request for a dismissal based on double jeopardy grounds. However, for purposes of this argument it should suffice to say that the prosecutor went to far as to file a motion *in limine* to prevent mention of the State proceeding because the cases were identical.  Clearly, since the case was previously tried, all of the evidentiary material was available at arraignment. There was no reason whatsoever for any delay except unfair advantage.

### B.    Standards for Implementing a Protective Order

The standard articulated by Rule 16 for a protective order is as follows:

(d) Regulating Discovery.

(1) Protective and Modifying Orders. At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief. The court may permit a party to show good cause by a written statement that the court will inspect *ex parte*. If relief is granted, the court must preserve the entire text of the party's statement under seal. Fed. R. Crim. P. Rule 16(d).

Very obviously, two issues come to the fore; 1) what constitutes good cause and 2) what constitutes appropriate relief. In this case, good cause shown was ostensibly demonstrated by the government by simply asserting that there was a general danger because these were dangerous individuals. Dkt. 41. In other words, good cause was not shown. It was entirely based on conjecture when, in fact, there was no more danger to the public than in any other federal criminal case. In point of fact, very few Federal defendants are not dangerous individuals but, because they are incarcerated, they are a danger to no one. This was so, as was pointed out to the Court, for the following reasons.

21. However, there is, in fact, no public safety hazard. Towards that end, I ask the Court to consider the following:
a.) Mr. Hopper is incarcerated some seventy miles from the alleged location of the 110 gang.
b.) Mr. Hopper's location is justified, we are told by the U.S. Marshall's Service, by the need to keep 110 gang members separate and, indeed, they are separate. No other alleged gang member is in the Broome County Jail. Mr. Hopper has contact with no one.
c.) Mr. Hopper's phone calls are monitored and recorded. In fact, it is likely that his calls will be used as evidence at this trial. Emphatically, he cannot communicate outside the jail without the Government knowing about the call and recording it.
d.) Mr. Hopper's visitors are recorded by jail officials. They must sign in and they are observed throughout the visit. They are not allowed to pass materials back and forth. Only attorneys may do this.

e.) Some of the material that is "protected" and kept from Mr. Hopper's possession is the Government's Witness List and statements by those individuals that appear on it.

f.) As I must, I have discussed these witnesses with Mr. Hopper. He knows who is likely to appear.

g.) Moreover, the Maddox murder trial, the New York State proceeding in which Mr. Hopper was acquitted, was conducted, obviously, in Mr. Hopper's presence. Of course, he knows who was involved.

h.) All of the alleged 110 gang members and co-defendants are well known to Mr. Hopper.

i.) All of the co-defendants have entered a plea except for Mr. Hopper. As such, there is no need for secrecy.

j.) Because of his location, I am informed that Mr. Hopper receives almost no visitors and it is very unlikely that that situation will change.

22. The "Protective Order" serves no legitimate function as it does not protect anyone. Statements to the contrary are pure fiction.

23. Rather, the protective order ensures that the defense will not be prepared because Mr. Hopper cannot review the discovery materials privately within the confines of his jail cell. Frankly, I would have to be in attendance for weeks were review to be accomplished under the present circumstances.

24. Moreover, the Government cannot argue as to a legitimate function because no showing of an actual threat or danger has even been articulated.

25. As the Court is aware, the issuance of a Protective Order must be based on a clearly articulated danger and not speculation.

26. To establish good cause for a Government proposed protective order under Fed. R. Crim. P. 16, as is true with the assertion of protecting the interests of third parties, the Government has the burden of demonstrating, and not just alleging, that public disclosure of the Rule 16 materials could jeopardize ongoing investigations. *See generally United States v. Smith*, 985 F. Supp. 2d 506 (2013). Dkt. 204 *depicting the Affirmation of Jeffrey Parry in a defense motion seeking to lift the protective order.*

Thus, the District Court was made well aware of the impediments posed by the protective order but, again, all efforts to have it lifted were denied. Rule 16 also contains a provision governing protective orders related to the production of pretrial discovery. Indeed, it is this provision, Rule 16(d)(1), that the Government cites in support of its request for a protective order. See Fed. R. Crim P. 16(d)(1) (providing that "[a]t any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief."); see also In re Terrorist Bombings of U.S. Embassies in E. Afr., 552 F.3d 93, 122 (2d Cir. 2008) (noting that Rule 16(d) grants district courts the discretion to establish [**31] conditions "under which the defense may obtain access to discoverable information"); *United States v. Delia*, 944 F.2d 1010, 1018 (2d Cir. 1991) (noting that because the language of Rule 16(d)(1) "is . . . permissive," the district court may "limit or otherwise regulate discovery had pursuant to the Rule"); *United States v. Bulger,* 283 F.R.D. 46, 51 (D. Mass. 2012) ("Where . . . a defendant seeks unlimited access to discovery that is subject to a protective order, the federal rules provide the framework to adjudicate the disclosure and dissemination issue."); *United States v. Lindh*, 198 F. Supp. 2d 739, 741 (E.D. Va. 2002) ("Analysis of the government's request for a protective order . . . appropriately begins with Rule 16(d). . . ."). Under the explicit terms of Rule 16(d), "good cause provides the basis to enter a protective order." *Bulger,* 283 F.R.D. at 52; *see also United States v. Lee,*

374 F.3d 637, 652 (8th Cir. 2004) (applying "good cause" standard to Rule 16(d)

analysis). "As the party seeking a produced by [a party], without a showing of

good cause for confidentiality as to any individual documents." *Bulger,* 283 F.R.D.

at 52-53 (*quoting Public Citizen*, 858 F.2d at 790) (alterations in original); see also

*In re Terrorist Attacks on Sept. 11, 2001,* 454 F. Supp. 2d at 222 ("In cases of

unusual scope and complexity . . . broad protection during the pretrial stages of

litigation may be warranted without a highly particularized finding of good

cause.").

"Examining [a] protective order under the framework of Rule 16(d). . . does not eliminate the First Amendment as a relevant concern." *Bulger*, 283 F.R.D. at 50. Rather, "[t]he existence of the protective order . . . confines First Amendment scrutiny, including defendant's right to disseminate the discovery material, to the framework of Rule 16(d)'s good cause requirement." Id.; see also *Chi. Tribune Co. v. Bridgestone/Firestone, Inc.,* 263 F.3d 1304, 1310 (11th Cir. 2001) ("The district court required Firestone to meet a compelling interest standard. To the extent this was predicated on a constitutional right of access, it was error."); *Public Citizen*, 858 F.2d at 788 (noting that *Seattle Times* did not eliminate the First Amendment "as a relevant consideration in protective order," but rather established that protective orders must be considered "within the framework of [the] requirement of good cause"); *Anderson*, 805 F.2d at 7 (noting that under *Seattle Times*, if the good-cause standard is met, then a protective order "does not offend the First Amendment"). Applying this standard requires courts to balance several interests, including whether dissemination of the discovery materials inflicts "hazard to others," *Carriles,* 654 F. Supp. 2d at 566 (*quoting Alderman*, 394 U.S. at 185), and whether "the imposition of the protective order would prejudice the defendant," id.; *see also United States v. Davis,* 809 F.2d 1194, 1210 (6th Cir. 1987) (requiring the defendant to "demonstrate substantial prejudice" from "imposition of a Rule 16 protective order"). Finally, "[t]he good cause determination must also balance

the public's interest in the information against the injuries that protective order, the Government bears the burden of showing good cause." *United States v. Carriles*, 654 F. Supp. 2d 557, 565-66 (W.D. Tex. 2009); *see also Gambale v. Deutsche Bank AG,* 377 F.3d 133, 142 (2d Cir. 2004) ("The party seeking a protective order [under Fed. R. Civ. P. 26(c)] has the burden of showing that good cause exists for issuance of that order.") (internal quotation marks and brackets omitted); *United States v. Jones*, No. 06-CR-149, 2007 U.S. Dist. LEXIS 91743, 2007 WL 4404682, at (E.D. Tenn. Dec. 13, 2007) (rejecting government's request for a Rule 16(d) protective order where government failed to "make the requisite showing" of good cause). Indeed, good cause remains the standard "even where parties consent to a stipulated protective order." *United States v. Luchko*, No. 06-CR-319, 2006 U.S. Dist. LEXIS 78684, 2006 WL 3060985, at (E.D. Pa. Oct. 27, 2006). *United States v. Smith*, 985 F. Supp. 2d 506 (2013).

As to appropriate relief, the Order should have been denied as good cause was never shown. Instead, the Goerrnment makes several general, non-specific references to the welfare of witnesses and the manner in which the danger is supposed to emanate. To wit; the Government alleges "clearly serious risks", risks that should be considered because "the indictment alleges", that "as a practical matter, it is virtually impossible to maintain documents in secret at a correctional facility", it speculates that "if other inmates gained access" and "almost certainly place witnesses at a risk". Dkt. 41. The burden is upon the Government and, in reality this is just vacuous speculation.

Good cause exists "when a party shows that disclosure will result in a clearly defined, specific and serious injury." In re Terrorist Attacks on September 11, 2001, 454 F. Supp. 2d 220, 222 (S.D.N.Y. 2006) (quoting Shingara v. Skiles, 420 F.3d 301, 306 (3d Cir. 2005)). A finding of harm "must be based on a particular factual demonstration

of potential harm, not on conclusory statements." Gangi, 1998 U.S. Dist. LEXIS 6308, 1998 WL 226196, at *2 (quoting Anderson v. Cryovac, Inc., 805 F.2d 1, 8 (1st Cir. 1986)); see also Wecht, 484 F.3d at 211 ("Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not support a good cause showing." (internal quotation marks omitted)). "The nature of the showing of particularity, however, depends upon the nature or type of protective order at issue." Bulger, 283 F.R.D. at 52. Protective orders come in all shapes and sizes, "from true blanket orders (everything is tentatively protected until otherwise ordered) to very narrow ones limiting access only to specific information after a specific finding of need." Poliquin v. Garden Way, Inc., 989 F.2d 527, 532 (1st Cir. 1993). "A blanket protective order 'extend[s] broad protection to all documents disclosure would cause." [*524] Wecht, 484 F.3d at 211 (citing Pansy v. Borough of Stroudsburg, 23 F.3d 772, 787-91 (3d Cir. 1994)).8 Thus, "courts should take care to ensure that the protection afforded to [discovery] information is no broader than is necessary to accomplish the [proffered] goals" of the protective order. Lindh, 198 F. Supp. 2d at 741-42. United States v. Smith, 985 F. Supp. 2d 506 (2013).

Emphatically, good cause is not shown. Rather, and as noted above in Smith, we have broad allegations, unsubstantiated by specific examples. Too, the Government cannot claim a lack of prejudice as Hopper was denied a constitutional right to an appropriate defense based upon the inability of counsel to properly prepare. And, in this regard, as counsel in the District Court I have no difficulty whatsoever announcing that we were not allowed to properly prepare. Mr. Hopper did not get adequate representation as a result.

### c. Travel as a Compounding Factor

This case however, poses a unique challenge to the caselaw in this area in that the discovery guarantees contained in Rule 16 and further streamlined by local

Rule 14,1 are entirely obliterated by the Court's use of a jail facility distant from the trial venue, the vast amount of material to be reviewed, the dilatory and frankly abusive ignoring of the Court's own discovery rules and an overreaching protective order that prevents discovery material from being in Mr. Hopper's possession. In combination, this resulted in Mr. Hopper, and counsel, reviewing only a small fraction of the enormous volume of evidence as a direct result. This compromised his defense as, literally, everything at trial came as a surprise.

In fact, and while the Court Reporter cannot find it in the record, both defense counsel announced "not ready" for trial on the first day of jury selection. The reaction from the bench was palpable.

Furthermore, and crucial to an appropriate consideration of the prejudice involved, is the fact that Mr. Hopper had been to trial on this matter previously in a New York State Court. Accordingly, he could recognize and provide a testimonial background on each exhibit admitted *had he had only been afforded the opportunity to view and be apprised of the evidence against him.*

d. **Effects of the Protective Order**

As the protective order forbade leaving materials in my client's possession at the Broome County Jail, I was forced to go to the jail and literally sit there while he reviewed documents. Then I would have to take them home, as I could not leave them for his further private review, and bring them back on my next trip for his

continued perusal. As the Broome County Jail is located slightly more than 3 hours and twenty minutes round trip from my home and two hours twenty-two minutes round trip from my office, this caused a logistic nightmare. For this reason, on multiple occasions I asked the Court to move Mr. Hopper to a more convenient location, not because I was somehow upset with the drive, I had made it with other clients in many other cases before, but because in this case it was an insurmountable incumbrance to trial preparation.

As noted below, this is compounded by the Court's Order which grants discretion to the Government to decide whether materials fall under the blanket protection of the protective order. It should come as no surprise that the Government acted in their own self-interest and simply delineated nearly everything as falling within the confines of the Order. For the defendant to combat this, he would have to bring repeated motions, to the trial courts great displeasure, as discovery proceeded in a very late and protracted fashion right up to the eve of trial.

### E. THE PREJUDICIAL DELAY OF DISCOVERY

In the face of mounting discovery obstacles, I initially asked that Mr. Hopper be moved to a more accessible location on July 29, 2019. DKT. 121. On July 29, 2019, the Court responded with an Order directing the US Marshall's Service "to the extent possible, transfer the defendant, currently being held at the

Broome County Jail, to a facility closer to Syracuse, New York. If circumstances will not allow such a transfer, the USM shall notify the Court." Dkt. 123. If the Marshall's Service ever did respond that is unknown to this writer however, Mr. Hopper was not moved.

As a result of this deprivation, his inability to access the materials that would be used against him and his attorney, Mr. Hopper did not testify and I can think of no more serious an impediment than that. To be sure, he indicated his desire to do so many times throughout this case and in the trial itself but, ultimately, did not go forward because he could not be sure what he was up against. If the plan was to stifle Mr. Hopper, it was extremely successful.

**Please note that, with Mr. Hopper unable to view the evidence against him and unable to participate in his defense, this is emphatically not a housekeeping function but a matter of constitutional proportions. Moreover, and as I pointed out to the Court, the Oneida County Correctional Facility is approximately 15 minutes from my home and routinely houses Federal prisoners. I have personally visited incarcerated Federal clients there many, many times. Moreover, I am aware that other defendants in this action that were NOT GOING TO TRIAL were housed close-by. Mr. Hopper could, and should, have been moved to another location to substitute for any one of these prisoners. Had this been done, all of this could have been avoided.**

With matters rapidly spiraling out of control, I requested co-counsel on several occasions and, in doing so, specifically mentioned the enormous challenges facing the defense in preparing for trial.

> By this letter I request that the Court appoint Jarrod Smith, Esq. to second chair these proceedings. The necessity for this arises due to the very large volume of discovery material made available by the U.S. Attorney's Office together with the management difficulties this entails during the trial itself. As of today's date, I have received five (5) shipments of discovery documents consisting of CD's of documents, photographs, etc. plus additional thumb drives of evidence. Were this not enough, I expect to receive voluminous records from earlier New York State proceedings concerning matters related to alleged overt acts very shortly. As an additional complication, Mr. Hopper's incarceration at a distant correctional facility places time at a premium. Under these circumstances, a managed and calculated approach to this evidentiary material, both in court and out, simply requires more attention than one attorney can reasonably provide. Dkt. 126 *dated August 5, 2019.*

My request for a second chair was denied the next day. Dkt. 132. However, the motion also serves to memorialize the circumstances that made a second attorney necessary. That is, over a period of ten months, and with only one attorney to digest these many documents, five separate shipments of evidence were received where one was to be anticipated. However, matters got much worse.

By August 29, 2019, there have been eight separate shipments of discovery materials and one remained to be delivered. Dkt. 154. At this point, trial is only 25 days away. Id. Three additional shipments of discovery materials have arrived in

the month of August alone and the defense is nowhere near ready. As such, I requested an adjournment of the trial. Id.

In response the trial date of September 23, 2021 was adjourned until October 1, 2019 and the defense was permitted a second chair. Dkt. 158. That is only an additional week and, for the reasons stated below, with trial to commence in 28 days, the assistance of another attorney was simply too little, much too late. One week was not going to make any difference whatsoever and, in pained discussion, I informed the District Court as such.

Then, on September 10, 2019, seven days after the Court granted an adjournment, appointed additional counsel, etc., I received yet another shipment of additional discovery materials. Dkt. 179. In reporting this to the Court, it was necessary to delineate *a small portion of the discovery history in an attempt to procure relief. I would specifically note that the history of discovery that follows is by no means complete but, it does generally lend itself to the immense prejudice that was inflicted.* Dkt. 179.

> In support of this request, I would ask the Court to consider the following. <u>Aside from the notification of additional discovery received today,</u> on September 6th I received a very late demand for alibi defenses, on August 30th I received a disc and a thumb drive of discovery material literally while I was attending a discovery conference with the Court and requesting additional time as a result of previous, late disclosures, on August 19th I received two discs of discovery materials, on July 31st I received another disc of discovery materials, on February 8th I received two discs of discovery materials

and on November 26th I received both a disc and a thumb drive of discovery materials. Dkt. 179 *emphasis added*.

At this point we are ten months post-arraignment and a scant three weeks to trial. However, and as the Court may have already guessed, things do indeed get worse.

## F. FAILURES IN EXPERT DISCLOSURE.

Also on September 10, 2019, the Government served this office with a witness list that included fourteen (14) experts. WhIle the subject of expert disclosure is handled separately, it is important to review it at this juncture because of the timing issue combined with that of the protective order. Had we still been subject to the original September 23, 2019 trial date, we would have been less than two weeks to trial and, once again, for all purposes known to this writer this was simply a repeat of the New York State trial held several years previously.

As the Court is no doubt aware by know, the disclosure of experts is similarly subject to the District Court's Rule 14.1. Once again, I will remind the Court that this matter was tried before in a State Court with, for every practical purpose imaginable, the very same witnesses. The Government knew at *arraignment* that these witnesses would be appearing as experts. There is no question about that whatsoever. Even so, the District Court ignored its own rule, disallowed efforts for a reasonable adjournment and <u>literally found defense</u> <u>arguments to the contrary and for permission to hire countervailing experts</u>

<u>humorous. As to the Court's reaction, I would be glad to elaborate at oral</u>

<u>argument.</u>

As will be specifically explored elsewhere, aside from being prejudicially late, the Government's disclosures were incredibly lacking in the information guaranteed by statute. Fed. R. Crim. P. Rule 16(a)(1) §(G). As such, the defense was put in the impossible position of having to prepare for, and cross-examine, expert witnesses without prior knowledge of their area of expertise, the subject matter and their qualifications. Moreover, even if this subject matter was made known, it was far too late to hire, or even consult, experts in any of the subject areas. Expert witnesses are not that readily available in Syracuse, New York.

As the Court is further aware, the means for disclosing experts is highly regulated by statute. Fed. R. Crim. P. Rule 16(a)(1)(G). In addition to the timing issues there are also content issues in that the opposing party is entitled to a summation of the expert's testimony. Specifically, the statute provides as follows.

> (G) Expert Witnesses. At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial……….. The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications. Fed. R. Crim. P. Rule 16(a)(1)(G).

This rule is designed to minimize the risk of surprise to the defense, avoid unnecessary continuances and provide the defendant with a fair opportunity to

Too, the rule provides "an incentive for the Government to limit its use of experts to proper subject matters of expert testimony, lest broader expert testimony require broader pre-trial disclosure. *United States v. Dukagjini,* 326 F.3d 45 (2d Cir 2003).

> When the government has failed to comply with Rule 16, the district court has broad discretion to determine what remedial action, if any, is appropriate. See Fed. R. Crim. P. 16(d)(2) (court "may order [the government] to permit the discovery or inspection, grant a continuance, or prohibit the [government] from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances"). The court's determination will not be set aside absent abuse of discretion. *United States v. Giraldo*, 822 F.2d 205, 212 (2d Cir.), cert. denied, 484 U.S. 969, 98 L. Ed. 2d 405, 108 S. Ct. 466 (1987). A "reversal will only be warranted if the nondisclosure results in substantial prejudice to the defendant." *United States v. Sanchez,* 912 F.2d 18, 21 (2d Cir. 1990). We have described "substantial prejudice" in the Rule 16 context as "meaning more than that the statement was damaging to the defendant: the defendant must demonstrate that the untimely disclosure of the statement adversely affected some aspect of his trial strategy." *United States v. Adeniji,* 31 F.3d 58, 64 (2d Cir. 1994). *United States v. Miller,* 116 F.3d 641, 1997 U.S. App. LEXIS 14974, 46 Fed. R. Evid. Serv. (Callaghan) 1174.

In this case, the Government failed to provide any summation of their witness's opinions, the bases and reasons for those opinions, and the witness's qualifications as is made mandatory under Rule 16. Fed. R. Crim. P. Rule 16(a)(1)(G). Bearing in mind that this encompassed 14 witnesses over the course of the trial, the shear percentage of witnesses that were subject to mandatory disclosure as experts was large. In a motion *in limine,* defense counsel moved to preclude this testimony or, in the alternative, for an adjournment sufficient to

prepare. Dkt. 184-1. Thereafter, a supplemental letter in support of the motion is submitted to the Court. It specifically mentions the need for at least 5 to 6 expert witnesses in light of the Government's very late disclosure of fourteen experts. Dkt. 186. This motion was also denied although the Court rationalized this, for reasons unknown to this writer, on its perception that nothing had changed since the previous motion. What had changed, and I respectfully submit that it is obvious enough, is that the defense had identified the need for 5 – 6 expert witnesses to rebut the fourteen only recently made known by the Government in their late disclosure.

I would note that, in previous documents, opposing counsel rationalized the failure to provide expert information by stating that their findings were contained in such things as laboratory and investigative reports. Aside from the fact that this is simply untrue, it is not consistent with the demands of the statute. Fed. R. Crim. P. Rule 16(a)(1)(G). A written summary is required and is routinely given by every attorney on either side of any case at an early juncture. Id. The statute requires this and defense counsel cannot be made accountable for every name that occurs somewhere in disclosure and contemplate whether, by some stretch of the imagination, this arises to expert disclosure.

Rather, disclosure is just what the name implies. Matters must be *disclosed so that there is no room for mistake and the material to be admitted, their*

*qualifications, etc. are clearly spelled out. That did not happen in this case and, as a result, the defense was unprepared to present their own witnesses.*

Prejudice is abundant in the aftermath of the Government's failure to disclose. Defense counsel cannot consult with or hire opposing experts, he cannot properly prepare cross-examination because he doesn't know the subjects or the conclusions that will follow, he cannot advise his client as to the wisdom of entering a plea because he can't evaluate the strength of the prosecution's case, etc. Obviously, I could go on for some length on this issue.

On September 20, 2019, a final attempt was made to relieve the defense from the burden of the Protective Order. Dkt. 204. This was once again denied. Dkt. 212. Therefore, with trial but a few days away, with thousands upon thousands of documents remaining unread by counsel and unreviewed by the defendant, with no appropriate expert disclosure having been made and attempt was made to procure a stay for an interlocutory appeal. Dkt. 216. The stay, although entirely appropriate, was not granted. Dkt. 221. The appeal was not perfected, very simply, because trial was upon us and I did not have the luxury of time to address these matters with this Court.

This incredibly inefficient and prejudicial constraint on the attorney/client function is compounded many, many times over by the immense volume of discovery material involved. It simply cannot be ignored that this volume of

material greatly exceeded the amount that could be consumed by any attorney in the time allotted. And I must emphasize that I am being quite literal in this assertion. If I did nothing but review discovery in the time allotted, I could not have completed the task. In turn, this is compounded by the fact that the discovery time table, as mandated by the law and the rules of the Northern District, was absolutely ignored in this case.

## VI. DOUBLE JEOPARDY AND THE INCONSISTENT VERDICT

## A. DOUBLE JEOPARDY

Very simply, the Constitutional protection of Double Jeopardy applies only when successive prosecutions, or multiple charges in the same prosecution, involve the same offense. *United States v. Usury,* 518 U.S. 267 (1996). To invoke this protection, there must be two prosecutions that involve the same offense "in fact and law". *United States v. Estrada*, 320 F.3d 173 (2d Cir. 2003).

The question as to whether the two prosecutions are sufficiently identical *in law* relies on the "Blockberger test". *Blockberger v. United States*, 284 U.S. 299 (1932). Under this admittedly aging doctrine, two offenses are not the same for double jeopardy purposes if "each requires proof of a fact which the other does not". Id.

However, the Second Circuit holds that in limited circumstances the two offenses may be the same even when they have different elements.

Normally we would apply *Blockburger* by examining the facts required to be proved for conviction under the provisions supporting Liller's prior and pending charges. However, in certain circumstances, including where one of the statutes covers a broad range of conduct, it is appropriate under *Blockburger* to examine the allegations of the indictment rather than only the terms of the statutes. *See United States v. Seda,* 978 F.2d 779, 781-82 (2d Cir. 1992). Similarly, in *Dixon,* at least four Justices, see 61 U.S.L.W. at 4837-39 (Scalia, J., joined by Kennedy, J.); id. at 4846-48 (White, J., joined by Stevens, J.), and perhaps five, see id. at 4855 (Souter, J., joined by Stevens, J.), examined the content of the particular Court order violated by the defendants rather than the more general statutory elements of the criminal contempt provision under which they were charged. But see id. at 4842-43 (Rehnquist, C.J., joined by O'Connor, J., and Thomas, J.). *United States v. Liller*, 999 F.2d 61, 63, (1993).

It is urged that this approach is appropriate in this case. Should this matter be re-tried, and I think that justice is screaming for that to occur, anything associated with the prior litigation should be expunged from the case and kept from the jury. Very simply, an expanded view of the indictment will reveal that this case is simply about a Government bent on getting a second chance conviction after an initial failure. It is not just a case in which the double jeopardy clause could apply, it epitomizes the very reason for its existence.

More specifically, most of the Government's witnesses admitted that they were part of a joint task force, a conglomerate of Federal and local police agencies joined for the purpose of investigating a gang of Federal interest. The management

of the task force is entirely Federal while local agencies provide personnel sufficient to fill out the ranks. Under these circumstances, there is only one Government entity in reality. Attempting to argue otherwise, is an exercise in creative writing.

**B. THE INCONSISTANT VERDICT**.

Going further, I would specifically call the Court's attention to the Verdict Form. Dkt. 234. It is more than noteworthy that the jury found Mr. Hopper guilty of RICO Conspiracy, count one because, going down the page, the jury found him guilty of a pattern of racketeering activity after already finding him guilty of the crime itself. In other words, the essential element of a pattern of racketeering activity could not have been part of the deliberation as to a RICO conspiracy as the form itself instructs the jurors to come to that conclusion first. Dkt. 234.

Nevertheless, they find that racketeering activity does exist but, the form does not express predicate acts beyond "a pattern of racketeering activity that included acts involving murder, as alleged in the Superseding Indictment". Dkt 234 at ¶2. However, and without conceding that Mr. Hopper was appropriately convicted, that would seem to satisfy the requirement of *Salinas* in terms of the necessary elements. *Salinas v. United States*, 522 U.S. 52 (1997). Indeed, under *Salinas* it is clear that the defendant need not have committed an overt act. Id.

This begs the question as to why the acts of murder are included as predicate acts at all. In fact, Mr. Hopper's membership in the enterprise was alleged by co-conspirators and other means. Going further, since the enterprise had committed numerous acts of drug dealing and similar felonies which would more than suffice as predicate acts (and were hardly contested to the degree the murders were) why did the murders take center stage? Since an individual member of the RICO conspiracy does not have to commit any predicate acts himself and since plenty are available to satisfy the statute, why did this supposed RICO prosecution become a redo of a previous murder case? *Salinas v. United States*, 522 U.S. 52 (1997).

Running afoul of the Fifth Amendment, the Jury is offered the Maddux homicide and they respond with a not guilty verdict. (Notably, Maddux died of a gunshot wound.) They then consider the Sistrunk homicide and a guilty plea is rendered but, it is rendered by a jury that does not think that Mr. Hopper has filed a shot. We know this because he is then acquitted on the charge of Discharge of a Firearm During a Crime of Violence. Dkt. 234.

But with the RICO conviction seemingly in hand, why did we go to all of this trouble?

The answer is simple. It is because Mr. Hopper was tried on the Maddux charge previously and was acquitted. That trial was conducted using the *very same witnesses, investigators and evidence that was used in this trial, There was no*

*difference whatsoever. In fact, the police officers in this matter were all part of, of affiliated with, a combined task force operating under the supervision and funding of the federal government. Only two federal investigators were utilized in this most recent trial and their contributions to the sum of the testimony were just about zero.*

The human ego is a frail thing. People don't like to lose and elected officials even less so. Therefore, when the original State murder trial ended in acquittal the District Attorney "sent it over", a colloquial expression in Syracuse and elsewhere referring to the practice of sending a case to the US Attorney in the face of a loss. In this case it meant retrying the case under cover of federal law so that the image of a murder conviction could be maintained. The Sistrunk murder is included because it is weak and can ride along on the Maddux homicide. In point of fact, we still don't know who shot at Sistrunk but, we know it was not Anthony Hopper. This is exactly the prejudicial practice that the Double Jeopardy clause was designed to prevent. U.S. Const. amend. V.

Finally, following on to the Second Count, Discharge of a Firearm During a Crime of Violence, Mr. Hopper is found innocent. As noted, this is an anomaly. Sistrunk was, of course, not killed by gunshot wounds but, someone was known to have been firing at him when his vehicle hit a tree. Yet, in the face of this, Hopper was found to have never fired a weapon.

Under New York law, applicable here, "[t]wo counts are "inconsistent" when guilt of the offense charged in one necessarily negates guilt of the offense charged in the other. NY CLS CPL § 300.30(5). A murder by gunshot when one is found never to have fired a gun is unquestionably inconsistent.

> When there is a claim that repugnant . . . verdicts have been rendered in response to a multiple-count indictment, a verdict as to a particular count shall be set aside only when it is inherently inconsistent when viewed in light of the elements of each crime as charged . . . . The critical concern is that an individual not be convicted for a crime on which the jury has actually found that the defendant did not commit an essential element, whether it be one element or not at all. Allowing such a verdict to stand is not merely inconsistent with justice, but is repugnant to it. . . . [A] conviction will be reversed only in those instances where acquittal on one crime as charged to the jury is conclusive as to a necessary element of the other crime, as charged, for which the guilty verdict was rendered.
> *People v. Tucker*, 55 N.Y.2d 1 (N.Y. 1981) *cited in Jenkins v. Unger,* 2007 U.S. Dist. LEXIS 103495.

As these two counts, the Sistrunk murder and the Discharge of a Firearm During a Crime of Violence, cannot logically be reconciled; the matter should be set aside. *People v. Tucker*, 55 N.Y.2d 1, 4, 431 N.E.2d 617, 447 N.Y.S.2d 132 (1981); *People v. James*, 112 A.D.2d 380, 381, 491 N.Y.S.2d 836 (2d Dep't 1985) *cited in Green v. James*, 2021 U.S. Dist. LEXIS 32477, 2021 WL 623746.

## VII.   THE WRONGFUL APPLICATION OF THE MADDUX HOMICIDE.

At sentencing, Anthony Hopper received a sentence of 385 months based in large measure upon the rejection of the jury's findings of innocence and Judge Scullin's finding of guilt on the Maddux homicide.

> "The jury did find you responsible for the murder of Anthony Sistrunk, and I find by *preponderance of the evidence* that you are also responsible for the murder of Rodney Maddux. Not only are you responsible for those two murders, but countless other acts of violence and drug distribution. If there's ever a case that calls out for life imprisonment, it may be this one." A550, *emphasis added.*

As an initial matter, it is conceded that the United States Sentencing Commission Guidelines Manual (the "Guidelines") mandates the consideration of relevant acquitted conduct. *United States v. Shonubi,* 103 F.3d 1085 (2d Cir. 1997). By including relevant acquitted conduct, the Guidelines took the unprecedented step of punishing only relevant conduct at the same degree of severity as if it were the subject of an indictment and conviction. Id. As this treads upon a fine line of the constitutional infraction, if it is not entirely unconstitutional as a matter of law, the Second Circuit has specifically differed with the Sentencing Commission as to the standard of proof to be applied.

> A guideline system that prescribes punishment for unconvicted conduct at the same level of severity as convicted conduct obviously obliges courts to proceed carefully in determining the standards for establishing whether the relevant conduct has been proven. We have recognized the need for such care with regard to the basic issue of the degree of the burden of proof. Thus, HN5 though the Sentencing Commission has favored the preponderance-of-the-evidence standard for resolving all disputed fact issues at sentencing, U.S.S.G. § 6A1.3., p.s., comment., we have ruled that a more rigorous standard should be

used in determining disputed aspects of relevant conduct where such
conduct, if proven, will significantly enhance a sentence. *See United
States v. Gigante,* 94 F.3d 53, 56-57 (2d Cir. 1996) (denying petition
for rehearing). *United States v. Shonubi*, 103 F.3d 1085, 1089, (2d Cir.
1997).

Therefore, while it may be said in general terms that a trial court may apply

the preponderance of the evidence standard to disputed facts at sentencing and not

run afoul of Constitutional scrutiny, that is not the law in the Second Circuit

particularly where, as in the present case, relevant conduct of the magnitude of a

murder is under consideration. *United States v, Concepcion,* 983 F.2d 369 (2d Cir.

1992). In fact, Second Circuit decisions strongly support the use of a higher

standard in certain cases of this type. The history of this case line is thought to

arise from the concurring opinion of the Hon. Jon Newman in the *Concepcion* case

itself.

[T]he courts then had to decide what standard of proof to apply in
determining whether the misconduct alleged to be relevant conduct
had occurred. We have accepted the "preponderance of the evidence"
standard, *see United States v. Guerra*, 888 F.2d 247, 251 (2d Cir.
1989), *cert. denied*, 494 U.S. 1090, 108 L. Ed. 2d 961, 110 S. Ct.
1833 (1990), although a strong argument can be made that the "clear
and convincing evidence" standard should be used, at least for
substantial enhancements*, see United States v. Kikumura*, 918 F.2d
1084, 1103 (3d Cir. 1990). The "preponderance of the evidence"
standard was originally made applicable to sentencing decisions in the
pre-Guidelines regime. *See, e.g., United States v. Lee*, 818 F.2d 1052,
1057 (2d Cir*.), cert. denied,* 484 U.S. 956, 98 L. Ed. 2d 376, 108 S.
Ct. 350 (1987). It is highly questionable whether it should have been
imported so readily into the Guidelines regime, particularly in light of
the Commission's decision to price unconvicted conduct as severely as

convicted conduct. The case for a higher standard is even stronger where, as here, the Guidelines require the "finding [of unconvicted conduct] to be a tail which wags the dog of the substantive offense [of conviction]." *See McMillan v. Pennsylvania,* 477 U.S. 79, 88, 91 L. Ed. 2d 67, 106 S. Ct. 2411 (1986). See also *United States v. Lee,* 818 F.2d at 1058 (Oakes, J., concurring) ("We may very well want to hold at some future time in some other context that proof by clear and convincing evidence is required. . . .").
*United States v. Concepcion*, 983 F.2d 369, 394 (2d Cir. 1992).

Clearly, from the very outset, this doctrine was deemed inapplicable under facts and circumstances such as those we face at the moment. By adding a second murder conviction the Court has, unquestionably, indulged in the tail wagging the dog just as Judge Newman feared. More specifically, an entire murder acquittal based upon an exhausting trial before a jury cannot be tossed aside upon the preponderance of the evidence. Too, much is at stake. *See McMillan v Pennsylvania,* 477 U.S. 79 (1986) *arguing for the implementation of the higher "clear and convincing" standard.*

Therefore, in the matter at bar the Court is urged to find the sentencing of Anthony Hopper in error on complimentary premises;

1.) that the preponderance of the evidence standard should not have been applied to this case with the unique characteristics of a murder present as it is unconstitutional and simply not the law of the Second Circuit in matters such as this, and

2.)     regardless of the standard the Court decides is applicable, the evidence does not warrant the conclusion that Anthony Hopper committed the Maddux murder under either the "preponderance of the evidence" standard, the "clear and convincing" standard or "beyond a reasonable doubt". The evidence is simply insufficient.

## A.   THE TRIAL COURT'S REVIEW OF THE EVIDENCE WAS SIMPLY WRONG UNDER THE LAW.

Before proceeding, I must first remind the Court that the Maddux murder was tried in a New York State court and resulted in an acquittal. Thereafter, the Maddux murder was tried once again in Federal District Court and he was once again acquitted by a jury. Thereafter, and in contradiction to the above, the trial court judge in this case concluded that Anthony Hopper had killed Rodney Maddux. In other words, 24 jurors had decided that Hopper should be acquitted and 1 individual decided that he was guilty. That does not bode well for the Judge's interpretation of the evidence. Nevertheless, the Government, at sentencing, urged the conclusion of guilty by citing to the following absolutely inadequate testimony and evidence. A537

1.) Richard Chatman testified that:
- he used to be a member of the 110 Gang and he depicts his violent propensities.
- on the evening of the Maddux shooting he went to the B&B Lounge to rob someone named Donald.

- he is on parole having been convicted in two other shootings, he has previously been shot six times, he shot at other people when he says Hopper was    present, he admits to a previous association with "Muffy", a murderer.
- he can't remember the number of meetings he's had with the prosecutor, he can't describe the crime scene, he says he wasn't promised anything for his testimony but, he is hoping the Government will help him relocate and put in a "good word" with his parole officer
- and he says that he saw Anthony Hopper shoot Maddux but he never told the police.

2.) Irwin Johnson testified that:
- he heard a third party ("Canon") argue with Hopper because he made matters "hot" for killing "a lane". (An explanation for the phrase "a lane" is not available and this writer has no idea of its meaning.) Johnson admits to a past affiliation with the 110 Gang, he has a history of felony convictions for shootings and violent acts and, were that not enough, he also wants financial and other assistance from the Government for relocation.

3.) The Video evidence at trial shows, by the government's admission, only someone of Hopper's build and general description. From the video one can only conclude that Hopper was present at the scene but, he was in the company of several hundred other members of the community. The shooter, whoever that may be, cannot be seen or identified from the enhanced video. The Court is specifically invited to view this evidence.

4.) A sweatshirt located in the garbage at a former residence of Hopper's contains his DNA along with that of several others. Although the actual number remains unclear, it may be as many as five people, there is no question but that a large number of individuals wore the sweatshirt. As well, based on the above video, it can certainly be ascertained that many of those in attendance at the B&B Lounge were attired in large gray hoody's.

## B.    REQUIREMENT OF SPECIFIC EVIDENCE

The Second Circuit has held that relevant conduct must be proved by

"specific evidence". *United States v. Archer,* 672 F.3d 149 (2d Cir 2011). The need

for this is plain; "When the Guidelines allow for punishment of relevant conduct as

though it were convicted conduct, we have a special obligation to ensure that the evidence of relevant conduct is solid." *United States v. Shonubi*, 103 F.3d 1085 (2d Cir. 1997) ("*Shonubi IV*"); *United States v. Shonubi*, 998 F.2d 84, (2d Cir. 1993)("*Shonubi II"). United States v. Murgas,* 31 F. Supp. 2d 245 (1998). Therefore, in the context of a drug case, this doctrine has been invoked to prevent mere mathematical computations from being substituted for actual evidence of the amount of drugs involved in a series of sales. Id. Here, the government, with even less hard evidence to put forth, seeks to employ the preponderance of the evidence to convict Mr. Hopper of an acquitted murder.

Emphatically, the evidence is not specific and, upon the District Court's admission, the preponderance of the evidence standard was employed. This constitutes reversable error.

## C.    VIDEO EVIDENCE

It is specifically requested that the Court review the videotape alluded to above as it admissibility was objected to at trial, and, together with the "expert testimony" that accompanied it, it was highly prejudicial to the jury. Even though it was enhanced by laboratory methods, it shows nothing that is determinative of the identity of the shooter although police witnesses state otherwise. Should this case be returned to a lower court for another trial, and this writer is strongly of the opinion that it should, the videotape should be precluded.

## VIII. CONCLUSION

I must say that I have never experienced, or even heard, of a debacle such as this in a Federal District Court or, for that matter, anywhere else. Such events as these denigrate the Federal court and, indeed, all of us that work here.

Mr. Hopper did not get anything resembling a fair trial. However, in the face of that I can truly say that no two attorneys have ever tried harder. There were simply impediments that could not be overcome. Without the assets, expert witnesses, time to review the evidence necessary and, most importantly, without being able to leave materials in my client's possession, Mr. Hopper was at an impossible disadvantage. Even so, he was acquitted of one murder and Discharging a Firearm During a Crime of Violence. Now, we must consider the prospect that, had Mr. Hopper been given a fair trial, he might not have been convicted at all.

Unquestionably, this case should be returned to the lower Court and retried in observation of Mr. Hopper's rights but also because this matter is beneath the dignity of a court system I care about deeply.

September 1, 2021

Respectfully submitted,

*Jeffrey Parry*

_____

Jeffrey R. Parry
Bar Roll No. 508023
7030 E. Genesee Street
Fayetteville, N.Y. 13066
(315)412-9126
JeffreyParry404@gmail.com