# 19-3087(L)

*To be Argued by:* RAJIT S. DOSANJH

# United States Court of Appeals
## FOR THE SECOND CIRCUIT
**Docket Nos. 19-3087 (L), 20-3415 (con),
20-3501 (con), 20-3700 (con), 20-4149 (con),
20-4150 (con), 20-4190 (con)**

UNITED STATES OF AMERICA,
*Appellee,*
v.

Javon PETERSON, FKA Sealed Defendant #3,
Davon Sullivan, FKA Sealed Defendant #4,
*(case caption continued on reverse)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## BRIEF FOR APPELLEE UNITED STATES OF AMERICA

CARLA B. FREEDMAN
*United States Attorney*
*Northern District of New York*
100 South Clinton Street
Syracuse, NY 13261-7198
Tele: 315-448-0672
Email: Rajit.S.Dosanjh@usdoj.gov

RAJIT S. DOSANJH
NICOLAS COMMANDEUR
*Assistant United States Attorneys*
    *of Counsel*

**CASE CAPTION,** *continued*

Deshawnte Waller, FKA Sealed Defendant #6,
Shaquille Breland, FKA Sealed Defendant #7,
Rashawn Wynn, FKA Sealed Defendant #9, AKA
Wormy, Qualik Vaughn, FKA Sealed Defendant
#10, AKA Q, AKA Qualik Vaugh, Terry Linen,
FKA Sealed Defendant #11, Jason Lebron, FKA
Sealed Defendant #12, AKA Rilla, Damani Prince,
FKA Sealed Defendant #14,

*Defendants*,

Anthony Hopper, FKA Sealed Defendant #2,
AKA A-Dog, Daquan Dowdell, FKA Sealed
Defendant #1, AKA Cannon, Kemnorris Kinsey,
FKA Sealed Defendant #13, AKA Pep, Jamar
Long, FKA Sealed Defendant #5, Reddell Smith,
FKA Sealed Defendant #8,

*Defendants - Appellants.*

# TABLE OF CONTENTS

PAGE

STATEMENT OF THE ISSUES
 PRESENTED ................................................. 2

STATEMENT OF THE CASE ............................. 5

STATEMENT OF FACTS .................................... 8

 A. The Activities of the 110 Gang .............. 8

 B. The Original and Superseding
  Indictments .......................................... 10

 C. Long's Plea and Hopper's Trial ............ 13

SUMMARY OF ARGUMENT ............................ 14

ARGUMENT ...................................................... 22

POINT I:
 The District Court Entered a Protective
 Order Supported by Good Cause, and
 Neither the Protective Order nor the
 Government's Discovery Disclosures
 Violated Hopper's Due Process Rights. ........ 22

 A. Background .......................................... 22

  1. Discovery Protective Order ............. 22

  2. Discovery Productions and
   Pretrial Motion Practice .................. 24

 B. Governing Law ..................................... 40

ii

    1. Bases for Protective Orders............. 40

    2. Timing of Discovery
      Productions....................................... 41

    3. Expert Disclosures........................... 42

    4. Prejudice Requirement ................... 43

C.  Standard of Review............................... 43

D.  Discussion............................................. 45

    1. The district court did not abuse
      its discretion by entering, and
      later refusing to lift, the
      protective order. ............................... 45

    2. The timing of the government's
      discovery disclosures did not
      deprive Hopper of due process. ....... 52

    3. The government's expert
      disclosures complied with Rule
      16(a)(1)(G). ...................................... 55

POINT II:
  There Was No Double Jeopardy
  Violation....................................................... 57

POINT III:
  The Jury's Verdict Was Not
  Inconsistent and, In Any Event, A New
  Trial is Not Warranted. ............................... 60

POINT IV:

    The District Court Properly Relied on
    Acquitted Conduct in Determining
    Hopper's Sentence. ....................................... 63

    A.  Background ........................................... 63

    B.  Governing Law and Standard of
        Review ................................................. 65

    C.  Discussion............................................ 66

POINT V:

    Although a Remand for Resentencing is
    Necessary to Correct Plain Error in the
    Determination of Kinsey's Offense Level
    Under U.S.S.G. §2E1.1 and the
    Imposition of an Invalid Condition of
    Supervised Release, Kinsey Fails to
    Establish Clear Error in the
    Determination of his Relevant Conduct
    or Plain Error in his Criminal History
    Category....................................................... 71

    A.  Background ........................................... 71

        1. Guilty Plea....................................... 71

        2. Sentencing Proceedings ................... 75

            a.  PSR............................................ 75

            b.  Sentencing Submissions............ 79

            c.  Sentencing................................. 79

iv

B. Governing Law ....................................... 81

   1. Racketeering Activity ...................... 81

   2. Criminal History ............................. 81

C. Discussion.............................................. 83

   1. Kinsey has shown no clear error in the district court's determination that the August 9, 2014 retaliatory shooting and the October 23, 2014 robbery were relevant conduct for which Kinsey was accountable....................................... 83

   2. The government concedes plain error in the consideration of aggravated assault as a "racketeering activity" under U.S.S.G. §2E1.1............................... 87

   3. There was no plain error in the calculation of Kinsey's criminal history category................................ 92

   4. The district court plainly erred by imposing a third-party risk condition that has been invalidated by this Court............... 101

POINT VI:

    The District Court Satisfied Its Obligations under Fed. R. Crim. P. 32 by Adopting the Factual Statements and Guidelines Calculations that Dowdell Challenged in the PSR; Committed Plain Error in Treating Aggravated Assault as "Racketeering Activity" under U.S.S.G. §2E1.1; But Did Not Err When It Determined the Scope of Dowdell's Relevant Conduct, Applied the Dangerous Weapon Enhancement under §2D1.1, or Denied Dowdell's Request for a Criminal History Departure. .................................... 104

    A.   Background ......................................... 104

        1. Guilty Plea...................................... 104

        2. PSR ................................................ 106

        3. Sentencing Submissions ................ 109

        4. Sentencing ..................................... 110

    B.   Discussion.......................................... 112

        1. The district court satisfied its obligations under Fed. R. Crim. P. 32(i)(3)(B)........................ 112

        2. The district court committed plain error in calculating

Dowdell's offense level under §2E1.1. ........................................... 114

3. The district court can consider the retaliatory shooting as relevant conduct in resentencing Dowdell..................... 115

4. The district court did not clearly err in applying the dangerous weapon enhancement under U.S.S.G. §2D1.1(b)(1). ................................. 117

5. The district court did not abuse its discretion by denying Dowdell's motion for a criminal history departure. .......................... 120

POINT VII:
Although Smith's Sentences for His RICO Offense and Violation of Supervised Release Should be Vacated and Remanded in Light of Plain Errors in the Calculation of his Guidelines Range and Imposition of the Risk Condition Invalidated in *Boles*, This Court Should Make Clear That the District Court Did Not Abuse Its Discretion by Imposing a Consecutive Sentence. .................................................. 123

A. Background ......................................... 123

vii

1. Smith's Plea to the Present RICO Conspiracy ............................ 123

2. Smith's Prior RICO Conviction and Sentence .................................. 125

3. Smith's Conduct on Supervised Release and His State Assault Conviction....................................... 126

4. Federal Sentencing Proceedings ..................................... 129

B. Discussion.............................................. 134

1. The district court committed plain error in calculating Smith's offense level and imposing an invalid condition of supervised release...................... 134

2. The district court also committed plain error in the calculation of the recommended imprisonment range for Smith's violation of supervised release........................... 135

3. The district court did not abuse its discretion by denying Smith's request that his RICO sentence run concurrently with his state sentence for second degree assault. ................................ 138

POINT VIII:

    Long's Sentence Should Be Affirmed. ....... 140

  A.  Background ........................................ 140

  B.  Discussion.......................................... 145

CONCLUSION................................................ 147

# TABLE OF AUTHORITIES

**Cases:**

*Alderman v. United States,*
  394 U.S. 165 (1969) .......................................... 40

*Anders v. California,*
  386 U.S. 738 (1967) ........................................... 7

*Auer v. Robbins,*
  519 U.S. 452 (1997) ....................................... 100

*Bartkus v. Illinois,*
  359 U.S. 121 (1959) .................................... 59, 60

*Blockburger v. United States,*
  284 U.S. 299 (1932) ........................................ 58

*Bowles v. Seminole Rock & Sand Co.,*
  325 U.S. 410 (1945) ....................................... 100

*Brady v. Maryland,*
  373 U.S. 83 (1963) .......................................... 39

*Dunn v. United States,*
  284 U.S. 390 (1932) ........................................ 62

*Gamble v. United States,*
  139 S. Ct. 1960 (2019) ............................... 58, 59

*Giglio v. United States,*
  405 U.S. 150 (1972) ........................................ 39

*Kisor v. Wilkie,*
  139 S. Ct. 2400 (2019) ..................... 99, 100, 101

*Lugo v. Hudson*,
   785 F.3d 852 (2d Cir. 2015) ........................... 145

*Marlow v. United States Marshal Serv.*,
   No. 3:21-CV-156-CEA-DCP, 2021 WL 2292244
   (E.D. Tenn. June 4, 2021) ............................... 49

*Molina-Martinez v. United States*,
   578 U.S. 189 (2016) ........................................ 91

*Patriarca v. United States*,
   511 U.S. 1069 (No. 93-1350) ........................... 90

*Rosales-Mireles v. United States*,
   138 S. Ct. 1897 (2018) ............................. 91, 134

*Setser v. United States*,
   566 U.S. 231 (2012) ...................................... 139

*Stinson v. United States*,
   508 U.S. 36 (1993) ....................................passim

*United States v. Acosta*,
   17 F.3d 538 (2d Cir. 1994) .............................. 62

*United States v. Adeniji*,
   31 F.3d 58 (2d Cir. 1994)........................... 43, 57

*United States v.*
*All Assets of G.P.S. Auto. Corp.*,
   66 F.3d 483 (2d Cir. 1995) .............................. 60

*United States v. Angleton*,
   314 F.3d 767 (5th Cir. 2002) ........................... 60

*United States v. April,*
   854 F. App'x 410 (2d Cir. 2021) .................... 145

*United States v. Babwah,*
   972 F.2d 30 (2d Cir. 1992) ............................ 114

*United States v. Basciano,*
   599 F.3d 184 (2d Cir. 2010) ........................... 58

*United States v. Batista,*
   684 F.3d 333 (2d Cir. 2012) .................. 119, 120

*United States v. Bennett,*
   252 F.3d 559 (2d Cir. 2001) ........................... 67

*United States v. Bigham,*
   No. 14-CR-20676, 2016 WL 738045
   (E.D. Mich. Feb. 25, 2016) .............................. 49

*United States v. Boles,*
   914 F.3d 95 (2d Cir. 2019) ................... 102, 135

*United States v. Botti,*
   711 F.3d 299 (2d Cir. 2013) ........................... 69

*United States v. Brown,*
   613 F. App'x 58 (2d Cir. 2015) ....................... 77

*United States v. Burden,*
   600 F.3d 204 (2d Cir. 2010) ..................... 59, 60

*United States v. Campa,*
   529 F.3d 980 (11th Cir. 2008) ........................ 40

*United States v. Campbell,*
   850 F. App'x 102 (2d Cir. 2021) ..................... 53

xii

*United States v. Campbell,*
  No. 20-4112, 2021 WL 6140303
  (2d Cir. Dec. 29, 2021) .................................... 136

*United States v. Cannone,*
  528 F.2d 296 (2d Cir. 1975) ............................ 43

*United States v. Capers,*
  20 F.4th 105 (2d Cir. 2021) ............................ 61

*United States v. Casey,*
  No. 20-2239, 2021 WL 5617739
  (2d Cir. Dec. 1, 2021) ........................................ 94

*United States v. Celis,*
  608 F.3d 818 (D.C. Cir. 2010) ................... 41, 46

*United States v. Cook,*
  722 F.3d 477 (2d Cir. 2013) ............................ 85

*United States v. Coonan,*
  938 F.2d 1553 (2d Cir. 1991) .......................... 59

*United States v. Coppa,*
  267 F.3d 132 (2d Cir. 2001) ............................ 54

*United States v. Coppola,*
  671 F.3d 220 (2d Cir. 2012) .......................... 138

*United States v. Cordoba-Murgas,*
  233 F.3d 704 (2d Cir. 2000) ...................... 66, 67

*United States v. Cordova,*
  806 F.3d 1085 (D.C. Cir. 2015) ...................... 44

*United States v. Cruz,*
    363 F.3d 187 (2d Cir. 2004) ............................ 42

*United States v. Delia,*
    944 F.2d 1010 (2d Cir. 1991) .................... 40, 44

*United States v. Dixon,*
    175 F. App'x 384 (2d Cir. 2006) ...................... 67

*United States v. Douglas,*
    525 F.3d 225 (2d Cir. 2008) ............................ 53

*United States v. Fermin,*
    252 F.3d 102 (2d Cir. 2001) .......................... 145

*United States v. Firment,*
    296 F.3d 118 (2d Cir. 2002) ............................ 85

*United States v. Flores,*
    912 F.3d 613 (D.C. Cir. 2019) ......................... 89

*United States v. Garcia,*
    406 F. Supp. 2d 304 (S.D.N.Y. 2005).............. 48

*United States v. Gigante,*
    94 F.3d 53 (2d Cir. 1996)................................. 66

*United States v. Giraldo,*
    822 F.2d 205 (2d Cir. 1987) ............................ 43

*United States v. Gist,*
    488 F. App'x 536 (2d Cir. 2012) .................... 137

*United States v. Gordon,*
    291 F.3d 181 (2d Cir. 2002) ....................... 92, 93

*United States v. Gray*,
626 F.2d 494 (5th Cir. 1980) .......................... 114

*United States v. Greenland*,
790 F. App'x 234 (2d Cir. 2019) .................... 139

*United States v. Greenwood*,
627 F. App'x 33 (2d Cir. 2016) ....................... 92

*United States v. Haynie*,
8 F.4th 801 (8th Cir. 2021) ................. 89, 90, 91

*United States v. Hester*,
664 F. App'x 73 (2d Cir. 2016) ....................... 89

*United States v. Jackson*,
813 F. App'x 14 (2d Cir. 2020) ...................... 102

*United States v. Jones*,
531 F.3d 163 (2d Cir. 2008) ..................... 65, 67

*United States v. Labeille-Soto*,
163 F.3d 93 (2d Cir. 1998) .......................... 144

*United States v. Lee*,
834 F.3d 145 (2d Cir. 2016) ........................... 43

*United States v. Legree*,
836 F. App'x 54 (2d Cir. 2020) ..................... 140

*United States v. Liller*,
999 F.2d 61 (1993) ......................................... 58

*United States v. Magda*,
547 F.2d 756 (2d Cir. 1976) ........................... 28

*United States v. Maniktala,*
 934 F.2d 25 (2d Cir. 1991) ............................... 44

*United States v. Marcus,*
 560 U.S. 258 (2010) ......................................... 44

*United States v. Marrone,*
 48 F.3d 735 (3d Cir. 1995) ........................ 98, 99

*United States v. Martinez-Rios,*
 143 F.3d 662 (2d Cir. 1998) .............. 85, 96, 116

*United States v. Massino,*
 546 F.3d 123 (2d Cir. 2008) ...................... 66, 89

*United States v. Medina,*
 74 F.3d 413 (2d Cir. 1996) ............................... 85

*United States v. Minicone,*
 960 F.2d 1099 (2d Cir. 1992) .................... 83, 95

*United States v. Mizell,*
 671 F. App'x 826 (2d Cir. 2016) ...................... 99

*United States v. Molina,*
 106 F.3d 1118 (2d Cir. 1997) .......................... 87

*United States v. Montez-Gaviria,*
 163 F.3d 697 (2d Cir. 1998) .......................... 146

*United States v. Moreno-Diaz,*
 257 F. App'x 435 (2d Cir. 2007) ...................... 60

*United States v. Morgano,*
 39 F.3d 1358 (7th Cir. 1994) ........................... 77

*United States v. Morrison,*
　153 F.3d 34 (2d Cir. 1998) ............................ 117

*United States v. Mulder,*
　273 F.3d 91 (2d Cir. 2001) .............................. 67

*United States v. Napout,*
　963 F.3d 163 (2d Cir. 2020) ............................ 99

*United States v. Ntshona,*
　156 F.3d 318 (2d Cir. 1998) ...................... 44, 51

*United States v. Padilla-Galarza,*
　990 F.3d 60 (1st Cir. 2021) ........... 40, 41, 44, 48

*United States v. Parkins,*
　935 F.3d 63 (2d Cir. 2019) ............................ 101

*United States v. Pica,*
　692 F.3d 79 (2d Cir. 2012) .............................. 66

*United States v. Pierce,*
　940 F.3d 817 (2d Cir. 2019) ...................... 62, 63

*United States v. Porraz,*
　943 F.3d 1099 (7th Cir. 2019) ......................... 91

*United States v. Powell,*
　469 U.S. 57 (1984) ..................................... 62, 63

*United States v. Requena,*
　980 F.3d 30 (2d Cir. 2020) ............................ 112

*United States v. Robinson,*
　354 F. App'x 518 (2d Cir. 2009) ...................... 98

*United States v. Robison,*
19 F. App'x 490 (9th Cir. 2001) ........................ 57

*United States v. Roque,*
628 F. App'x 65 (2d Cir. 2016) ......................... 53

*United States v. Samuel,*
653 F. App'x 37 (2d Cir. 2016) ...................... 140

*United States v. Sanchez,*
419 F. App'x 27 (2d Cir. 2011) ...................... 120

*United States v. Sandoval,*
6 F.4th 63 (1st Cir. 2021) ................................. 90

*United States v. Scott,*
387 F.3d 139 (2d Cir. 2004) .......................... 113

*United States v. Shonubi,*
103 F.3d 1085 (2d Cir. 1997) .................... 66, 67

*United States v. Smith,*
502 F.3d 680 (7th Cir. 2007) .......................... 43

*United States v. Sofsky,*
287 F.3d 122 (2d Cir. 2002) ............................ 92

*United States v. Soto,*
959 F.2d 1181 (2d Cir. 1992) ........................ 118

*United States v. Stevens,*
985 F.2d 1175 (2d Cir. 1993) ........................ 119

*United States v. Tabb,*
949 F.3d 81 (2d Cir. 2020) ............................ 101

xviii

*United States v. Trafficante,*
   966 F.3d 99 (2d Cir. 2020) ............ 102, 103, 109

*United States v. Vaughn,*
   430 F.3d 518 (2d Cir. 2005) ............................ 65

*United States v. Vinas,*
   910 F.3d 52 (2d Cir. 2018) .............................. 43

*United States v. Wagner-Dano,*
   679 F.3d 83 (2d Cir. 2012) ............................ 112

*United States v. Watts,*
   519 U.S. 148 (1997) .................................. 65, 67

*United States v. Williams,*
   247 F.3d 353 (2d Cir. 2001) ............................ 93

*United States v. Williams,*
   260 F.3d 160 (2d Cir. 2001) .......................... 138

*United States v. Wilson,*
   503 U.S. 329 (1992) ...................................... 146

*United States v. Yannotti,*
   541 F.3d 112 (2d Cir. 2008) ............................ 65

*United States v. Young,*
   811 F.3d 592 (2d Cir. 2016) .................. 120, 121

*Werber v. United States,*
   149 F.3d 172 (2d Cir. 1998) .......................... 146

*Williams v. United States,*
   503 U.S. 193 (1992) ........................................ 98

**Federal Statutes, Rules and Other Authorities:**

U.S. Const. amend. V ........................................... 58

18 U.S.C. §924(c) ................................................ 61

18 U.S.C. §924(c)(1)(A) ............................ 13, 23, 24

18 U.S.C. §924(c)(1)(A)(iii) .................................... 6

18 U.S.C. §1029 ................................................ 11

18 U.S.C. §1111 ......................................... 141, 142

18 U.S.C. §1513(a)(1)(B) .................................... 23

18 U.S.C. §1961(1) ...................................... passim

18 U.S.C. §1961(1)(A) ........................................ 81

18 U.S.C. §1961(1)(B) ........................................ 81

18 U.S.C. §1961(1)(C) ........................................ 81

18 U.S.C. §1961(1)(D) ........................................ 81

18 U.S.C. §1961(1)(E) ........................................ 81

18 U.S.C. §1961(1)(F) ........................................ 81

18 U.S.C. §1961(1)(G) ........................................ 81

18 U.S.C. §1961(4) ........................................... 10

18 U.S.C. §1961(5) ........................................... 71

18 U.S.C. §1962(c) ...................................... 10, 125

18 U.S.C. §1962(d) .......................................... 5, 58

18 U.S.C. §1963(a) ..................... 67, 131, 136, 142

18 U.S.C. §2119(a)(1) ...................................... 136

18 U.S.C. §3500................................................ 29

18 U.S.C. §3553(a) ........................ 92, 99, 110, 111

18 U.S.C. §3559(a)(1) ...................................... 136

18 U.S.C. §3583(e)(3) ....................................... 137

18 U.S.C. §3584............................................... 139

18 U.S.C. §3585(b) ..................................... 21, 145

21 U.S.C. §841........................................... 11, 93

21 U.S.C. §841(b)(1)(B)(iii) ............................. 136

21 U.S.C. §846...................................... 11, 93, 118

Fed. R. Crim. P. 16........................................... 41

Fed. R. Crim. P. 16(a) .................................. 41, 42

Fed. R. Crim. P. 16(a)(1)(G)................... 42, 55, 56

Fed. R. Crim. P. 16(c)........................................ 41

Fed. R. Crim. P. 16(d)(1).................................... 40

Fed. R. Crim. P. 29............................................ 39

Fed. R. Crim. P. 32.......................................... 104

Fed. R. Crim. P. 32(i)(3)(B)................. 18, 112, 113

Fed. R. Crim. P. 33 .............................................. 39

Fed. R. Evid. 404(b) ........................................... 42

U.S.S.G. §1B1.3 ............................................ 82, 90

U.S.S.G. §1B1.3(a)(1)(B) .................................. 116

U.S.S.G. §1B1.7 ................................................ 97

U.S.S.G. §2A1.2(a) .......................................... 141

U.S.S.G. §2A2.1 ................................................ 88

U.S.S.G. §2A2.2 ............................ 88, 89, 106, 124

U.S.S.G. §2A2.2(a) .......................................... 105

U.S.S.G. §2A2.2(b)(3)(B) .................................. 124

U.S.S.G. §2D1.1 ........................ 19, 106, 108, 110

U.S.S.G. §2D1.1(b)(1) ................................. passim

U.S.S.G. §2D1.1(c)(8) ...................................... 122

U.S.S.G. §2D1.1(e) ............................................. 4

U.S.S.G. §2D1.1 cmt. n.11 ................................ 119

U.S.S.G. §2E1.1 .......................................... passim

U.S.S.G. §2E1.1(a) ............................................ 76

U.S.S.G. §2E1.1(a)(1) ........................................ 81

U.S.S.G. §2E1.1(a)(2) .................................... 81, 90

U.S.S.G. §2E1.1 cmt. n.1 ................................... 88

U.S.S.G. §2E1.1 cmt. n.4 ..............................passim

U.S.S.G. §3D1.4...........................................passim

U.S.S.G. §3D1.4(a) ............................................ 77

U.S.S.G. Ch. 4 intro. cmt. .................................. 99

U.S.S.G. §4A1.1............................................ 81, 82

U.S.S.G. §4A1.1(b) ........................................... 78

U.S.S.G. §4A1.1(d) ................................. 78, 82, 130

U.S.S.G. §4A1.1 cmt. n.4 ................................... 82

U.S.S.G. §4A1.2............................................... 82

U.S.S.G. §4A1.2(a) ........................................... 97

U.S.S.G. §4A1.2(a)(1) ...................... 81, 83, 97, 121

U.S.S.G. §4A1.2(k)(1)........................................ 78

U.S.S.G. §4A1.2 cmt. n.1 ................................... 82

U.S.S.G. §4A2.1................................................ 94

U.S.S.G. §5G1.1............................................... 142

U.S.S.G. §5G1.3(b) .................... 131, 132, 138, 144

U.S.S.G. §7B1.4........................................ 20, 137

U.S.S.G. §7B1.4(b)(1) ...................................... 137

U.S.S.G. §7B1.4(b)(1) ...................................... 137

U.S.S.G. App. C, amend. 142 ............................. 98

**State Statutes, Rules and Other Authorities:**

New York Penal Law §110.00 ............................ 10

New York Penal Law §105.10 ........................... 11

New York Penal Law §105.15 ........................... 10

New York Penal Law §125.25 ..................... 10, 12

New York Penal Law §125.25(1) ....................... 12

New York Penal Law §125.25(2) ................. 12, 61

New York Penal Law §160.05 ........................... 11

New York Penal Law §160.10 ........................... 11

New York Penal Law §160.15 ........................... 11

New York Penal Law §220.03 ........................... 93

**Other Authorities:**

Fair Sentencing Act of 2010,
    Pub. L. No. 111-220, 124 Stat. 2372.............. 136

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
### Docket Nos. 19-3087 (L), 20-3415 (con), 20-3501 (con), 20-3700 (con), 20-4149 (con), 20-4150 (con), 20-4190 (con)

---

UNITED STATES OF AMERICA,
*Appellee,*

v.

Daquan DOWDELL, et al.,
*Defendants,*

Anthony Hopper, FKA Sealed Defendant #2, AKA A-Dog, Daquan Dowdell, FKA Sealed Defendant #1, AKA Cannon, Kemnorris Kinsey, FKA Sealed Defendant #13, AKA Pep, Jamar Long, FKA Sealed Defendant #5, Reddell Smith, FKA Sealed Defendant #8,
*Defendants-Appellants.*

---

## BRIEF FOR THE UNITED STATES OF AMERICA

---

In this consolidated appeal, defendant-appellants Anthony Hopper, Daquan Dowdell, Kemnorris Kinsey, Reddell Smith, and Jamar Long appeal from the judgments entered by the United States District Court for the Northern District of New York (Scullin, *S.J.*), following their convictions for a racketeering conspiracy. Each

defendant was a member of a criminal gang in Syracuse, NY that engaged in acts of violence intended to intimidate rivals, retaliate against incursions into the gang's territory, and protect and facilitate the gang's drug trafficking activity. Hopper was convicted following a jury trial and raises claims on appeal regarding discovery, trial, and sentencing. The remaining defendants-appellants pleaded guilty pursuant to plea agreements and raise only sentencing issues on appeal.

## STATEMENT OF THE ISSUES PRESENTED

*Hopper*

1. Whether the district court abused its discretion by issuing a protective order that limited disclosure of the government's discovery productions to the defendants, their attorneys, and members of the defense team, and prohibited defendants from retaining copies of certain designated materials in their possession while incarcerated; and whether the timing and volume of the government's discovery productions violated Hopper's due process rights.

2. Whether Hopper's federal trial for racketeering conspiracy violated his right against double jeopardy, where an overt act and special sentencing factor proven at trial involved a murder for which Hopper had been acquitted in state court.

3. Whether Hopper is entitled to a new trial based on an alleged inconsistency in the jury's verdict.

4. Whether the district court erred by considering acquitted conduct in calculating Hopper's offense level under the sentencing guidelines and determining the appropriate sentence.

### *Kinsey*

5. Whether the district court (a) clearly erred in determining the scope of Kinsey's relevant conduct; (b) committed plain error in calculating Kinsey's offense level, where the government concedes that aggravated assault is not "racketeering activity" under U.S.S.G. §2E1.1 and this error affected Kinsey's substantial rights; (c) plainly erred in determining Kinsey's criminal history category; and (d) committed plain error by imposing a standard condition of supervised release that has been invalidated by this Court.

### *Dowdell*

6. Whether the district court (a) committed plain error in sentencing Dowdell by failing to resolve disputed factual and legal issues, where the district court adopted the factual information and guidelines calculations in the PSR after considering defense counsel's arguments; (b) committed the same plain error by treating

aggravated assault as a "racketeering activity" under U.S.S.G. §2E1.1 as conceded in Kinsey's case; (c) committed clear error by considering the assault in question as relevant conduct; (d) committed clear error by applying the dangerous weapon enhancement under U.S.S.G. §2D1.1(b)(1); and (e) abused its discretion by denying Dowdell a criminal history departure.

## *Smith*

7. Whether, despite the appeal waiver in Smith's plea agreement, this Court should notice the same plain error in the calculation of Smith's guidelines range as conceded in Kinsey's case; whether the district court committed plain error in the calculation of the recommended imprisonment range for Smith's violation of supervised release; and whether the district court abused its discretion in rejecting Smith's request that his sentence for the present RICO offense run concurrently to his state sentence for conduct that was charged as an overt act in this case.

## *Long*

8. Whether Long should be credited for time spent in prior custody, where he remained in primary state custody while awaiting trial and sentencing in this case and the district court had no authority to grant such credit; and whether Long's challenge to the calculation of his criminal

history category is precluded by the appeal waiver in his plea agreement and lacks merit in any event.

## STATEMENT OF THE CASE

On October 25, 2018, a federal grand jury in the Northern District of New York (NDNY) returned a single-count indictment charging defendants-appellants Hopper, Kinsey, Dowdell, Smith, Long, and others with conspiracy to engage in a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §1962(d) (Count One). HA:23-32.[1] In August 2019, Kinsey, Dowdell, and Smith pleaded guilty to Count One pursuant to plea agreements. KA:35, 38-57; DA:28-48, 61; SA:222-242, 259.

The grand jury returned a superseding indictment against Hopper and Long on August 22, 2019. HA:54-64. The superseding indictment added special sentencing factors regarding the RICO conspiracy charged in Count One. HA:62-63.

---

[1] References to "HA," "DA," "KA," "SA," and "LA" are to the separate appendices filed by Hopper, Dowdell, Kinsey, Smith, and Long respectively. In addition, references to "SSA" are to the Special Appendix filed by Smith and attached to his brief. References to "GA" are to the government's proposed appendix. References to "Dkt" are to entries in the docket report for Case No. 18-cr-853 (NDNY).

The superseding indictment also charged Hopper with discharge of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §924(c)(1)(A)(iii) (Count Two). HA:63-64.

Long pleaded guilty to Count One on August 29, 2019, pursuant to a plea agreement. LA:23-44, 62. In that agreement, Long waived his right to appeal, *inter alia*, any sentence of imprisonment of 240 months or less. LA:30. Following an eight-day jury trial in October 2019, HA:13-15 (Dkt. ##224-231), Hopper was convicted on Count One, but acquitted on Count Two. GA:139-40 (verdict).

The district court sentenced the defendants-appellants as follows:

| Name | Term of Imprisonment | Supervised Release Term |
|---|---|---|
| Hopper | 385 months | 5 years |
| Long | 210 months | 3 years |
| Kinsey | 150 months | 3 years |
| Dowdell | 120 months | 3 years |
| Smith | 78 months[2] | 3 years |

---

[2] Smith had a previous federal conviction for racketeering conspiracy (NDNY Case No. 09-cr-337), and was sentenced in March 2011 to a term of imprisonment of 100 months, to be followed by a five-year term of supervised release. SA:99-156. Smith's term of imprisonment later was reduced to time served due to retroactive guideline

HA:130-31; LA:116-17; KA:99-100; DA:11-12; SSA:24-25. Each defendant-appellant filed a timely notice of appeal.[3] HA:1; DA:17; KA:105; SA:544; LA:122.

───────────────

amendments, and he was released to supervision on October 30, 2015. SA:167-68. On December 1, 2020, the Probation Office for the NDNY filed an Amended Petition for Revocation of Supervised Release, alleging that Smith had violated supervised release by committing additional criminal conduct related to his involvement in the instant racketeering conspiracy. SA:512-13. At sentencing in the present case, Smith admitted the violations of supervised release, SSA:17-18, and the district court imposed a thirteen-month term of imprisonment for these violations, to run consecutively to his 78-month term of imprisonment for the present RICO conviction, SSA:21.

[3] On July 22, 2021, appellate counsel for Long filed a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967), identifying no non-frivolous issues for appeal. On July 27, 2021, the government moved to dismiss the appeal as it pertains to Long's conviction and the sentence of imprisonment and supervised release, on the basis of the appeal waiver in Long's plea agreement. LA:30. The government also sought summary affirmance with the respect to the special assessment component of Long's sentence, for the

## STATEMENT OF FACTS

### A. The Activities of the 110 Gang[4]

Hopper, Dowdell, Kinsey, Smith, Long, and other co-defendants and unidentified individuals were members and associates of a criminal organization known as the "110 Gang," which has operated for over twenty years within a multi-block area on the southwest side of the City of Syracuse.[5] PSR ¶12. Members of the 110 Gang

---

reasons set forth in defense counsel's *Anders* brief. On August 11, 2021, this Court granted Long's motion to file a *pro se* brief. The government's motion for dismissal/summary affirmance remains pending before this Court.

[4] The following account is based on the factual statements in the Presentence Investigation Report (PSR) issued in Hopper's case, which the district court adopted at sentencing. HA: 541-42. Identical facts were set forth in the PSRs of the other defendants-appellants, and adopted by the district court at each of their sentencings. *See* DA:84; KA:95; SSA:7; LA:104-105. The PSRs for each defendant-appellant have been filed with the Clerk of the Court.

[5] A 2009 investigation into the 110 Gang led to the arrest of twelve members, including Smith, who were convicted of a RICO conspiracy. Despite

routinely resort to violence, including murder and assault, to ensure that no rival gang members encroach on their territory to sell drugs. Gang members also resort to violence within their territory that is not directly related to their drug trade, but which helps to establish their reputation for violence. PSR ¶¶12, 19. Through acts of violence and intimidation, 110 Gang members maintain exclusive territory in Syracuse within which to distribute crack cocaine, heroin, and other drugs. PSR ¶13.

Members of the 110 Gang routinely arm themselves with firearms to protect their territory and drug trade, and to retaliate against rival gang members. Many of these firearms are "community guns," which circulate among members of the gang. PSR ¶¶19, 21-32.

For many members of the 110 Gang, the sale of cocaine, crack cocaine, and/or heroin is their sole or primary source of income. PSR ¶11. Recently, a number of gang members have used counterfeit credit cards to steal merchandise and money. PSR ¶13. Members of the 110 Gang signal their membership through shared terminology, hand signals, specific clothing, self-produced rap music, and social media posts. PSR ¶¶17-18, 36-41.

_____

the impact of these convictions, the 110 Gang survived. The remaining gang members maintained control over the gang's territory and expanded its drug trade to other areas. PSR ¶15.

## B. The Original and Superseding Indictments

The original indictment alleged that the 110 Gang constitutes a RICO "enterprise," as defined by 18 U.S.C. §1961(4), whose purposes include enriching members through drug trafficking and credit card theft; maintaining control over gang territory; and preserving and expanding the power and reputation of the 110 Gang through intimidation, violence, threats of violence, robberies, assaults, murders, and attempted murders. DA:19. The indictment further described the "Manner and Means of the Enterprise," setting forth the structure and operation of the 110 Gang. DA:20-21.

The original indictment charged that defendants-appellants, their co-defendants, and others, being persons employed by and associated with the 110 Gang, conspired from 2012 until the date of the indictment (October 25, 2018) to violate 18 U.S.C. §1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity consisting of (1) multiple acts involving murder, in violation of New York Penal Law §§125.25, 110.00, and 105.15; (2) multiple acts involving robbery, in violation of New York Penal Law §§160.15, 160.l0, 160.05, 110.00, and 105.10; (3) multiple acts indictable under 18 U.S.C. §1029 (for fraud and related activity in connection with

access devices); and (4) multiple offenses involving selling and dealing in controlled substances, in violation of 21 U.S.C. §§841 and 846. DA:21-22. The indictment further alleged that it was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise. DA:22. The indictment set forth 38 overt acts that were committed by the defendants in furtherance of the 110 Gang enterprise. These included homicides, shootings, stabbings, and acts of drug trafficking. DA:14-51; *see also* PSR ¶35 (overt act chart). The indictment described the "purposes of the enterprise" which include enriching the members of the gang through the distribution of controlled substances; "[p]reserving, protecting, and expanding the power and reputation of the 110 Gang through the use of intimidation, violence, threats of violence, robberies, assaults, murders and attempted murders;" "[p]romoting and enhancing the prestige, reputation, and position of the 110 Gang with respect to rival criminal organizations;" and "[k]eeping victims and rivals in fear of the enterprise and its members and associates." DA:19-20.

After Kinsey, Dowdell, and Smith, pleaded guilty to the original indictment pursuant to plea agreements, KA:35, 38-57; DA:28-48, 61; SA:222-242, 259, the grand jury returned a superseding indictment against Hopper and Long. The superseding indictment added "special sentencing

factors" concerning the RICO conspiracy charged in Count One – specifically, that as part of their agreement to participate in the 110 Gang enterprise, Hopper, Long, and others agreed that multiple acts of murder would be committed, in violation of New York Penal Law (NYPL) §125.25(1) and (2).[6] HA:62. The superseding indictment further alleged that, on or about September 30, 2012, Hopper intentionally and recklessly caused the death of a person identified as Victim 2, in violation of NYPL §125.25(1) and (2); and that on or about October 24, 2014, Hopper and Long intentionally and recklessly caused the death of a person identified as Victim 3, in violation of NYPL §125.25(1) and (2). HA:62-63. At trial, Victim 2 was identified as Rodney Maddux, and Victim 3 was identified as Anthony Sistrunk. GA:140. The superseding indictment further charged in Count Two that Hopper discharged a firearm during a crime of violence, in violation of 18 U.S.C. §924(c)(1)(A). HA:63-64.

---

[6] In relevant part, NYPL §125.25 provides that a person is guilty of second-degree murder who (1) with intent to cause the death of another person, causes the death of such person or a third person, or (2) under circumstances evincing a depraved indifference to human life, recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person.

### C. Long's Plea and Hopper's Trial

Long pleaded guilty pursuant to a plea agreement to Count One of the superseding indictment. JA:12, 23. Hopper proceeded to trial, where the government presented evidence from 48 witnesses and introduced dozens of exhibits. That evidence included (i) testimony from multiple 110 Gang members about the gang, Hopper's membership in it, and acts of violence committed by Hopper and other gang members; (ii) physical evidence and surveillance videos of shootings and homicides connected to the 110 Gang; (iii) multiple expert witnesses on topics such as Syracuse gangs, firearms, DNA, and latent fingerprints; (iv) wiretap recordings of Hopper engaged in drug transactions and discussing 110 Gang activities; (v) evidence of drugs seized from Hopper; and (vi) evidence regarding Hopper's social media accounts, which reflected 110 Gang membership. *See* PSR ¶11.

Hopper chose not to testify and did not present evidence in his defense. On October 10, 2019, the jury found Hopper guilty on Count One, but acquitted him on Count Two. GA:139-40. In response to questions in the verdict sheet regarding the special sentencing factors, the jury unanimously found that the 110 Gang engaged in "a pattern of racketeering activity that included acts involving murder," and that Hopper was guilty of the murder of Anthony Sistrunk on October 24, 2014. GA:139-40. The jury found that

he was not guilty of the murder of Rodney Maddux.
GA:140.

## SUMMARY OF ARGUMENT

### *Hopper*

Hopper does not show an abuse of discretion in the district court's decision to enter a protective order that (a) prevented defense counsel from sharing the government's discovery productions with anyone but their clients and members of the defense team; and (b) prevented defendants, while incarcerated, from retaining copies of a subset of discovery materials (those designated as "Protected Materials" by the government) which could reveal the identity of witnesses or reveal sensitive, nonpublic information regarding victims and others. The protective order appropriately balanced the government's well-founded concerns over witness intimidation and retaliation in this case with the defendants' right to participate in their defense. The order did not prevent Hopper and defense counsel from reviewing discovery and consulting about it. Hopper fails to identify, let alone establish, substantial prejudice from his inability to keep copies of the Protected Materials with him in jail.

Neither the timing nor volume of the government's discovery productions warranted lifting the protective order. Hopper's attorney received the government's first discovery

production, which was voluminous, nearly a year before trial, and received most of the remaining productions months before trial. The government made its last production, which involved only a report establishing the uncontroversial fact that a foreign-made firearm had traveled in interstate commerce, two weeks before trial. Although Hopper's attorney had to drive approximately 75 miles each way to consult with his client in jail, Hopper and his attorney had ample time to review the government's discovery and consult about it. Defense counsel's conclusory and unsubstantiated assertions that Hopper's defense was compromised by the protective order, and by the timing and volume of the government's disclosures, are insufficient to establish an abuse of discretion or violation of Hopper's due process rights.

Hopper's complaints over the adequacy of the government's expert disclosures are also unfounded. Well before trial, the government provided Hopper with its experts' reports and notified Hopper of its intent to call the authors of those reports to testify at trial about the reports' conclusions. Defense counsel provides no support for his claims that he was unable to know the subject matter of the government's expert testimony or the identity of the government's expert witnesses, and could not consult or retain opposing experts. The district court did not abuse its discretion by denying Hopper's motion to preclude the government's expert testimony.

Hopper's remaining claims are equally without merit. His federal RICO prosecution did not violate his constitutional right against double jeopardy. Although Hopper had been acquitted in state court of a murder that was charged as an overt act and special sentencing factor in the superseding indictment, Hopper's RICO offense was a separate crime, as established by well settled precedent. His double jeopardy claim also is precluded under the "dual sovereignty" doctrine. Hopper's further claim that the jury's verdict was inconsistent is likewise precluded by case law. Finally, Hopper's claim that the district court improperly relied on acquitted conduct in determining his sentence has no legal basis, and his factual claim that the government failed to establish this conduct by a preponderance of the evidence is contradicted by the record.

### *Kinsey*

Although a remand for resentencing is necessary in Kinsey's case due to plain error in the calculation of his offense level under the sentencing guidelines, the Court should reject Kinsey's claim that the district court clearly erred in holding him accountable for a retaliatory shooting and a separate robbery in which he was involved, and which were reasonably foreseeable to him as part of the RICO conspiracy to which he pleaded guilty. The record before the district court supported this determination.

The guidelines error in Kinsey's case arises from the treatment of the retaliatory shooting – which the PSR classified as "aggravated assault" – as a separate count of "racketeering activity" under U.S.S.G. §2E1.1. Aggravated assault does not qualify as "racketeering activity" under the RICO statute to which §2E1.1 applies. This error requires remand because it affected Kinsey's substantial rights.

Contrary to Kinsey's claim on appeal, the district did not commit plain error in determining his criminal history category. Kinsey fails to establish that the conduct underlying one of his previous sentences, which was counted towards his criminal history score, was also used to calculate his offense level. In any event, Kinsey fails to show that any such error affected his substantial rights. Moreover, the district court's treatment of the prior conviction was authorized by the commentary to §2E1.1, and this Court should reject Kinsey's effort to invalidate that commentary as inconsistent with the criminal history guidelines.

Finally, the government concedes that the district court plainly erred by imposing a standard condition of supervised release authorizing the Probation Office to determine whether a supervisee poses a risk to another person and to require the supervisee to notify that person of the risk. This condition has been invalidated by this Court. When resentencing Kinsey, the district

court can impose a revised third-party risk condition adopted by other districts in this Circuit.

*Dowdell*

The district court satisfied its obligations under Fed. R. Crim. P. 32(i)(3)(B) to rule on disputed issues at Dowdell's sentencing by adopting the contested factual statements and guidelines calculations in the PSR, after considering Dowdell's arguments to the contrary. Dowdell did not raise this objection at sentencing and does not establish plain error on appeal.

Nevertheless, a remand for resentencing in Dowdell's case is necessary to correct the same guidelines error as in Kinsey's case, arising from the classification of the retaliatory shooting as aggravated assault, and the concomitant treatment of aggravated assault as a "racketeering activity" under §2E1.1. Although Dowdell did not raise this claim on appeal, the Court has discretion to notice this error, given that the issue is fully briefed in this consolidated appeal and the arguments apply equally to Dowdell's sentencing. At the same time, the Court should make clear that the district court did not err in finding that the retaliatory shooting was relevant conduct for which Dowdell was otherwise accountable at sentencing. The district court was not required to hold an evidentiary hearing on this issue. Having presided at Hopper's trial and observed the testimony underlying the account of the retaliatory

shooting in Dowdell's PSR, the district court was able to assess the credibility and weight of that testimony, and the accuracy of the PSR. The factual statements in the PSR supported the district court's determination.

Dowdell's remaining claims of guidelines error should be rejected. He fails to establish clear error in the district court's application of the dangerous weapon enhancement under U.S.S.G. §2D1.1(b)(1) when it calculated Dowdell's offense level for his other "underlying racketeering activity" of drug trafficking conspiracy. Dowdell's admissions and offense conduct establish that the use of firearms in connection with the drug trafficking conspiracy was, at the very least, foreseeable to him. In addition, the district court did not abuse its discretion by refusing to grant Dowdell's request for a criminal history departure. Dowdell fails to establish that counting his prior sentences for drug trafficking towards his criminal history score led to double counting that affected his offense level under §2D1.1.

## *Smith*

The district court plainly erred in its calculation of the guidelines range for Smith's present RICO offense, and in its determination of the recommended imprisonment range for Smith's violations of the conditions of supervised release – conditions that were imposed as a result of Smith's *prior* conviction in 2011 for a RICO conspiracy

involving the 110 Gang. The district court erred in treating "attempted aggravated assault" as "racketeering activity" when determining Smith's offense level under §2E1.1. Although Smith's waiver of appeal rights in his plea agreement would otherwise preclude consideration of this error, the government elects not to enforce the appeal waiver with respect to this issue. In addition, the court erred in classifying Smith's previous RICO conspiracy conviction as a Class A felony, which caused the court to consider the wrong imprisonment range under U.S.S.G. §7B1.4 when determining the appropriate prison term for his violations of supervised release. A remand is necessary to permit the district court to consider the effect of these errors on its sentencing determinations.

Smith fails to establish an abuse of discretion in the district court's denial of his request to have his sentence for the present RICO offense run concurrently with his state sentence for second degree assault, which was imposed after Smith was found guilty of a stabbing in a Syracuse restaurant. Even though this incident was charged as an overt act in furtherance of the present RICO conspiracy, it was well within the court's discretion to impose a consecutive sentence, given that this was Smith's second conviction for a RICO conspiracy involving the same gang, and his recidivism warranted an increased measure of deterrence and incapacitation.

*Long*

Long's claims in his *pro se* brief should be rejected. Contrary to his argument on appeal, he was not entitled to credit for time he spent in jail after being produced from state custody on a federal writ of habeas corpus ad prosequendum, to make his initial appearance in this case. As a factual matter, Long remained in primary state custody, and thus the jail time could not count towards his federal sentence under 18 U.S.C. §3585(b). More importantly, the district court did not have authority under §3585(b) to grant Long credit. Such determinations are reserved for the Bureau of Prisons ("BOP"). Insofar as Long challenges the calculation of his criminal history category, his claim is precluded by the waiver of appeal rights in his plea agreement, and lacks merit in any event.

## ARGUMENT

**POINT I:  The District Court Entered a Protective Order Supported by Good Cause, and Neither the Protective Order nor the Government's Discovery Disclosures Violated Hopper's Due Process Rights.**

## A. Background

### 1. Discovery Protective Order

The original indictment was unsealed on October 29, 2018. Hopper made his initial appearance and received appointed counsel on October 30, 2018. Dkt. #17. On November 6, 2018, the government moved for a protective order applicable to its discovery productions. HA:33-35. The district court granted the government's motion over the opposition of Hopper and his co-defendants, *see, e.g.*, HA:36-41, and issued the protective order on November 21, 2018, HA:42-45.

The protective order prohibited attorneys for the defendants from disclosing discovery materials to anyone other than the defendants and members of the defense team. HA:44. The order authorized the government to designate as "Protected Materials" certain discovery materials that revealed the identity of witnesses, and/or that might reveal sensitive, non-public information

regarding victims and others not involved in the crimes alleged. HA:44-45. The order further provided, *inter alia*, that such Protected Materials could be shown to and reviewed with any incarcerated defendant, but that such defendants could not keep a copy of such materials in their possession while incarcerated. HA:45. Finally, the order authorized defense counsel to apply to the district court to challenge the government's designation of materials as Protected Materials, and/or seek additional use and disclosure of such materials. HA:45.

In support of its motion for a protective order, the government noted that the indictment charged defendants with participation in a violent gang that engaged in murders and assaults, along with drug trafficking – which raised inherent concerns over witness retaliation should the discovery materials be publicly disclosed. HA:34. The government further noted that one of the defendants in this case – Shaquille Breland – currently was facing federal charges for witness retaliation in a separate case, and the court had issued a similar protective order there. GA:4; *see United States v. Breland*, Case No. 18-cr-09 (NDNY).[7] In addition, the government cited its

---

[7] Breland pleaded guilty pursuant to a plea agreement on May 7, 2019, to obstructing justice by retaliation, in violation of 18 U.S.C. §1513(a)(1)(B), and using and carrying a firearm in relation to a crime of violence, in violation of 18

recent experience in other cases involving similar allegations of violence and drug trafficking where inmates circulated discovery through the jails with notes purporting to identify cooperating witnesses. The government also noted that it had intercepted jail calls of defendants in other recent cases discussing posting discovery materials on social media accounts, to identify cooperating witnesses. GA:5. The district court found that the government had made "a sufficient showing" to justify the protective order. HA:42.

## 2. Discovery Productions and Pretrial Motion Practice

The government made its initial discovery disclosures to defendants on November 27, 2018 – six days after the district court granted the government's motion for a protective order. GA:131, 136-37. This preceded Hopper's trial by approximately ten months.

---

U.S.C. §924(c)(1)(A). GA:248. As Breland admitted, he attempted to shoot the victim because he believed the victim was providing information to law enforcement against Breland's cousin, who was facing federal charges for the illegal use of stolen credit cards. GA:251. Breland was sentenced principally to a total term of imprisonment of 180 months. GA:10.

The government made a voluminous initial disclosure to the defendants. With minor variations, each defendant received the same discovery production. The government organized the initial production by defendant, and broke down the provided evidence by the particular overt acts to which it related. The production included, *inter alia*, police reports, expert reports, photographs, and videos related to various overt acts. GA:131. With respect to expert witnesses, the government informed defense counsel that the discovery production included "laboratory reports analyzing certain drug exhibits, firearms and ammunition, as well as reports of extractions from phones and computers." GA:136. The government notified defense counsel that it intended to call the authors of the respective reports as expert witnesses at trial, to testify regarding the conclusions described in their reports. GA:136.

The government designated a subset of the discovery materials as "Protected Materials," subject to the heightened disclosure restrictions described in the protective order. In the government's initial production, these materials were provided to counsel on a separate compact disc. GA:136. For this discovery production, and all those that followed which contained "Protected Materials," the government requested that defense counsel confer with the government to resolve any disagreements over whether the material was properly designated as "Protected Materials," before seeking judicial intervention. None of the

defendants' attorneys, including Hopper's attorney, ever challenged the government's designations.

Pursuant to speedy trial stipulations by the parties, the district court adjourned the trial date several times to permit defendants' attorneys to adequately review discovery, consult with their clients, conduct investigation, and prepare pretrial motions. Dkt. ##72, 74, 98, 100, 112, 113.

On February 8, 2019, approximately eight months before Hopper's trial, the government made an additional discovery production to Hopper's attorney transmitted on two compact discs, one of which contained "Protected Materials." GA:144; HA:66. The government explained that the Protected Materials in this production included a Facebook search warrant, which had been unsealed only for the limited purpose of discovery; laboratory reports analyzing certain DNA results; and certain medical examiner's reports. GA:144. The government notified Hopper's attorney that it intended to call the authors of the enclosed reports as expert witnesses at trial, to testify regarding the conclusions described in their reports. GA:144.

On April 3, 2019, approximately six months before trial, the government produced additional discovery materials to Hopper's attorney, including intercepted communications, Syracuse Police Department reports, and copies of search

warrants obtained for numerous social media accounts and electronic devices. GA:146. The government also provided Hopper's attorney with notice that it had received productions from Snapchat and Facebook in response to these warrants, that those responses were "voluminous," and that the government was in the process of reviewing those responses. The government offered to make the responses available for immediate inspection by counsel, while the government continued its review. GA:146-47. Hopper's attorney did not request immediate access. The government further informed counsel that it was waiting for completion of the forensic analysis of the electronic devices identified in the device search warrant. GA:147.

On May 20, 2019, the district court issued a final pretrial scheduling order that set trial for September 23, 2019, and ordered all pretrial submissions to be filed by August 23, 2019. Dkt. #114.

On July 27, 2019, Hopper's attorney requested that the district court order Hopper to be transferred from Broome County Correctional Facility (BCCF) in Binghamton, N.Y., to a facility closer to counsel's home and office in the Syracuse area. HA:46-47. Counsel explained that the distance between BCCF and his home and office made it difficult for him to review with his client the "vast amount of potential evidence" that the

government had disclosed.[8] HA:46. In response, the court issued a text order requesting that the United States Marshals Service (USMS) review its custody records and, to the extent possible, transfer Hopper to a facility closer to Syracuse. Dkt. #123. Hopper was not transferred at that time.[9]

On July 30, 2019, approximately two months before trial, the government produced additional discovery materials. HA:66. None of these materials were designated as "Protected Materials." The government informed Hopper's attorney that this production included police reports and ballistic reports regarding certain multiple-use firearms; social media extractions pertaining to Hopper (referenced in the government's discovery letter of April 3, 2019), and Hopper's certificates of conviction. GA:148. The

---

[8] According to Google Maps, BCCF is approximately 75 miles from Hopper's attorney's office in Fayetteville, NY, and it takes approximately one hour and eleven minutes to drive that distance. *See, e.g.*, *United States v. Magda*, 547 F.2d 756, 764 n.16 (2d Cir. 1976) (taking judicial notice of the distance from a park to an office building).

[9] In a later filing by Hopper, defense counsel stated that the USMS denied the request based on the "necessity to keep the various co-defendants separate and apart." Dkt. #145, at 2-3.

government notified Hopper's attorney that it intended to call the author of the ballistic report as an expert witness at trial, to testify regarding the conclusions of his report. GA:148. In addition, the government stated that it intended to call another expert witness to testify on gang activity in Syracuse. GA:148. The government provided a detailed summary of the expected testimony of the gang expert, and identified the basis of his opinions. GA:148-50.

On August 5, 2019, defense counsel requested appointment of a second attorney for Hopper, to assist in preparation for trial – citing the voluminous discovery produced by the government, and Hopper's continued detention at BCCF. HA:48. On August 6, 2019, the district court denied Hopper's motion for a second attorney without comment. Dkt. #132.

During the first two weeks of August 2019, seven of Hopper's co-defendants pleaded guilty pursuant to plea agreements. Dkt. ##128, 130, 133, 134, 137, 140, 142. On August 19, 2019, the government moved the district court for a protective order for the government's witness list, exhibit list, and material disclosed pursuant to the Jencks Act, 18 U.S.C. §3500. GA:57-58. The government contended that this protective order was appropriate given the "documented history" of 110 Gang members "attempting to intimidate and harm witnesses." GA:58. The government offered to provide the district court additional evidence

under seal, concerning attempts at witness intimidation and retaliation by 110 Gang members. GA:58.

Also on August 19, 2019, the government made another discovery production to Hopper, which included jail calls involving him, and medical records relating to the Rodney Maddux homicide. Only the medical records were designated as "Protected Materials." GA:151.

Hopper opposed the government's motion for a protective order, and sought a one-week extension of time to file pretrial motions, until August 30, 2019. GA:61-64. Hopper cited the government's continuing production of discovery materials, the volume of discovery, and the need to review those materials with Hopper at BCCF. GA:62-63.

The district court granted the government's motion for a second protective order on August 21, 2019. GA:65-66. The district court also granted Hopper's motion for a seven-day extension of time to file his pretrial motions until August 30, 2019. Dkt. #147 (text order).

On August 22, 2019, the grand jury returned the superseding indictment against Hopper and Long, the only remaining defendants. HA:54-64. On August 26, 2019, the government made an additional discovery production, along with a list of the government's intended expert witnesses,

identifying them by name, and describing the scope of their testimony. GA:97-98.

On August 28, 2019, two days before pretrial motions were due, Hopper's attorney wrote to the court seeking a second extension of time to file pretrial motions, and for a thirty-day adjournment of the September 23, 2019, trial date. GA:67-70. Defense counsel argued that this adjournment was necessitated by the return of the superseding indictment, and an additional discovery production by the government – which defense counsel had not yet received, but assumed would contain a "very large" amount of materials. GA:68. Defense counsel stated that he also had just learned that a DNA sample had been collected from Hopper that same evening. Defense counsel claimed it would be a "physical impossibility" to review the new discovery material with his client on August 29, 2019, and file motions by August 30, 2019. GA:68.

In response, the government explained that, although the superseding indictment added a new count and new sentencing factor allegations, the additional charge and allegations were based on the two homicides (of Maddux and Sistrunk) that were identified as overt acts committed by Hopper in the original indictment. Similarly, the government explained that the additional discovery productions generally supplemented information about matters that were already the subject of prior disclosures. The government further noted that the additional productions had

been made roughly one month before the scheduled trial date. GA:71. Nevertheless, the government stated that it would not oppose a modest adjournment of the trial date, provided that the government's deadline for pretrial filings be similarly adjourned, to prevent premature disclosure of the government's witness list – given the government's concern over potential witness intimidation. GA:71-72.

The district court held a status conference on September 3, 2019, to address Hopper's motion for an adjournment of the September 23rd trial date. Defense counsel explained that the "problem" was that he was "drowning" in evidentiary material. GA:157. The district court observed in response that "the basic information supporting the indictment … has been there for a long time." GA:157. Defense counsel agreed, but noted that a DNA sample had been taken from Hopper during the previous week, and he would likely need to retain a DNA expert. GA:158. Defense counsel further cited the need to review an additional discovery production that he had not yet received. GA:160-61.

The government explained that it had recently developed new DNA evidence concerning a sweatshirt recovered by police that was consistent with the sweatshirt worn by the shooter in the Maddux murder alleged in the superseding indictment. As the government explained, DNA found on the sweatshirt matched Hopper's DNA

records that were already in the Combined DNA Index System (CODIS). GA:158-59. The government further explained that it had received the lab results on the sweatshirt approximately two weeks earlier, and had immediately disclosed the DNA match to defense counsel. GA:158. The more recent DNA sample taken from Hopper was intended to confirm that the DNA records in the CODIS system for Hopper were accurate. The government noted that those lab results and final report would be available the following week. GA:158-59. The district court agreed to adjourn trial to October 1, 2019, in part to allow Hopper to retain a DNA expert (which he never did). The court further agreed to assign a second attorney to assist defense counsel. GA:161-62. The court ordered that pretrial filings would be due a week later, on September 10, 2019. GA:162-63; Dkt. #158.

Also on September 3, 2019, the government transmitted a disk and thumb drive to Hopper's attorney containing files relating to forensic analyses, phone records, surveillance video, and police reports concerning the Maddux homicide, photographs of the scene of the Sistrunk homicide, and miscellaneous records relating to both murders. GA:153. The government noted, however, that many of the materials being provided had been produced to Hopper's attorney previously, and were being transmitted "in an abundance of caution to ensure no gaps in the production." GA:153.

On September 10, 2019, the government submitted its pretrial filings, including its trial brief, witness list, exhibit list (identifying 41 trial exhibits), and several motions *in limine*. Dkt. ##166-71, 173-77. Rather than filing his pretrial submissions, Hopper's attorney filed a letter to the court late in the evening on September 10th, seeking a three-day extension of time. Defense counsel explained that he had received notice from the government that afternoon of an additional discovery production, which defense counsel assumed would be "voluminous," based on the government's previous productions. (Counsel acknowledged that he had not yet received the production.) HA:65-66. Defense counsel claimed that an adjournment of his deadline to file motions *in limine* was necessary to permit him to review the new discovery production. Counsel further contended that the timing of the government's discovery disclosures was prejudicial. HA:66.

The government responded to defense counsel's letter the following day, noting that counsel had not contacted the government to determine the contents of the new production. GA:73. The government explained that the production consisted of the confirmatory DNA analysis that was discussed at the September 3rd status conference and which defense counsel knew would be forthcoming. The government further explained that it had received this analysis on the afternoon of September 10th, and had produced it to defense

counsel immediately. The analysis consisted of only three files that totaled less than 100 pages and consisted mainly of lab data. GA:73. With regard to the government's previous productions, the government noted that the August 30th production had been discussed at the September 3rd status conference, and was the basis for the court's adjournment of the trial date.[10] The government further noted that even the most recent discovery productions still had been made weeks before trial, and defense counsel had not asserted specific prejudice from the productions (other than his general complaints about the volume of the materials, which were addressed at the September 3rd conference). GA:73-74. In reply, defense counsel moved for a 90-day adjournment of trial. GA:75-76. Defense counsel also filed additional motions seeking an adjournment and other relief, based on the assertion that the government had failed to provide adequate and timely expert disclosures. GA:77-114. The government responded to these motions, refuting defense counsel's claims that it provided inadequate expert disclosures, noting that defense counsel was seeking to further delay trial after the government had disclosed its witness list, and emphasizing the government's concern over witness intimidation. GA:115-16.

---

[10] The government also referenced an additional production on September 9, 2019, consisting of a small number of phone records relating to the Sistrunk homicide. GA:74.

On September 12, 2019, the district court issued a text order granting defense counsel's initial motion for a three-day extension of time to file pretrial motions until September 13, 2019, and noting that it would consider a request for additional time for defense counsel to retain a DNA expert. Dkt. #185. After defense counsel submitted his pretrial filings on September 13th, the district court issued a text order on September 17, 2019, denying counsel's request for a 90-day extension of the trial date. HA:10-11. The court found that "no circumstances had changed since the September 3, 2019 conference." HA:10.

Approximately two weeks before trial, on September 16, 2019, the government produced an interstate nexus report for the firearm involved in the Sistrunk murder. GA:120. This report was produced promptly after it was received by the United States Attorney's Office, and was limited to the uncontroversial conclusion that the firearm – manufactured in Brazil – had traveled in interstate commerce before it was recovered in New York. GA:120.

On September 20, 2019, defense counsel filed a motion to lift the original protective order, to allow him to leave discovery materials with Hopper at BCCF. HA:107. Defense counsel claimed that he had not had sufficient time to review all of the discovery "for reasons that are beyond my control." HA:109. Defense counsel asserted that the volume

of discovery was too great to permit investigation "in the time allotted," that the restrictions imposed by the protective order compounded that difficulty, and that those restrictions were unnecessary. HA:109-11.

The government opposed Hopper's motion to lift the protective order, recounting the basis for the order, and noting that the government had provided Hopper with a large volume of discovery nearly a year before. The government contended that the timing of its discovery disclosures had not prevented defense counsel from reviewing those materials with Hopper, and that the government's productions were organized in a manner that allowed counsel to navigate and prioritize the materials directly related to Hopper and his involvement in the alleged overt acts of the RICO conspiracy. GA:132-33. The government further noted that defense counsel had never sought to confer about, or challenge, the government's designation of certain materials as "Protected Materials" subject to increased restrictions. GA:132. The government emphasized that the same concerns about witness intimidation and retaliation remained, particularly given the impending commencement of trial. GA:132. The government also noted that Hopper's defense team now included two assigned attorneys, as well as those employed by defense counsel, who could facilitate Hopper's review of the Protected Materials. GA:133.

The district court issued an order on September 24, 2019, denying Hopper's motion to lift the protective order. HA:113-14. The court also held the final pretrial conference that day, and ordered that the trial would proceed as scheduled on October 1st. HA:12; GA:200. The next day, defense counsel filed a notice of interlocutory appeal, and moved the district court for a stay pending appeal, which the district court denied on September 27, 2019. Dkt. #221. On September 29, 2019, defense counsel filed a petition for mandamus in this Court, seeking an order requiring the district court to stay trial due to the government's claimed failure to provide adequate and timely expert disclosures and the district court's failure to order Hopper moved closer to Syracuse.[11] *See United States v. Hopper*, Case No.19-3144 (2d Cir.), Doc. #5. This Court eventually denied Hopper's mandamus petition on January 28, 2020, finding that his request for relief was moot due to the conclusion of his trial and his failure to show that he did not have other adequate means of relief. *Id.*, Doc. #18.

Trial commenced as scheduled on October 1, 2019. Defense counsel effectively cross-examined witnesses, *see, e.g.*, 387-403, 405-406, 473-77, 555-56, 666-73, 768-69, 822-23, 1067-70; raised

---

[11] The USMS had transferred Hopper to a facility closer to Syracuse on September 27, 2019, in anticipation of trial. GA:174-75.

evidentiary challenges, *see, e.g.*, GA:183-85; Tr.282-85, 917, and argued cogently against conviction, *see, e.g.*, GA:216-47 (Tr.1259-89).[12] Defense counsel succeeded in convincing the jury to acquit Hopper of the Maddux homicide, despite strong evidence to the contrary – including eyewitness, video, and DNA evidence. *See* PSR ¶45 (summarizing evidence). Defense counsel also secured an acquittal for Hopper on the firearm charge in Count Two. GA:140.

Although Hopper filed post-trial motions pursuant to Fed. R. Crim. P. 29 and 33, he did not seek a new trial on the basis of his alleged inability to adequately prepare for trial as a result of the protective orders, or an alleged failure of the government to comply with its discovery obligations and/or obligations under *Brady*,[13] *Giglio*,[14] or the Jencks Act. *See* Dkt. #268.

---

[12] Volume 8 of the trial transcript that is available in the district court docket omits defense counsel's closing argument. It is provided in the government's proposed appendix. GA:215-247.

[13] *Brady v. Maryland*, 373 U.S. 83 (1963).

[14] *Giglio v. United States*, 405 U.S. 150 (1972).

## B. Governing Law

### 1. Bases for Protective Orders

Fed. R. Crim. P. 16(d)(1) provides that "[a]t any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief." This provision "authorizes the district court to limit or otherwise regulate discovery had pursuant to the Rule." *United States v. Delia*, 944 F.2d 1010, 1018 (2d Cir. 1991); *see also Alderman v. United States*, 394 U.S. 165, 185 (1969) ("[T]he trial court can and should, where appropriate, place a defendant and his counsel under enforceable orders against unwarranted disclosure of the materials which they may be entitled to inspect.").[15] Thus "district courts possess considerable latitude both in determining whether to issue protective orders and in fashioning their terms." *United States v. Padilla-Galarza*, 990 F.3d 60, 77 (1st Cir. 2021); *see also United States v. Campa*, 529 F.3d 980, 995 (11th Cir. 2008) (recognizing "[t]he broad authority of the district court to regulate discovery" in a criminal case).

"A finding of good cause must be based on a particular factual demonstration of potential harm, not on conclusory statements." *Padilla-*

---

[15] Unless noted, all case quotations in this brief omit internal quotation marks, alterations, and citations, and include original emphasis.

*Galarza*, 990 F.3d at 77. "Among the considerations to be taken into account by the court will be the safety of witnesses and others, [and] a particular danger of perjury or witness intimidation." Fed. R. Crim. P. 16, Advisory Committee Notes, 1966 Amendment. "Although the rule does not attempt to indicate when a protective order should be entered, it is obvious that one would be appropriate where there is reason to believe that a witness would be subject to physical or economic harm if his identity is revealed." Fed. R. Crim. P. 16, Advisory Committee Notes, 1974 Amendment. Consistent with this guidance, courts have generally upheld orders regulating discovery of information that creates a risk of harm to a victim or witness, where the government makes an adequate showing of potential harm. *See, e.g.*, *United States v. Celis*, 608 F.3d 818, 829-33 (D.C. Cir. 2010) (upholding protective order that prevented defendants from learning identities of witnesses until a few days before trial).

## 2. Timing of Discovery Productions

Fed. R. Crim. P. 16(a) requires the government to disclose various information and items of evidence "[u]pon request of the defendant." Rule 16(a). Rule 16 contains no specific timing requirements. Nevertheless, at least with regard to the parties' continuing obligation to disclose newly-discovered evidence, Rule 16(c) provides that each party make such disclosures "promptly."

Likewise, the Advisory Committee has noted that parties are expected to comply with discovery requests concerning expert disclosures "in a timely fashion." *See* Advisory Committee Notes to 1993 Amendments.

The local rules of criminal procedure in the NDNY require disclosure of information encompassed by Rule 16(a), along with *Brady* material and Rule 404(b) evidence, fourteen days after arraignment or on a date that the court otherwise sets for good cause shown. *See* NDNY L. R. Cr. P. 14.1.

### 3. Expert Disclosures

Rule 16(a)(1)(G) provides that, at the defendant's request, the Government must provide the defendant a written summary of any expert testimony that it intends to use "during its case in-chief at trial," and that summary "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." The Rule "is intended to minimize the surprise that often results from unexpected testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." *United States v. Cruz*, 363 F.3d 187, 196 n.2 (2d Cir. 2004).

### 4. Prejudice Requirement

Even if a party establishes a violation of Rule 16 for untimely disclosure, reversal is warranted only if the defendant establishes "substantial prejudice." *United States v. Adeniji*, 31 F.3d 58, 64 (2d Cir. 1994); *United States v. Vinas*, 910 F.3d 52, 60-61 (2d Cir. 2018). This means that "the defendant must demonstrate that the untimely disclosure … adversely affected some aspect of his trial strategy." *Id.*; *see also United States v. Smith*, 502 F.3d 680, 689 (7th Cir. 2007) ("A Rule 16 violation prejudices a defendant only when he is unfairly surprised by the evidence and cannot adequately prepare his defense or when the violation has a substantial influence on the jury.") "Rule 16 is concerned with the prejudice resulting from the government's untimely disclosure of evidence, rather than with the prejudice attributable to the evidence itself." *United States v. Lee*, 834 F.3d 145, 158 (2d Cir. 2016).

### C. Standard of Review

This Court has long recognized the inherent authority of district courts to regulate the nature and timing of discovery, subject to review for abuse of discretion. *United States v. Cannone*, 528 F.2d 296, 298 (2d Cir. 1975); *United States v. Giraldo*, 822 F.2d 205, 212 (2d Cir. 1987).

With regard to protective orders, "[s]triking a balance between a defendant's rights and the need

to protect witnesses must be left, in the first instance, to the sound judgment of the district court." *Padilla-Galarza*, 990 F.3d at 78. Thus, a district court's decision to grant, modify, or vacate a protective order is reviewed for abuse of discretion. *See Delia*, 944 F.2d at 1018; *United States v. Cordova*, 806 F.3d 1085, 1090 (D.C. Cir. 2015).

A defendant's failure in the district court to raise a claim of substantial prejudice from the government's alleged discovery violations either waives that claim, *United States v. Ntshona*, 156 F.3d 318, 320 (2d Cir. 1998), or requires review for plain error, *see, e.g.*, *United States v. Maniktala*, 934 F.2d 25, 27-28 (2d Cir. 1991). To establish plain error, the defendant must show

> 1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*United States v. Marcus*, 560 U.S. 258, 262 (2010).

## D. Discussion

### 1. The district court did not abuse its discretion by entering, and later refusing to lift, the protective order.

Contrary to Hopper's claim on appeal, the government established good cause for the protective order governing discovery in this case,[16] and the district court did not abuse its discretion by issuing and maintaining that order. As alleged in the indictment, and as proven at trial, Hopper and his co-defendants were involved in a criminal enterprise, the 110 Gang, whose members routinely engaged in acts of violence – including shootings, assaults, and robberies – to intimidate and retaliate against others, and to protect the enterprise from external threats. HA:23-31; GA:139-40. The government and district court's concern over potential witness intimidation and retaliation was justified by the nature of the alleged criminal conduct. In addition, as the government noted below, one of the defendants in this case, Shaquille Breland, had been charged in a separate case for witness retaliation – a charge

---

[16] On appeal, as below, Hopper does not challenge the district court's issuance of the witness-list protective order on August 21, 2019. GA:65-66. His claims instead concern the alleged prejudicial effect of the discovery protective order, issued on November 21, 2018. A:44-45.

to which he ultimately pleaded guilty.[17] GA:248-66. Under these circumstances, the district court did not abuse its discretion by entering the protective order. The fact that Hopper or his co-defendants were not alleged personally to have issued threats against witnesses did not obviate the need for the protective order. *See, e.g.*, *Celis*, 608 F.3d at 829-33 (finding government established risk of harm despite lack of showing that appellant "had personally threatened any government witness").

The protective order struck an appropriate balance between the right of Hopper to participate in his defense, and the government's ability to present its case, which rested in no small part on the willingness of former 110 Gang members, members of the community, and victims, to testify at trial and identify Hopper as both a member of the gang and perpetrator of violent acts. *See, e.g.*, Tr.360-85 (eye-witness testimony of Maddux's brother concerning his murder); Tr.511-47 (testimony of former member of 110 Gang, testifying to nature of gang and acts of violence by Hopper, including Maddux and Sistrunk murder); Tr.912-26 (testimony of witness connecting Hopper and Long to Sistrunk murder); Tr.1071-81

---

[17] Breland also pleaded guilty to the RICO charge in this case, admitted his membership in the 110 Gang, and the violent nature of the enterprise, which included acts of retaliation. GA:16-35.

(testimony of victim's friend, implicating Hopper and Long in his murder). The potential damage to the government's case from witness intimidation was substantial.

The concerns over potential witness intimidation proved well founded. During trial, the government notified the court about on-going social media posts by Hopper's brother, including one post that included a picture of a government witness – a former 110 Gang Member who had testified the day before – which labeled him a "rat."[18] Tr.1054-56.

At the same time, the protective order did not restrict Hopper's access to the government's discovery. The order did not preclude Hopper from reviewing the evidence against him and conferring with his attorney about it. Instead, it prohibited Hopper only from *retaining copies* of a subset of the government's discovery (designated as "Protected Materials") while he was incarcerated. HA:44-45. As then-District Judge Lynch explained in a case involving charges of murder in aid of a racketeering enterprise:

---

[18] Another government witness, Semare Manning, who was incarcerated at the time of trial, refused to testify against Hopper despite the possibility of contempt and obstruction charges. Tr.1094-99. Manning did not explain his reason for refusing to testify.

Any lawyer with experience in the criminal
justice system knows that copies of witness
statements or other discovery material are
often passed from hand to hand within the
prisons. In particular, the wide
dissemination of statements by cooperating
witnesses who are regarded as "snitches" or
"rats" by their criminal associates, and who
often must serve their own sentences in close
proximity to other prisoners, poses obvious
dangers. It is not enough to say, as the
defendants argue in this case, that the
damage is done by the mere disclosure that
a witness has cooperated with the
authorities. Hard evidence of the witness's
betrayal can facilitate retaliation or
intimidation of the witness. It is therefore
appropriate, in a case where such retaliation
may be feared, to restrict the circulation of
such material.

*United States v. Garcia*, 406 F. Supp. 2d 304, 306
(S.D.N.Y. 2005). Moreover, the protective order in
this case enabled defendants to challenge the
government's designation of Protected Materials
and to seek additional use and disclosure of those
materials, HA:45, but defense counsel never made
use of those mechanisms. The narrow limitations
of the protective order did not deprive Hopper of
his ability to participate in his own defense. *See*
*Padilla-Galarza*, 990 F.3d at 76-77 (upholding
similar protective order prohibiting defendant
from retaining copies of government witness list).

That defense counsel had to travel 75 miles (approximately 1 hour and 11 minutes) from his office to show Hopper copies of the Protected Materials in jail does not establish an abuse of discretion by the district court in its refusal to lift the protective order.[19] Although defense counsel complains on appeal that he was "forced to go to the jail and literally sit there while [Hopper] reviewed documents," defense counsel does not explain why this presented an "insurmountable incumbrance to trial preparation," as he claims. Hopper Br. at 19. Defense counsel received the majority of the discovery materials, including the Protected Materials, months before trial. Nothing in the protective order prevented defense counsel from reviewing the Protected Materials himself, describing the nature of those materials to Hopper, consulting with Hopper on particular areas of

---

[19] As a general matter, decisions by the United States Marshals Service concerning where to house pretrial detainees are entitled to deference by courts. *See, e.g.*, *Marlow v. United States Marshal Serv.*, No. 3:21-CV-156-CEA-DCP, 2021 WL 2292244, at *2 (E.D. Tenn. June 4, 2021) ("Courts will not interfere with the U.S. Marshal's exercise of discretion as where to place a federal pretrial detainee absent extraordinary circumstances."); *United States v. Bigham*, No. 14-CR-20676, 2016 WL 738045, at *2 (E.D. Mich. Feb. 25, 2016) (collecting cases).

concern or attention (either in person or by telephone), and organizing the Protected Materials to facilitate Hopper's personal review of key evidence. Moreover, the district court took the unusual step of appointing a second attorney for Hopper, nearly four weeks before the start of trial, further facilitating Hopper's ability to review the Protected Material in advance of trial. GA:161-62. And Hopper was transferred to a jail closer to Syracuse three days before trial, in time for counsel to show Hopper any remaining Protected Materials he had not yet reviewed due to the burdens of travel. GA:174-75. Given the narrow restrictions imposed by the protective order, the district court steps to accommodate defense counsel's concerns, and the important countervailing interests at stake, there was no abuse of discretion in the court's refusal to lift the protective order due to travel distance.

Finally, even if Hopper could establish that the issuance of the protective order was an abuse of discretion, he fails to demonstrate that he suffered substantial prejudice. It is notable that on appeal, nearly two years after Hopper's trial, defense counsel still fails to identify specific evidence that Hopper was unable to review, let alone show how Hopper's personal review of that evidence would have affected the outcome of the trial. *See* Hopper Br. at 17-18. Instead, defense counsel broadly asserts in conclusory fashion that, as a result of the protective order, "literally everything at trial came as a surprise." *Id.* at 18. This assertion is curious,

given that defense counsel was provided discovery well in advance of trial, and the protective order imposed no restrictions on *defense counsel's* ability to review the evidence.

Also meritless is Hopper's assertion that he decided not to testify at trial because of the restrictions imposed by the protective order. Hopper Br. at 20. Hopper raised no such claim below, either when confirming at trial that he had made an informed decision not to testify, *see* Tr. 1192-93, or in his post-trial Rule 33 motion, which raised no discovery claims whatsoever, Dkt. #268. Assuming, *arguendo*, that this claim of substantial prejudice has not been waived, *Ntshona*, 156 F.3d at 320, Hopper cannot show error, much less plain error, in the issuance and maintenance of the protective order. Here, again, Hopper relies on the conclusory claim that "he could not be sure what he was up against." Hopper Br. at 20. This claim is belied by his attorney's unfettered access to the evidence, and Hopper's ability to review that evidence and consult with his attorney about the government's case.[20]

---

[20] Notably, Hopper did not testify at his previous state trial for the Maddux murder – where he was acquitted.

## 2. The timing of the government's discovery disclosures did not deprive Hopper of due process.

This Court also should reject Hopper's claim that the timing and volume of the government's discovery disclosures denied him a fair trial. As Hopper's attorney later acknowledged before trial, he had possessed the evidence which provided the basis for the indictment's allegations for "a long time." GA:157. The government made its initial discovery production on November 27, 2018, approximately ten months before trial.[21] GA:136-37. Although voluminous, that production helpfully was organized by defendant, and further broken down by each overt act identified in the indictment. GA:131. The government made additional productions in February, April, and July of 2019 – again, months before the trial date. At the same time, the government agreed to several speedy trial stipulations, to permit defense counsel to review discovery. Dkt. ## 72, 74, 98, 100, 112, 113. The government's later productions in August and September 2019 included, *inter alia*, newly acquired evidence (including the results of social media search warrants, recordings of jail telephone calls, and newly-developed DNA evidence) that were produced to Hopper as soon as possible, and materials that the government had

[21] The government made this production soon after the district court decided its pending motion for a protective order.

produced previously (but retransmitted in an abundance of caution). GA:153. In any event, the last of these productions – involving the uncontroversial interstate nexus report – was made two weeks before trial. GA:120. Moreover, to aid in the review of this material, the district court granted Hopper's request for a second attorney, who joined the defense team approximately one month before trial. GA:161-62. Defense counsel and Hopper thus were provided with discovery in sufficient time to prepare for trial. Indeed, this Court has rejected due process challenges to evidence disclosures occurring much closer to trial. *See, e.g.*, *United States v. Douglas*, 525 F.3d 225, 245-46 (2d Cir. 2008) (no *Brady* violation where 290 pages of purported impeachment material was disclosed on the Friday before trial); *United States v. Campbell*, 850 F. App'x 102, 109 n.4 (2d Cir. 2021) (no prejudice from alleged *Brady* violation, where evidence disclosed five days before trial); *United States v. Roque*, 628 F. App'x 65, 66 (2d Cir. 2016) (upholding disclosure of impeachment evidence eleven days before trial).

Insofar as Hopper claims that the government failed to comply with the timing requirements of NDNY Local Rule 14.1, Hopper does not establish a due process violation. As an initial matter, it is the prerogative of the district court to determine whether the government's alleged non-compliance with the Local Rule warrants further action. Here, the district court repeatedly refused to find the government in noncompliance with the local rule.

GA:166-67, 170-72. Moreover, the failure of the government to disclose evidence in accordance with deadlines set by district court rules does not establish a due process violation. In *United States v. Coppa*, 267 F.3d 132 (2d Cir. 2001), this Court was presented with an analogous situation where the government was alleged to have failed to comply with a district court's order that it provide *Brady* material "immediately" upon defendant's demand. On mandamus review, the Court vacated the district court's order and reiterated the "longstanding constitutional principle that as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner." *Id*. at 145. Here, too, Hopper had the government's discovery disclosures in time to prepare for trial effectively.

Finally, it is important to note what Hopper is *not* claiming: he does not assert that the government suppressed or failed to disclose any discovery material, including *Brady, Giglio* or Jencks Act material. Nor does he cite any discovery demands by him that were wrongly denied by the government or the district court. Indeed, Hopper does not identify *any* specific document, statement, or other piece of evidence whose allegedly untimely production caused him prejudice. Defense counsel's conclusory claim that the timing of government's discovery productions left him unable to prepare adequately for trial is not

supported by the record, and does not warrant reversal.

### 3. The government's expert disclosures complied with Rule 16(a)(1)(G).

Hopper's claim that the government failed to comply with the expert disclosure requirements of Rule 16(a)(1)(G) also should be rejected because it is not supported by the record. Contrary to his claim on appeal, Hopper's attorney had notice months before trial that the government intended to rely on expert witnesses. In its first discovery production on November 27, 2018 (ten months before trial), the government notified defense counsel that the production included "laboratory reports" and the government intended to call at trial the authors of the respective reports as expert witnesses, to testify regarding the conclusions in their reports. GA:142. The government provided similar expert disclosures on February 8, 2019 (laboratory reports analyzing certain DNA results and medical examiner's reports), GA:144; July 30, 2019 (reports by ballistics experts and a summary of the testimony of an expert on Syracuse gangs, along with his qualifications and the basis for his testimony), GA:148-50; and August 26, 2019 (reports of DNA, ballistics, and accident reconstruction), GA:97-98. In each instance, the government made clear that it intended to call the authors of the included reports as expert witnesses to testify regarding the conclusions described in their reports. In addition, on August 26, 2019, five

weeks before trial, the government provided defense counsel with a list of the experts it intended to call at trial, along with a description of their intended testimony that referenced their reports. GA:98.

Despite Hopper's attorney long having been on notice of the government's intention to rely on expert testimony, he did not request additional summaries of that testimony or otherwise complain about the sufficiency of the government's expert disclosures until September 11, 2019, in Hopper's pretrial omnibus motion, which sought to preclude the government from calling its expert witnesses. GA:77-81. The district court did not abuse its discretion by denying this motion. In response to defense counsel's claim that the government failed to provide the written summaries of the proposed expert testimony required under Rule 16(a)(1)(G), the government submitted each report of the experts identified on the government's witness list. GA:119. The district court agreed with the government that the reports provided a detailed description of the experts' opinions and the bases for those opinions, and further determined that the government had complied with Rule 16. GA:167-68. Hopper does not demonstrate an abuse of discretion in this determination.

Even if Hopper could establish that the government's expert disclosures were inadequate, he does not demonstrate substantial prejudice

from those violations, as required to establish his entitlement to a new trial. *Adeniji*, 31 F.3d at 64. While Hopper claims that he could not consult or hire opposing experts, and could not know the subject matter of the government's expert testimony, Hopper Br. at 27, his claims are belied by the fact that the government provided defense counsel with the expert reports weeks, and in most cases, months, before trial. When those reports were disclosed, the government informed defense counsel that it intended to call the authors of those reports to testify as experts about the reports' conclusions – adequately identifying the subject matter of the experts' testimony. *See, e.g.*, *United States v. Robison*, 19 F. App'x 490, 494 (9th Cir. 2001) (finding no prejudice from lack of written summary of expert testimony, where expert's report provided to defendant). Defense counsel does not explain how he was prevented from hiring experts, or why he could not foresee the content of their testimony, under these circumstances. His unsupported claims of prejudice should be rejected.

## POINT II: There Was No Double Jeopardy Violation.

Hopper wrongly contends that his right against double jeopardy was violated because he was tried for a RICO conspiracy in which one of the alleged overt acts, and one of the special sentencing factors identified in the superseding indictment, was the murder of Rodney Maddux (Victim 2) – a murder for which he had been acquitted in state court in

2014. Hopper Br. at 29-30; *see* HA:58, 62. Hopper raised this claim below through a motion *in limine*, HA:76-77, and the district court correctly rejected it, GA:191.

Hopper was not twice prosecuted for the same offense, as prohibited by the Double Jeopardy Clause. U.S. Const. amend. V. Under longstanding precedent, the Double Jeopardy Clause permits successive prosecutions for the same criminal act under two different criminal statutes whenever each statute "requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). While a RICO conspiracy charge requires proof of an agreement with others to conduct the affairs of an enterprise through a pattern of racketeering activity, 18 U.S.C. §1962(d), no such facts must be proved to convict a defendant for substantive murder. Under the *Blockburger* test, then, a RICO conspiracy charge and a state substantive murder charge do not involve the same offense, foreclosing Hopper's claim at the outset.[22]

---

[22] *Hopper*'s reliance on *United States v. Liller*, 999 F.2d 61, 63 (1993) is misplaced. This Court subsequently rejected the fact-based approach to double jeopardy claims involving prosecutions under different statutes that was "briefly entertained" in *Liller. United States v. Basciano*, 599 F.3d 184, 198 (2d Cir. 2010); *see also Gamble v. United States*, __ U.S.__, 139 S. Ct. 1960, 1980 (2019) (reaffirming "rule that an 'offence' for

Hopper's successive state and federal prosecutions raise no Double Jeopardy concerns. This Court repeatedly has held, under the "dual sovereignty" doctrine, that an acquittal in state court of murder does not preclude federal authorities from charging that offense as a predicate act in a RICO prosecution. *See United States v. Burden*, 600 F.3d 204, 228-29 (2d Cir. 2010); *United States v. Coonan*, 938 F.2d 1553, 1562–63 (2d Cir. 1991). Even if Hopper was prosecuted for the "same offense" in state and federal courts (which he was not), the "dual sovereignty" doctrine precludes his double jeopardy claim. *See generally*, *Gamble*, 139 S. Ct. at 1978-79 (rejecting challenge to "dual sovereignty" doctrine).

On appeal, Hopper unsuccessfully attempts to invoke the narrow exception to the "dual sovereignty" doctrine that has arisen from the Supreme Court's decision in *Bartkus v. Illinois*, 359 U.S. 121, 123-24 (1959). Hopper thus asserts, without citation to the record, that "most" of the government's witnesses admitted that they were part of a "joint task force," involving federal and state law enforcement cooperation. Hopper Br. at 29. Even crediting Hopper's claim, however, it is insufficient to invoke the *Bartkus* exception, which

double jeopardy purposes is defined by statutory elements, not by what might be described in a looser sense as a unit of criminal conduct).

"is not triggered simply by cooperation between the two authorities." *Burden*, 600 F.3d at 229; *see also United States v. All Assets of G.P.S. Auto. Corp.*, 66 F.3d 483, 495 (2d Cir. 1995) ("[W]e have repeatedly held that even significant cooperation between state and federal authorities does not provide a basis for applying the *Bartkus* exception."). Instead, *Bartkus* "applies only in an extraordinary type of case," *United States v. Moreno-Diaz*, 257 F. App'x 435, 437 (2d Cir. 2007), and requires that "one government must have effectively manipulated the actions of the other government, so that the other government's officials retained little or no independent volition," *Burden*, 600 F.3d at 229. The formation of a joint task force between state and federal authorities is insufficient to invoke *Bartkus*, *see, e.g.*, *United States v. Angleton*, 314 F.3d 767, 774 (5th Cir. 2002). Likewise, Hopper's further speculation concerning the motives of state and federal officials, *see* Hopper Br. at 31-32, is wholly insufficient to show that either the state government or the federal government was not acting independently in deciding to prosecute him for murder or racketeering conspiracy, respectively. Hopper therefore does not establish a *Bartkus* claim.

**POINT III: The Jury's Verdict Was Not Inconsistent and, In Any Event, A New Trial is Not Warranted.**

Hopper is not entitled to a new trial based on an alleged inconsistency in the jury's verdict. This

Court has made clear that it is "not in the business of policing verdicts for the consistency of the jury's findings of guilty and not guilty on various counts." *United States v. Capers*, 20 F.4th 105, 126 (2d Cir. 2021). Accordingly, Hopper's claim is not reviewable.

The superseding indictment alleged that Hopper and co-defendant Long intentionally caused the death of Sistrunk by recklessly engaging in conduct that created a grave risk of death, in violation of NYPL §125.25(2). HA:62-63. The evidence at trial, which Hopper does not contest on appeal, established that Hopper and Long chased Sistrunk in their car at high speeds through Syracuse city streets, and fired a gun at Sistrunk's car while Sistrunk attempted to elude them. Sistrunk's car went out of control, and struck a tree, causing his death. Tr.544-57, 786-801, 810-20, 844-47, 935-38, 1075-79, 1133-36, 1163-67.

Even assuming, *arguendo*, that the jury's verdict on Count Two, which alleged the discharge of a firearm during a crime of violence in violation of §924(c), is inconsistent with jury's determination that, as part of his participation in the racketeering conspiracy charged in Count One, he was guilty of the murder of Anthony Sistrunk (Victim 3), the jury's verdict should not be disturbed. "[I]t has long been established that inconsistency in jury verdicts of guilty on some counts and not guilty on others is not a ground for

reversal of the verdicts of guilty." *United States v. Acosta*, 17 F.3d 538, 545 (2d Cir. 1994); *see also United States v. Powell*, 469 U.S. 57, 62-65 (1984) (upholding defendant's conviction for using telephone to facilitate commission of narcotics offenses, even though defendant was acquitted as to the underlying narcotics offenses; jury, though presumed to follow the instructions of the trial court, may make its ultimate decisions for impermissible reasons, such as "mistake, compromise, or lenity," but its power to do so is "unreviewable"); *Dunn v. United States*, 284 U.S. 390, 393-94 (1932) ("Consistency in the verdict is not necessary .... That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters."). Given this firmly established principle, Hopper's inconsistent verdict claim fails as a matter of law. Inconsistency in the jury's verdict "does not show that [the jurors] were not convinced of the defendant's guilt" on the count of conviction, and is simply not a ground for reversal.[23] *Powell*, 469 U.S. at 64-65.

---

[23] To be sure, this Court recently recognized that a jury's irreconcilable answers to special interrogatories concerning the same count of conviction may require setting aside the verdict on that count. In *United States v. Pierce*, 940 F.3d 817 (2d Cir. 2019), this Court sustained vacatur of a count of conviction where the jury found defendant guilty of a drug conspiracy, but then answered in

**POINT IV: The District Court Properly Relied on Acquitted Conduct in Determining Hopper's Sentence.**

## A. Background

In Hopper's PSR, the Probation Office determined that he was accountable for the murder of Rodney Maddux on September 30, 2012, based on the preponderance of the evidence at trial, even though the jury found him not guilty of his conduct. PSR ¶¶22, 35, 45. The inclusion of the Maddux murder as relevant conduct had the effect of increasing Hopper's offense level by 2, from 38 to 40, pursuant to the multi-count adjustment under U.S.S.G. §3D1.4. PSR ¶¶73-75. With a criminal history of VI, and a total offense level of 40, Hopper's guidelines imprisonment range was 360 months to life. PSR ¶121. However, if Hopper

---

the negative interrogatories that asked which drugs were involved. This Court found that reconciling the jury's answers to the special interrogatories with its verdict on the same count was "metaphysically impossible." 940 F.3d at 824. The Court distinguished *Powell* on the basis that *Powell* involved "inconsistencies between different counts." 940 F.3d at 823. The alleged inconsistency in this case is between counts, and therefore governed by *Powell*, not *Pierce*.

had not received this two-level increase, his guidelines imprisonment range would have remained 360 months to life. *See* U.S.S.G. Sentencing Table.

In response to the PSR and at his sentencing hearing, Hopper objected to the district court's consideration of the Maddux murder because he had been acquitted of that offense at trial in this case, and in his previous state trial. HA:540-41; PSR addendum. In reply, the government summarized the trial evidence, argued that it established Hopper's responsibility by a preponderance of the evidence, and cited case law permitting sentencing courts to consider acquitted conduct. HA:536-38; PSR Addendum.

At sentencing, the district court rejected Hopper's challenge to consideration of the Maddux murder, found that Hopper committed that murder by a preponderance of the evidence, adopted the factual findings and guidelines calculations in the PSR, and concluded that Hopper's guidelines imprisonment range was 360 months to life. HA:541-42, 550. Hopper addressed the court, and denied responsibility for both the Maddux and Sistrunk murders. The government urged the court to impose a life sentence given Hopper's violent and murderous conduct, his persistent recidivism, his lack of remorse, and refusal to accept responsibility for his actions. HA:543-50.

The district court imposed a 385-month term of imprisonment, at the low end of the guidelines range. HA:550-51. The court noted that it had "agonized over" the appropriate sentence, explaining that "[i]f there's ever a case that may require life imprisonment, maybe it was this one, but I do feel, and I believe, that you should have an opportunity to go on with your life."[24] HA:551.

## B. Governing Law and Standard of Review

"[A] district court may consider all information adduced during trial, including acquitted conduct, when sentencing a defendant," *United States v. Yannotti*, 541 F.3d 112, 129 (2d Cir. 2008), and may treat acquitted conduct as relevant conduct when calculating a defendant's guidelines range, "so long as that conduct has been proved by a preponderance of the evidence." *United States v. Watts*, 519 U.S. 148, 157 (1997); *see also United States v. Jones*, 531 F.3d 163, 176 (2d Cir. 2008); *United States v. Vaughn*, 430 F.3d 518, 521 (2d Cir. 2005). "When the offense of conviction is a RICO conspiracy, relevant conduct may include underlying predicate acts, even if not proven at trial beyond a reasonable doubt, as long as the sentencing court finds that they were proven by

---

[24] Hopper was 33 years old at the time of sentencing. According to a Bureau of Prison's website, he has a projected release date of June 11, 2046, at which time he will be 60 years old. PSR pg. 2.

the lower preponderance of the evidence standard." *United States v. Massino*, 546 F.3d 123, 135 (2d Cir. 2008). Findings of relevant conduct are reviewed for clear error. *United States v. Pica*, 692 F.3d 79, 88 (2d Cir. 2012).

## C. Discussion

Hopper's legal and factual challenge to the district court's consideration of the Maddux murder should be rejected. Hopper wrongly contends that this Court's decision in *United States v. Shonubi*, 103 F.3d 1085, 1089 (2d Cir. 1997), requires application of a higher standard of proof than "preponderance of evidence," given the seriousness of the conduct involved. Hopper Br. at 35-36. This Court, however, has rejected this argument:

> In *Shonubi*, we observed that, because the then-mandatory Guidelines system "prescribes punishment for unconvicted conduct at the same level of severity as convicted conduct," courts must "proceed carefully" in establishing standards for proving relevant conduct, *United States v. Shonubi*, 103 F.3d at 1089, and should look for "specific evidence" of any unconvicted drug quantity that "will significantly enhance a sentence," *id*. at 1089–90 (citing *United States v. Gigante*, 94 F.3d 53, 56-57 (2d Cir. 1996)). But, as we subsequently clarified in *United States v. Cordoba-*

> *Murgas*, 233 F.3d 704 (2d Cir. 2000), the quoted language from *Shonubi* "was merely dictum. In light of this Court's continual application of the preponderance of the evidence standard, it is incorrect to construe the *Shonubi* language as authorizing the use of a higher standard of proof," *id*. at 708; *accord United States v. Bennett*, 252 F.3d 559, 565 (2d Cir. 2001) (reiterating that *Shonubi* standards statement was dictum).

*Jones*, 531 F.3d at 176. Accordingly, this Court has affirmed the application of the preponderance standard in cases where, as here, the acquitted relevant conduct was murder or would otherwise result in a life sentence. *United States v. Mulder*, 273 F.3d 91, 116 (2d Cir. 2001); *United States v. Dixon*, 175 F. App'x 384, 385 (2d Cir. 2006). Although the Supreme Court has suggested, in dictum, that a "clear and convincing" standard of evidence may be appropriate where the sentencing enhancement that is triggered by acquitted conduct is "a tail which wags the dog of the substantive offense," *Watts*, 519 U.S. at 156-57 & n.2, that is not the situation here. Hopper already was found guilty of the Sistrunk murder as part of the RICO conspiracy, which substantially increased his offense level, PSR ¶60, and raised the statutory maximum penalty to life imprisonment. PSR ¶120; 18 U.S.C. §1963(a). Consideration of the acquitted conduct in this case resulted in only a two-level increase to Hopper's offense level, and here, that increase had no effect on the guidelines

imprisonment range, or the statutory maximum. PSR ¶¶73-75. Even assuming that the *Watts* dictum articulates a viable rule, it has no application in this case because acquitted conduct was not the main driver of Hopper's offense level. Accordingly, there was no legal error in the district court's use of the preponderance standard.

The district court did not clearly err in finding by a preponderance of the evidence that Hopper killed Maddux. Even if "specific evidence" of Hopper's responsibility for that murder is required, the trial record provided such evidence. A former 110 Gang Member, R.C., gave an eyewitness account at trial: he testified that he saw Hopper shoot and kill Maddux in front of the B&B Lounge, in Syracuse. Tr.511, 542-43. R.C. also explained the rationale for the murder: that Hopper did not like the fact that Maddux and his friends were causing a scene at the B&B Lounge, which the 110 Gang considered part of its territory. Tr.512-13, 540-44. R.C. recalled Hopper saying later that he shot Maddux because "this our shit, we got to protect it," which the witness understood to mean that "you got to take care of your neighborhood, can't let no outsiders in." Tr.544. Another witness and former 110 Gang member, I.J., testified that Hopper bragged about committing the murder after the fact. Tr.899. The district court presided over trial, heard these witnesses testify, and thus could make its own determination concerning their credibility and the weight to give their testimony. Likewise, the

government presented video evidence corroborating R.C.'s eyewitness account. GA:267. Syracuse Police Detective Christopher DeJoseph testified about the work he did in collecting and analyzing the surveillance video from that evening. Tr.621-59. Although the video of the actual shooting did not show the killer's face, it established that Hopper was at the B&B Lounge earlier that evening; was wearing clothing that matched the shooter's; and had a similar build and gait to the person who later was seen on the video opening fire. Tr.644, 658-59. Here, again, the district court viewed the video evidence at trial and was able to make its own assessment of its significance.[25] In addition, physical evidence corroborated the video evidence and testimony.[26] A

---

[25] Although Hopper contends that the video evidence should have been excluded at trial, Hopper Br. at 39, he provides no argument in support of this claim. Accordingly, this Court should not consider it on appeal. *United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

[26] In summarizing the evidence concerning the Maddux murder in response to Hopper's objection to the PSR, the government incorrectly stated that the gun used in this murder had been recovered in 110 Gang territory. *See* PSR Addendum, at pg. 45. Police recovered the gun in the *Sistrunk* murder,

sweatshirt with Hopper's DNA was found in a house nearby and it matched the sweatshirt that the shooter was identified as wearing, Tr.581-82, 635-36, 765-67.[27] Finally, analysis of Hopper's cell phone records showed that he was at the B&B Lounge at the time of the murder, and that before and after the shooting, he called an individual whose home address was the same as the address where the sweatshirt was later found. Tr.561, 578, 662-63, 1065-66. Given this evidence, Hopper cannot show clear error in the district court's sentencing determination that he was accountable for the Maddux murder by a preponderance of the evidence.

---

Tr.984, not the Maddux murder. This incorrect statement was not included in the Probation Office's summary of the trial evidence in the PSR, or cited as a basis for holding Hopper accountable for the Maddux murder. *See* PSR ¶¶22, 45, 66.

[27] R.C.'s testimony, the video analysis, and the DNA evidence presented in federal court were not available at Hopper's state trial in 2014 for the Maddux murder. PSR ¶45.

**POINT V: Although a Remand for Resentencing is Necessary to Correct Plain Error in the Determination of Kinsey's Offense Level Under U.S.S.G. §2E1.1 and the Imposition of an Invalid Condition of Supervised Release, Kinsey Fails to Establish Clear Error in the Determination of his Relevant Conduct or Plain Error in his Criminal History Category.**

## A. Background

### 1. Guilty Plea

On August 15, 2021, Kinsey pleaded guilty to the RICO conspiracy charged in the original indictment, pursuant to a plea agreement. KA:35, 38-57. Specifically, the indictment charged, and Kinsey admitted, to conspiring "to conduct and participate, directly and indirectly, in the conduct of the affairs" of the 110 Gang enterprise "through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of" multiple acts involving murder, attempted murder, robbery, access device fraud, and drug trafficking, in violation of specified state and federal statutes. KA:15. Kinsey also admitted that 110 Gang members "routinely arm themselves with firearms in order to protect their territory, to protect their drug trade, to project a violent attitude to rival

gang members, and to retaliate against any rival gangs who committed acts of violence against fellow gang members." KA:14, 33-34.

Kinsey was named in Overt Acts 7, 8, 11, and 38 of the original indictment. *See* PSR ¶31 (overt act chart).[28] With respect to Overt Acts 7 and 8, the indictment alleged that Kinsey met with other 110 Gang members on August 8, 2014, in the immediate aftermath of a shooting by rival gang members in 110 Gang territory. KA:16. The indictment further alleged that Kinsey and others "agreed that they would try to retaliate against the rival gang with acts of violence." KA:16. The indictment stated that Kinsey "retrieved a gun and went with [two other gang members] in a car looking for rival gang members with the intent to shoot any rival gang members they found." KA:16.

With respect to Overt Act 11, the indictment alleged that on August 9, 2014, Kinsey provided a car to co-defendant Hopper and another 110 Gang member, knowing that they intended to drive around looking for rival gang members to shoot in retaliation for the August 8, 2014 attack. KA:16. Hopper and the other 110 Gang member drove into rival territory and located rival gang members. Hopper gave a gun to the other 110 Gang member, who shot two rival gang members. The victims

---

[28] References to "PSR" in this section are to Kinsey's PSR.

suffered gunshot wounds, which required hospitalization. KA:16.

Overt Act 38 alleged that Kinsey sold an unspecified amount of crack cocaine to another individual in 110 territory on August 29, 2018. KA:20.

In his plea agreement and at his plea hearing, Kinsey admitted to knowingly conspiring to "form and/or maintain … the 110 Gang," and further admitted, *inter alia*, that he was a member of the 110 Gang; a conspiracy existed among the members "to further the enterprise, including by committing acts of racketeering activity in furtherance of the enterprise;" and that "110 Gang members commit acts of violence, including murder and assault, to instill fear of the gang and to protect and expand the gang's criminal operations." KA:32-34, 40, 42. Likewise, Kinsey admitted that "[f]rom at least 2012 through October 2018, [he] … was a member of the 110 Gang," and agreed with other members "to further the gang enterprise and its racketeering activity." KA:42. Kinsey, however, did not admit to participating in the conduct described in Overt Acts 7-8, and 11 (concerning the retaliatory shooting), but only to drug trafficking activity as part of his participation in the enterprise. Specifically, he admitted:

1) On or about August 29, 2018, the defendant sold an amount of cocaine base

("crack cocaine") to another individual in 110 Gang Territory. [Overt Act 38].

2) By virtue of his membership in the 110 Gang, the defendant was able to possess and distribute crack cocaine in and around 110 Gang territory.

KA:34-35, 42-43.

The plea agreement contained sentencing stipulations between the parties, including that Kinsey was "personally accountable for at least 28 grams but less than 112 grams of a mixture or substance containing cocaine base, in that [Kinsey] was personally involved with that quantity or it was reasonably foreseeable to [him] that the conspiracy involved that quantity." KA:43. Both parties reserved their right to argue at sentencing for enhancements or reductions under the guidelines, including those based on conduct not specifically addressed in the factual basis set forth in the plea agreement. KA:43. The plea agreement contained an appeal waiver, in which Kinsey waived his right to appeal or collaterally attack, *inter alia*, any sentence to a term of imprisonment of 115 months or less. KA:44.

## 2. Sentencing Proceedings

### a. PSR

In recounting the offense conduct, Kinsey's PSR provided detailed descriptions of numerous violent acts perpetrated by members of the 110 Gang, including shootings, murders, and stabbings. PSR ¶¶17-28. These accounts were based, in part, on evidence presented at Hopper's trial. Two of the acts of violence described in the PSR involved Kinsey. The first incident was the retaliatory shooting of rival gang members on August 9, 2014, described in the indictment, which occurred after a meeting of 110 Gang members, including Kinsey, on August 8, 2014. PSR ¶19. As stated in the PSR, during the August 8th meeting, Kinsey and others "agreed to retaliate against" the rival gang, and to split up and try to find the rival gang members. PSR ¶¶19, 41. The PSR explained that, according to trial testimony by R.C., a former 110-Gang member who was with Kinsey that night, "Kinsey drove, retrieved a gun, and gave it" to R.C. PSR ¶41. R.C., Kinsey, and another gang member then drove around on the evening of August 8th in rival gang territory, "looking for [rival] gang members to shoot at," but were unsuccessful and eventually returned to 110 territory. As the PSR noted, the next day, Hopper and R.C. shot two rival gang members. PSR ¶19.

The second incident was the murder of Anthony Sistrunk on October 24, 2014. As explained in the

PSR, the day before Sistrunk was killed in a car accident after being chased by Hopper and Long, Kinsey robbed Sistrunk of marijuana. On October 23, 2014, Sistrunk and his girlfriend drove to a prearranged location to conduct a marijuana sale. After he arrived, Kinsey "approached the driver's side of the vehicle where Sistrunk was seated" and requested that Sistrunk weigh the marijuana in front of him, which Sistrunk did. Kinsey then attempted to grab all of Sistrunk's marijuana, and the two had a brief struggle, before "Kinsey pulled out a handgun and pointed it" at Sistrunk. PSR ¶¶20, 42. Sistrunk drove away from the area, and "as he drove, shots were fired at the vehicle from behind." PSR ¶20. Sistrunk's girlfriend, T.H., testified at trial that she "did not see the person who fired at them because the shots came from behind them." PSR ¶42. A bullet struck the rear of the vehicle and a copper-jacketed projectile was later recovered from the bumper. PSR ¶20. Another trial witness testified that when he arrived at the scene of Sistrunk's death the next day, shortly after the accident had occurred, he observed Hopper, Long and Kinsey in the immediate area. PSR ¶42.

The Probation Office used U.S.S.G. §2E1.1 to calculate Kinsey's offense level. That guideline directs that the base offense level is 19 unless the offense level applicable to the "underlying racketeering activity" is greater. U.S.S.G. §2E1.1(a). PSR ¶48. The Probation Office determined that Kinsey was responsible for drug

trafficking (Overt Act 38), Aggravated Assault (Overt Acts 7&8), and Robbery. PSR ¶49. It treated each of these offenses as separate "pseudo-counts,"[29] and determined the offense level applicable to each. It concluded that the offense level applicable to the drug trafficking conduct was 26, the offense level applicable to the aggravated assault was 26, and the offense level applicable to the robbery was 28. PSR ¶¶50-66. Applying the multi-count adjustment under U.S.S.G. §3D1.4(a), (b), and (c), the Probation Office added one offense level for each of these counts, resulting in an adjusted offense level of 31, which was then decreased by three levels based on Kinsey's early acceptance of responsibility, producing a total offense level of 28. PSR ¶¶66-74.

As the Probation Office determined in the PSR, Kinsey's prior criminal convictions resulted in an initial criminal history score of 14. PSR ¶¶91, 93. As relevant here, Kinsey was convicted in 2015 in Syracuse City Court for criminal possession of a controlled substance in the 7th Degree, a

---

[29] The term "pseudo-count" has been applied by this and other courts to describe the result of the Sentencing Commission's instruction in various guidelines, including §2E1.1, to treat each underlying offense in a multi-object conspiracy "as if" contained in a separate count of conviction. *See, e.g.*, *United States v. Brown*, 613 F. App'x 58, 60 (2d Cir. 2015); *United States v. Morgano*, 39 F.3d 1358, 1366 (7th Cir. 1994).

misdemeanor. PSR ¶85. Kinsey had been pulled over for a traffic violation on October 29, 2014, and during this stop, police officers noticed the smell of marijuana on his clothes and a small quantity of crack cocaine between the driver's seat and center console. A check of the rear seat of the patrol vehicle in which Kinsey was transported to jail revealed another small quantity of crack cocaine. Officers searched Kinsey at jail, and found two "pieces" of crack cocaine on his person.[30] PSR ¶85. Kinsey was convicted on April 30, 2015, and sentenced to a three-year term of probation. On May 23, 2016, however, Kinsey was found to have violated probation, and was resentenced to a one-year term of imprisonment. PSR ¶85. The Probation Office assigned two criminal history points to this prior sentence, pursuant to U.S.S.G. §4A1.1(b) and §4A1.2(k)(1).

As noted in the PSR, Kinsey was on probation for the 2015 crack cocaine possession conviction between April 30, 2015, and May 23, 2016. PSR ¶92. As a result, the Probation Office added two points to Kinsey's criminal history score pursuant to U.S.S.G. §4A1.1(d), PSR ¶92, resulting in a total of 16 points, which established a criminal history category of VI, PSR ¶93. With a total offense level of 28, Kinsey's resulting guidelines range of imprisonment was 140-175 months. PSR ¶129.

---

[30] The PSR does not specify the quantity of crack cocaine found on Kinsey.

### b. Sentencing Submissions

In response to the PSR, defense counsel argued that, as a factual matter, Kinsey was not involved in either the August 9, 2014 retaliatory shooting, or the October 23, 2014 robbery of Sistrunk, and could not be held responsible for this conduct in the determination of his total offense level. Defense counsel also raised objections to the inclusion of certain convictions in Kinsey's criminal history score. The government responded to Kinsey's objections to the PSR. *See* PSR Addendum. The government did not object to the Probation Office's calculation of Kinsey's offense level or propose an alternative calculation.

In Kinsey's sentencing submission, defense counsel repeated his objections to the PSR and requested a non-guidelines sentence. KA:65-76. The government argued for a sentence within the guidelines range determined in the PSR. KA:58-64.

### c. Sentencing

At sentencing on October 22, 2020, the district court adopted the factual statements and guidelines calculations in the PSR. KA:84. It found that Kinsey's total offense level was 28, his criminal history category was VI, and his guidelines imprisonment range was 140 to 175 months. KA:84. After hearing from the parties and Kinsey, KA:84-92, the district court pronounced

sentence. The district court recounted Kinsey's extensive criminal history, repeated acts of violence, and lengthy participation in the 110 Gang. KA:93-94. The court noted that the 110 Gang was violent, and was involved not only in drug trafficking "but also murder and attempted murder." KA:94. The court also highlighted Kinsey's recidivism, noting that he had been arrested more than 28 times in a 15-year period. KA:94. The court explained that nothing in Kinsey's record suggested a genuine intent to rehabilitate himself. KA:94-95. Based on its consideration of the sentencing factors, the court sentenced Kinsey to a 150-month term of imprisonment, to be followed by a three-year term of supervised release.

As part of the standard conditions of supervision, the court imposed the following condition:

> If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

KA:101.

## B. Governing Law

### 1. Racketeering Activity

Under U.S.S.G. §2E1.1, a defendant's base offense level is set at 19, or, if higher, "the offense level applicable to the underlying racketeering activity." U.S.S.G. §2E1.1(a)(1) and (2). Neither the guideline nor the commentary provides a definition of "underlying racketeering activity."

The term "racketeering activity," as used in the RICO statute, is defined at 18 U.S.C. §1961(1), and includes, *inter alia*, "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical … which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. §1961(1)(A). Such activity also includes "any act which is indictable" under a host of specified federal statutes, as well as offenses involving specific types of fraud and drug trafficking. *Id*. §1961(1)(B)-(G).

### 2. Criminal History

Pursuant to U.S.S.G. §4A1.1, each "prior sentence of imprisonment" adds points towards a defendant's criminal history score. Section 4A1.2(a)(1) defines the term "prior sentence" as "any sentence previously imposed upon adjudication of guilt … for conduct not part of the

instant offense." The commentary to this guideline explains that "[a] sentence imposed after the defendant's commencement of the instant offense, but prior to sentencing on the instant offense, is a prior sentence if it was for conduct other than conduct that was part of the instant offense." U.S.S.G. §4A1.2 cmt. n.1. The commentary further explains that "[c]onduct that is part of the instant offense means conduct that is relevant conduct to the instant offense under the provisions of §1B1.3 (Relevant Conduct)." *Id*.

In addition, §4A1.1(d) provides that 2 points are added to the defendant's criminal history score "if the defendant committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status." The commentary to this guideline explains that, for purposes of §4A1.1(d), a "criminal justice sentence" is defined as "a sentence countable under §4A1.2 (Definitions and Instructions for Computing Criminal History) having a custodial or supervisory component." U.S.S.G. §4A1.1 cmt. n.4.

The commentary to the RICO guideline, U.S.S.G. §2E1.1, states:

> Certain conduct may be charged in the count of conviction as part of a "pattern of racketeering activity" even though the defendant has previously been sentenced for that conduct. Where such previously

imposed sentence resulted from a conviction prior to the last overt act of the instant offense, treat as a prior sentence under §4A1.2(a)(1) and not as part of the instant offense. This treatment is designed to produce a result consistent with the distinction between the instant offense and criminal history found throughout the guidelines. If this treatment produces an anomalous result in a particular case, a guideline departure may be warranted.

U.S.S.G. §2E1.1 cmt. n.4 ("Application Note 4"). This Court has held that this commentary may reasonably be construed "to mean that the conduct underlying the previously imposed sentence should not be used in calculating the base offense level for the instant offense." *United States v. Minicone*, 960 F.2d 1099, 1111 (2d Cir. 1992).

## C. Discussion

**1. Kinsey has shown no clear error in the district court's determination that the August 9, 2014 retaliatory shooting and the October 23, 2014 robbery were relevant conduct for which Kinsey was accountable.**

As an initial matter, Kinsey fails to establish clear error in the district court's determination that he was accountable for the August 9, 2014 retaliatory shooting of rival gang members, and

the October 23, 2014 robbery of Anthony Sistrunk, during which a firearm was discharged. First, as to the retaliatory shooting, trial testimony by eyewitness R.C. established that Kinsey was among the members of the 110 Gang who met to discuss retaliation shortly after two fellow gang members were shot at a party in 110 Gang territory on August 8, 2014. Tr.535. R.C. also explained that, immediately after this meeting, he (R.C.), Kinsey, and another 110 Gang member got into a car; Kinsey retrieved a gun; and they drove around looking (unsuccessfully) for rival gang members to target. Tr.535-36. The trio returned to 110 Gang territory at the end of the night, and R.C. gave Kinsey back the gun. Tr.537. R.C. further testified that he and Hopper continued their retaliatory efforts the following day, when R.C. shot at two rival gang members in a car driven by Hopper, using a gun provided by Hopper.[31] Tr.537-40.

---

[31] The record at sentencing showed further that the car used in the shooting had been provided to Hopper and R.C. by Kinsey, who had borrowed it from its owner, a woman who gave a statement to police the day after the shooting. A:70; PSR Addendum, pg. 44. The fact that the owner reported that Kinsey had told her that he had given the car to Hopper to allow him to visit 110 Gang members in the hospital, A:70, does not establish clear error. Obviously, Kinsey had incentive not to disclose that the owner's car was to be used in a shooting.

The trial testimony provided a firm basis to hold Kinsey accountable for the August 9th shooting. It was not only a reasonably foreseeable consequence of the events of August 8th, but it also was the *object* of the agreement that was reached on August 8 and which Kinsey attempted to carry out that night. *See United States v. Medina*, 74 F.3d 413, 417 (2d Cir. 1996) (holding that defendant at sentencing is responsible for acts of co-conspirators of which defendant lacked actual knowledge, so long as acts were "reasonably foreseeable"). At the very least, Kinsey does not carry his burden of showing that the shooting was not reasonably foreseeable to him. *United States v. Martinez-Rios*, 143 F.3d 662, 677 (2d Cir. 1998) ("[W]hen a defendant asserts that he is not responsible for the entire range of misconduct attributable to the conspiracy of which he was a member, the Guidelines place on him the burden of establishing the lack of knowledge and lack of foreseeability."), *superseded by rule on other grounds as stated in United States v. Cook*, 722 F.3d 477, 481 (2d Cir. 2013); *see also United States v. Firment*, 296 F.3d 118, 122 (2d Cir. 2002) (same).

Although Kinsey suggests that R.C.'s testimony is unreliable because it was "internally inconsistent," and co-conspirator testimony is to be treated with care, neither contention suffices to establish clear error. The alleged inconsistency concerning the source of the gun used in the shooting is simply the result of ambiguity in the

questioning on cross examination. R.C.'s testimony on direct examination was that he got a gun from Kinsey on August 8, which he returned to Kinsey later that night, Tr.536-37; and that he later got another gun from Hopper, which he used in the shooting and gave back to Hopper on August 9, Tr.537-40. On cross examination, R.C. confirmed that he had been given "a gun" by Kinsey in August, and was then asked whether he gave "the gun" back to Kinsey. Tr.553. R.C. stated that he "gave the gun back to [Hopper]." Tr.553. A reasonable reading of this testimony is that R.C. believed defense counsel's reference to "the gun" was to the weapon R.C. used in the shooting, not the gun he received the night before from Kinsey. In addition, the district court observed R.C.'s testimony at trial and could therefore make its own determination as to the meaning and credibility of that testimony.

Kinsey's effort to challenge his accountability for the October 23, 2014 robbery of Sistrunk is equally unavailing. T.H., who was with Sistrunk in his car at the time of the robbery, testified at trial that she clearly observed Kinsey rob Sistrunk of marijuana at gunpoint. Tr.1107. T.H. also testified to being shot at immediately after she and Sistrunk left the area of the robbery. While it is true that T.H. "didn't actually see the person who was firing the shots," because they came from behind her, Tr.1108, the evidence suggested that Kinsey was the shooter. He had a gun immediately before the shooting, and the shots "were …

immediately behind [T.H.] where [she] left [Kinsey]." Tr.1113. This evidence establishes, by a preponderance of the evidence, that Kinsey was the shooter. To the extent that Kinsey suggests that there were others involved in the robbery who may have shot at the car, Kinsey would nevertheless be responsible for the shooting as the reasonably foreseeable outcome of his involvement in an armed robbery. *See United States v. Molina*, 106 F.3d 1118, 1121-22 (2d Cir. 1997) (reversing district court's refusal to hold defendant responsible for shooting perpetrated by a co-conspirator during a robbery; and finding that even though the "intended plan was not to fire their weapons during the robbery," the discharge of weapons during an armed robbery is reasonably foreseeable).

### 2. The government concedes plain error in the consideration of aggravated assault as a "racketeering activity" under U.S.S.G. §2E1.1.

The government concedes that the determination of Kinsey's offense level under U.S.S.G. §2E1.1 was affected by plain error for the following reasons. Although this Court does not appear to have addressed the issue, the unanimous weight of authority holds that only an offense that qualifies as "racketeering activity" under 18 U.S.C. §1961(1) can be scored as a pseudo-count under §2E1.1. The PSR classified the August 9, 2014

retaliatory shooting as "aggravated assault." That offense, however, does not fall under the definition of "racketeering activity" in 18 U.S.C. §1961(1). It was therefore error to treat that offense as a pseudo-count in determining Kinsey's offense level under §2E1.1. Because this error affected Kinsey's substantial rights, this Court should vacate his sentence and remand for resentencing. The Court should make clear, however, that the August 9, 2014 shooting was relevant conduct that the district court may consider when determining the appropriate sentence.

Here, the Probation Office calculated the offense level applicable to the retaliatory shooting under U.S.S.G. §2A2.2, the guideline for aggravated assault. PSR ¶56. Assault with intent to commit murder or attempted murder – offenses that qualify as "racketeering activity" under §1961(1) – are covered by a different guideline, U.S.S.G. §2A2.1. Neither party objected to this classification, and the government did not propose that the retaliatory shooting be classified as a more serious crime, such as attempted murder.

Treating aggravated assault as a separate count under §2E1.1 was error. U.S.S.G. §2E1.1 directs courts to determine the "the offense level applicable to the underlying racketeering activity" by treating each "underlying offense" as if it were contained in a separate count of conviction. U.S.S.G. §2E1.1 cmt. n.1. In the proceedings below, the parties, the Probation Office, and the

district court appear to have assumed that "aggravated assault" could be scored in this manner, perhaps reflecting the lack of controlling authority from this Court to the contrary.[32] But all the federal circuits that *have* addressed this issue have held that only offenses that qualify as "racketeering activity" under 18 U.S.C. §1961(1) may be treated as separate counts under §2E1.1. In *United States v. Flores*, 912 F.3d 613, 621 (D.C. Cir. 2019), for example, the D.C. Circuit emphasized that the §2E1.1 guideline uses the same term of art, "racketeering activity," that is used and defined in the RICO statutes to which the guideline applies, and thus must have the same meaning. *See also United States v. Haynie*, 8 F.4th 801, 807 (8th Cir. 2021) ("Aggravated assault with

_____

[32] In *United States v. Hester*, 664 F. App'x 73, 75 (2d Cir. 2016), the Court considered a challenge to the application of a specific offense characteristic under §2A2.2, when scoring aggravated assault as a pseudo-count under §2E1.1. *Hester*, however, did not involve a challenge to the treatment of aggravated assault as "racketeering activity." Likewise, in *Massino*, 546 F.3d at 135, this Court held that "[w]hen the offense of conviction is a RICO conspiracy, relevant conduct may include 'underlying predicate acts,' even if not proven at trial beyond a reasonable doubt...." *Massino*, however, did not hold that such relevant conduct may include *only* RICO predicate acts, and that issue was not before the Court.

a firearm, however, is not a racketeering activity under 18 U.S.C. §1961(1) or USSG §2E1.1, so the district court erred in considering those offenses as 'underlying racketeering activity' under §2E1.1(a)(2).")*; United States v. Sandoval*, 6 F.4th 63, 104 (1st Cir. 2021) ("We have understood 'underlying racketeering activity' in this context to mean any act, whether or not charged against [the] defendant personally, that qualifies as a RICO predicate act under 18 U.S.C. §1961(1) and is otherwise relevant conduct under [U.S.S.G.] §1B1.3."). These decisions are consistent with the position taken by the government in other cases, *see, e.g.*, Brief for the United States in Opposition, *Patriarca v. United States*, 511 U.S. 1069 (No. 93-1350), 1994 WL 16100403 at *9 (agreeing that "underlying racketeering activity" means conduct, whether charged or uncharged, that qualifies as a RICO predicate under §1961(1)), and with non-binding guidance from the Sentencing Commission's Office of General Counsel, *see* United States Sentencing Commission, Office of General Counsel, *Primer: RICO Offenses*, at 11, *available at*: https://www.ussc.gov/sites/default/fil es/pdf/training/primers/2021_Primer_RICO.pdf (last visited Jan. 22, 2022) ("[A]n act that may be within the scope of a RICO conspiracy cannot be considered in determining the offense level if it is not chargeable under a statute in §1961(1).").

Aggravated assault (without an intent to commit murder) is not a category of conduct that qualifies as "racketeering activity" under §1961(1).

*Haynie*, 8 F.4th at 807. Given the use of the term of art "racketeering activity" in the guideline, and the weight of prevailing authority, the government concedes that, having been classified as "aggravated assault," the August 9, 2014 retaliatory shooting should not have been treated as a pseudo-count under §2E1.1, and further concedes that this error was obvious.

The error also affected Kinsey's substantial rights by increasing his offense level by one, *see Molina-Martinez v. United States*, 578 U.S. 189, 198 (2016), and satisfies the fourth prong of the plain error test, as explained in *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1908 (2018). Without an unambiguous indication in the record that the district court would have imposed the same sentence regardless of the guidelines error, a remand for resentencing is necessary. *Molina-Martinez*, 578 U.S. at 200 ("Where, however, the record is silent as to what the district court might have done had it considered the correct Guidelines range, the court's reliance on an incorrect range in most instances will suffice to show an effect on the defendant's substantial rights.").

On remand, the district court may consider the August 9, 2014 retaliatory shooting and other acts of violence that qualify as relevant conduct, when determining the appropriate sentence, *see, e.g.*, *United States v. Porraz*, 943 F.3d 1099, 1103 (7th Cir. 2019) (foreseeable acts committed by other gang members may be used to determine

defendant's sentence for RICO conspiracy), and may decide to impose the same sentence based on consideration of the sentencing factors under 18 U.S.C. §3553(a), *see United States v. Greenwood*, 627 F. App'x 33, 34 (2d Cir. 2016) (remanding for plain error but refusing to "foreclose the possibility" that the district court may impose the same sentence).

### 3. There was no plain error in the calculation of Kinsey's criminal history category.

Kinsey fails to establish plain error in the calculation of his criminal history category.[33] He fails to carry his burden of showing error, let alone one that is "clear or obvious," in the inclusion of his 2015 crack cocaine possession conviction in his criminal history score.

---

[33] Although Kinsey acknowledges that the plain error standard of review applies, he suggests that standard should be relaxed under *United States v. Sofsky*, 287 F.3d 122, 125 (2d Cir. 2002). This Court, however, has made clear that where the defendant had an opportunity to object to purported error in the PSR, and failed to do so at sentencing, plain error review applies with "full rigor." *See United States v. Gordon*, 291 F.3d 181, 190-91 (2d Cir. 2002) (plain error applies with "full rigor" where sentencing decision did not cause surprise and party had full opportunity to object).

As an initial matter, it is not obvious that the conduct underlying the 2015 crack cocaine possession conviction is "relevant conduct" to the charged RICO conspiracy. The charged RICO conspiracy here involved an agreement to engage in a pattern of racketeering activity, including "multiple offenses involving *selling and dealing* in controlled substances, in violation of 21, United States Code, Sections 841 and 846." KA:15 (emphasis added). But the 2015 conviction involved Kinsey's simple possession of a small amount of crack cocaine, found on the driver's seat of his car and on his person, resulting in only a misdemeanor charge. Seventh Degree possession of controlled substance is the lowest level of drug possession under the New York Penal Code. *See* NYPL 220.03. This charge does not involve possession with *intent to distribute*. *Id.* As described in the PSR, there is nothing in the underlying facts to suggest that Kinsey possessed the crack cocaine with an intent to distribute it, rather than for his personal use. *See United States v. Williams*, 247 F.3d 353, 358 (2d Cir. 2001) ("[W]e hold that, in calculating the quantity of drugs relevant for purposes of sentencing under 21 U.S.C. §841, any fractional quantity of drugs intended for personal use must be excluded."). Moreover, while Kinsey was part of a RICO conspiracy involving multiple acts of drug distribution during this period, there is no indication in the record that Kinsey obtained the crack cocaine involved in the 2015 crack cocaine conviction from his co-conspirators or through his

participation in the conspiracy. *Cf. United States v. Casey*, No. 20-2239, 2021 WL 5617739, at *1 (2d Cir. Dec. 1, 2021) (finding no error in counting quantity of drugs set aside for personal use as relevant conduct in drug distribution conspiracy, where record showed defendant obtained drugs through her participation in that conspiracy). As a result, the record does not permit the conclusion that it is "clear or obvious" that the crack cocaine possession qualified as relevant conduct, and thus, there was no plain error under U.S.S.G. §4A2.1 in counting that offense towards his criminal history.

On the other hand, even if Kinsey is correct that his possession of crack cocaine on October 29, 2014, was relevant conduct to the RICO conspiracy, the commentary to §2E1.1 permits his conviction and sentence for this conduct to count towards his criminal history score. Even assuming, *arguendo*, that the commentary permits only "charged" conduct to be counted towards the defendant's criminal history, that limitation presents no obstacle here. If, as Kinsey insists, his possession of crack cocaine was relevant conduct, it was in furtherance of the drug trafficking conspiracy that was "charged" in the indictment to be "part of a 'pattern of racketeering activity.'" U.S.S.G. §2E1.1 cmt. n.4; KA15. There is no indication in the commentary that only overt acts identified in the indictment qualify as "charged" conduct, and Kinsey cites no case law supporting that view.

At the same time, Kinsey does not carry his burden of showing that it is "clear or obvious" that his possession of crack cocaine on October 29, 2014, was "used in calculating the base offense level for the instant offense," *Minicone*, 960 F.2d at 1111, or that the quantity involved had any impact on his offense level. As noted, the parties stipulated in the plea agreement that Kinsey was accountable for 28 to 112 grams of crack cocaine as part of his participation in the RICO conspiracy – either because Kinsey "was personally involved with that quantity or it was reasonably foreseeable" to him "that the conspiracy involved that quantity." KA:43. The October 29, 2014 offense is not expressly referenced in the plea agreement, let alone in the stipulation, as contributing to the drug quantity for which Kinsey was accountable.

Moreover, even if the quantity of crack cocaine involved in the October 29, 2014 offense contributed to the total amount for which Kinsey was held accountable, he fails to show harm to his substantial rights from this error.[34] Kinsey does

---

[34] Although Kinsey contends that it was "error" to use the October 29, 2014 crack cocaine conviction in calculating his criminal history score, that is what Application Note 4 directs the district court to do. The "error" under Application Note 4, if any, lies in the purported use of the crack cocaine quantity involved in that offense towards the total amount of crack cocaine for which Kinsey was accountable. Kinsey must establish harm to his

not contend that absent the small quantity involved in this offense, the total amount attributable to him would have fallen below 28 grams. Indeed, in pleading guilty to the charged conspiracy, one of Kinsey's co-defendants, Rashawn Wynn, admitted that he sold specific quantities of crack cocaine several times in furtherance of the conspiracy, and the total amount of crack cocaine involved in those sales alone was *more* than 28 grams. GA:40-41. Likewise, the original indictment in this case lists 18 overt acts in furtherance of the RICO conspiracy that involved the possession of crack cocaine with intent to distribute. PSR ¶32 (overt act chart). Some of those overt acts describe sales of crack cocaine on "numerous" or "multiple" occasions by co-defendant members of the 110 Gang. PSR ¶32 (Overt Act 10, 28). These drug transactions all occurred during Kinsey's involvement in the RICO conspiracy, and Kinsey does not argue, let alone carry his burden of showing, that these drug transactions were not foreseeable to him as part of his participation in that conspiracy. *Martinez-Rios*, 143 F.3d at 677. On this record, Kinsey cannot show that his crack cocaine possession offense, or the small quantity of drugs involved, had any impact on his offense level, and thus cannot show any plain "double counting" error that affected his substantial rights.

---

substantial rights from *that* error to be entitled to relief, and the remedy for such an error would not involve decreasing his criminal history score.

Finally, the Court should reject Kinsey's effort to invalidate Application Note 4 to U.S.S.G. §2E1.1, based on his claim that the commentary is inconsistent with U.S.S.G. §4A1.2(a). Here, too, Kinsey did not raise this issue below, and fails to show a "obvious" error by the district court in following the commentary to §2E1.1. Application Note 4 requires that conduct charged as part of the "pattern of racketeering activity" that was the subject of an earlier conviction and sentence should be treated as a "prior sentence" under §4A1.2(a)(1), and not part of the "instant offense," if the defendant was convicted for that conduct before the "last overt act of the instant offense." U.S.S.G. §2E1.1 cmt. n.4. As the Supreme Court held in *Stinson v. United States*, 508 U.S. 36, 38 (1993), "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."[35]

---

[35] The Supreme Court reached this conclusion in light of two authorities. First, under "[a] guideline itself" - namely U.S.S.G. §1B1.7 - "[c]ommentary which functions to 'interpret [a] guideline or explain how it is to be applied' controls," and a failure to follow that commentary "would constitute an incorrect application of the sentencing guidelines." *Stinson*, 508 U.S. at 42 (quoting U.S.S.G. §1B1.7). Second, *Stinson* relied on the Supreme Court's previous holding that a

Kinsey fails to show that the commentary is inconsistent with the guidelines.

As the commentary makes clear, Application Note 4 ensures *consistency* with the rest of the guidelines. As stated in the commentary itself, Application Note 4 is "designed to produce a result consistent with the distinction between the instant offense and criminal history found throughout the guidelines." *Id.* (emphasis added); *see also* U.S.S.G. App. C, amend. 142 (explaining that Application Note 4 was added "to clarify the treatment of certain conduct for which the defendant previously has been sentenced as either part of the instant offense or prior criminal record."). As the Third Circuit explained in *United States v. Marrone*, 48 F.3d 735, 738 (3d Cir. 1995), "the previously convicted RICO offender is in effect a repeat offender who breaks the law once by committing a predicate act and again by engaging in a pattern of racketeering activity." *See also United States v. Robinson*, 354 F. App'x 518, 521 (2d Cir. 2009) (same; quoting *Marrone*). By ensuring that the RICO offender is held responsible for both the predicate offense and for engaging (or conspiring)

---

guidelines policy statement prohibiting a district court from taking a specified action is "authoritative." *Williams v. United States*, 503 U.S. 193, 201 (1992). The Court found that this holding "applie[d] with equal force to the commentary" at issue in *Stinson*. 508 U.S. at 43.

in a pattern of racketeering activity, Application Note 4 is consistent with the purpose of the Chapter Four criminal history provisions of the Guidelines, which aim to reflect that "a defendant with a record of prior criminal behavior is more culpable than the first offender and thus deserving of greater punishment." U.S.S.G. Ch. 4, intro. cmt; *see Marrone*, 48 F.3d at 738. Likewise, Application Note 4 is consistent with the statutory command of 18 U.S.C. §3553(a), which requires, *inter alia*, that sentences accurately reflect the history of the defendant, the seriousness of the crime, and the need for deterrence and incapacitation. On this basis, the Third Circuit in *Marrone* squarely rejected a claim under *Stinson* that Application Note 4 is inconsistent with §4A1.2(a)(1). 48 F.3d at 739. Instead, the court found that "Application Note 4 is a permissible interpretation of the guidelines applicable in the specific context of RICO," and thus binding under *Stinson*. *Id*. at 741. A panel of this Court has likewise concluded that Application Note 4 "is authoritative in this [RICO] context" *United States v. Mizell*, 671 F. App'x 826, 828 (2d Cir. 2016). In light of this case law, and the lack of controlling precedent to the contrary, Kinsey cannot show plain error in the district court following Application Note 4. *See United States v. Napout*, 963 F.3d 163, 183 (2d Cir. 2020) (no plain error where operative legal question is unsettled).

Although Kinsey relies on *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), that decision did not overrule *Stinson*'s holding that guidelines commentary is

authoritative and binding unless unconstitutional, in violation of a statute, or inconsistent with the guideline it interprets. Indeed, the plurality in *Kisor* identified *Stinson* in a footnote collecting "decisions applying *Seminole Rock*[36] deference." 139 S. Ct. at 2411 n.3. The majority later referred back to that footnote when observing that the Court itself had "applied *Auer*[37] or *Seminole Rock* in dozens of cases, and lower courts have done so thousands of times," and that its decision in *Kisor* was not intended to "cast doubt on many settled constructions of rules." *Id.* at 2422. The Court emphasized that it was declining to overrule *Seminole Rock* deference in part to avoid the "instability" that would result from "allow[ing] relitigation" of those numerous decisions. *Id.*

*Kisor* therefore cannot support the principle that Kinsey effectively advocates here, under which a court of appeals must consider anew every one of its prior decisions deferring to the Commission's commentary under *Stinson*. To be sure, *Kisor* provides the governing standards for determining whether a court must defer to an executive agency's interpretation of a regulation, *see* 139 S. Ct. at 2414-18, and *Stinson* reasoned that – by "analogy," albeit "not [a] precise" one – the Commission's commentary interpreting the

---

[36] *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945).

[37] *Auer v. Robbins*, 519 U.S. 452 (1997).

Guidelines should be treated the same way, 508 U.S. at 44; *see id.* at 44-46. But it does not follow that a court of appeals is required to reopen settled law in order to apply those standards to matters previously decided in reliance on *Auer* or *Seminole Rock* – or, in the case of the sentencing guidelines, *Stinson*. Indeed, the Court in *Kisor* adhered to *Auer* and *Seminole Rock* in part to avoid such wasteful "relitigation." 139 S. Ct. at 2422. Accordingly, this Court has continued to rely on *Stinson*'s criteria for determining whether guidelines commentary is binding, even after *Kisor. See United States v. Tabb*, 949 F.3d 81, 87 (2d Cir. 2020); *United States v. Parkins*, 935 F.3d 63, 66 (2d Cir. 2019).

> **4. The district court plainly erred by imposing a third-party risk condition that has been invalidated by this Court.**

The government concedes that the district court committed plain error by imposing the following standard condition of supervised release when sentencing Kinsey:

> If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may

contact the person and confirm that you have notified the person about the risk.

KA:101. An identical condition was invalidated by this Court in *United States v. Boles*, 914 F.3d 95 (2d Cir. 2019), because it gave "the probation office unfettered discretion with respect to the notification requirement." *Id*. at 112. The Court vacated the condition and remanded to the district court to clarify the scope of the condition. *Id*. The Court here, too, should vacate the condition imposed on Kinsey.

In response to *Boles*, other districts in this Circuit have imposed a revised risk condition through standing orders. *See United States v. Trafficante*, 966 F.3d 99, 104 (2d Cir. 2020); *United States v. Jackson*, 813 F. App'x 14, 17 (2d Cir. 2020). This revised condition states:

> If the court determines in consultation with your probation officer that, based on your criminal record, personal history and characteristics, and the nature and circumstances of your offense, you pose a risk of committing further crimes against another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

*Trafficante*, 966 F.32 at 104. Although no standing order has yet been issued by the United States District Court for the NDNY concerning the risk condition, the government is aware that recent judgments in the NDNY have included the revised risk condition quoted above.[38] *See, e.g.*, *United States v. Latulas*, 2d Cir. Case No. 21-1792, Doc. #2 (judgment issued July 15, 2021). The district court in this case can impose the revised risk condition when resentencing Kinsey.[39]

---

[38] The government will notify the Court promptly if the NDNY issues a standing order regarding the risk condition.

[39] In *Trafficante*, this Court refused to consider a vagueness and impermissible-delegation challenge to the revised risk condition. The Court found these claims to be unripe because, under the new condition, the district court had not yet made a finding that notification was necessary. *Trafficante*, 966 F.3d at 105-107.

**POINT VI:** **The District Court Satisfied Its Obligations under Fed. R. Crim. P. 32 by Adopting the Factual Statements and Guidelines Calculations that Dowdell Challenged in the PSR; Committed Plain Error in Treating Aggravated Assault as "Racketeering Activity" under U.S.S.G. §2E1.1; But Did Not Err When It Determined the Scope of Dowdell's Relevant Conduct, Applied the Dangerous Weapon Enhancement under §2D1.1, or Denied Dowdell's Request for a Criminal History Departure.**

## A. Background

### 1. Guilty Plea

Dowdell pleaded guilty pursuant to a plea agreement to the RICO conspiracy charged in the original indictment. DA:18-35, 60. He admitted that he was a member of the 110 Gang from 2012 through October 2018, that the gang was an enterprise engaged in a pattern of racketeering activity, and that he actively participated in that racketeering activity in furtherance of the 110 Gang, including by possessing cloned credit cards on June 27, 2015, and possessing a quantity of crack cocaine on August 12, 2017, with intent to sell that crack cocaine to others. DA:56-60. As

relevant here, Dowdell further admitted that 110 Gang members routinely carry and use firearms to protect their territory, their drug trade, and to retaliate against rival gangs. DA:32, 59. Specifically, Dowdell admitted that if "non-110 Gang members attempt to sell drugs in 110 territory, either on their own or in connection with a rival gang, 110 Gang members or their associates likely will confront or attack them." DA:31, 58.

The plea agreement contained sentencing stipulations, including the following: "[t]he parties agree that the defendant [Dowdell] is personally accountable for at least 28 grams but less than 112 grams of crack cocaine, in that the defendant was personally involved with that quantity or it was reasonably foreseeable to the defendant that the conspiracy involved that quantity." DA:33. The plea agreement further noted that the government intended to argue at sentencing that Dowdell was responsible for his participation in the August 9, 2014 retaliatory shooting, and that his conduct should be treated as a separate pseudo-count for purposes of determining his offense level. DA:33. The government contended that this pseudo-count would be scored under U.S.S.G. §2A2.2(a) – the guideline covering aggravated assault – and argued for the application of specific offense characteristics under that guideline. DA:33. The plea agreement further noted, however, that Dowdell disputed his responsibility for the conduct underlying the retaliatory shooting, and reserved his right to argue at sentencing "against the

applicability of the Guideline enhancements" related to that pseudo-count. DA:33-34. In the plea agreement, Dowdell waived his right to appeal or collaterally attack any sentence of imprisonment of 96 months or less. DA:35.

## 2. PSR

The Probation Office calculated Dowdell's sentence under U.S.S.G. §2E1.1, and found him accountable for two pseudo-counts: aggravated assault, which the PSR scored under §2A2.2; and conspiracy to possess with intent to distribute and to distribute crack cocaine, which it scored under §2D1.1. PSR ¶¶51-62.[40] As a result of the multi-count adjustment under §3D1.4, the inclusion of the aggravated assault pseudo-count increased Dowdell's total offense level by 2. PSR ¶¶63-65.

In determining Dowdell's offense level under §2D1.1, the Probation Office held him accountable for the stipulated quantity of crack cocaine (28 to 112 grams) and added two offense levels under §2D1.1(b)(1) because a dangerous weapon was possessed. The PSR explained that, as Dowdell admitted, 110 Gang members "routinely possessed and used firearms in furtherance of their criminal activities including the distribution of crack cocaine within their territory." PSR ¶57. The Probation Office further determined that "Dowdell

_____

[40] References in this section are to Dowdell's PSR.

was reasonably aware of the firearms that were carried or used in furtherance of the gang's drug trafficking activities and other acts of intimidation and violence." PSR ¶57. The Probation Office determined that Dowdell's total offense level, after a three-level reduction for early acceptance of responsibility, was 25. PSR ¶¶64-70.

The Probation Office found that Dowdell's criminal history score was 16, resulting in a criminal history category of VI. His score included three points for a felony conviction for criminal possession of a weapon in Onondaga County Court, arising from a drive-by shooting on June 19, 2008. PSR ¶73. Dowdell was found in the back seat of the car involved in the drive-by shooting, in close proximity to a gun and spent shell casings. His fingerprints were found on the gun. PSR ¶73.

Dowdell's criminal history score also included the following state convictions: (1) a May 28, 2014 misdemeanor conviction for criminal possession of a controlled substance in the 7th degree, involving a small amount of marijuana and crack cocaine (2 points), PSR ¶77; (2) an October 23, 2014 misdemeanor conviction for criminal possession of a controlled substance in the 7th degree, involving 1.1 grams of crack cocaine (2 points), PSR ¶78; and (3) a May 31, 2018 felony conviction for criminal possession of a controlled substance in the 5th degree, involving 2.3 grams of crack cocaine (2 points). PSR ¶80. As noted in the PSR, the latter felony conviction was included in the original

indictment as an overt act. PSR ¶80. The indictment alleged that Dowdell possessed the crack cocaine involved in this conviction "with the intent to distribute it." DA:25 (Indictment, ¶39).

With a total offense level of 25 and a criminal history category of VI, Dowdell's guidelines imprisonment range was 110 to 137 months. PSR ¶105.

In response to the PSR, Dowdell argued that he was not accountable for the August 9, 2014 retaliatory shooting as a factual matter, but did not contest that aggravated assault qualified as a "racketeering activity" under §2E1.1. PSR Addendum, pgs. 38-39. In response, the government recounted the trial evidence supporting the determination that Dowdell was accountable for the retaliatory shooting. *Id*. at 39. The Probation Office concluded that there was a sufficient evidentiary basis to hold Dowdell accountable, and noted that that district court "will need to rule on this issue." *Id*. at 40.

Dowdell also disputed the applicability of the two-level increase under §2D1.1(b)(1) for possession of a dangerous weapon, contending that the weapon must be "present," and the "reasonable foreseeability" standard did not apply. *Id*. at 40. The government responded to this objection by citing contrary case law and Dowdell's admissions concerning the use of firearms by 110 Gang members. *Id*. at 40-41. The Probation Office again

concluded that the enhancement was applicable, and noted that the court would have to rule on the issue. *Id.* at 41-42.

Dowdell also contended that his three prior crack cocaine convictions described above should not be counted towards his criminal history because they were part of the instant offense, insofar as they "are underlying acts of the conduct scored" in the drug trafficking pseudo-count. *Id.* at 42. The government responded that the criminal history score was correct under Application Note 4 to §2E1.1, but did not specifically address Dowdell's apparent double-counting claim, *i.e.*, that the quantities of crack cocaine involved in Dowdell's prior crack cocaine offenses contributed to the total 28 to 112 gram amount attributed to him under §2D1.1, in determining his offense level for the drug trafficking pseudo-count. *Id.* The Probation Office concluded that Dowdell's criminal history score was accurate and comported with Application Note 4 of §2E1.1. *Id.*

### 3. Sentencing Submissions

In his sentencing submission, Dowdell repeated his objections to the guidelines calculations in the PSR. DA:66-72. Concerning his accountability for the retaliatory shooting, Dowdell requested a hearing for the district court to determine the "credibility" of the trial testimony connecting him to that shooting, and the weight to be given to that testimony. DA:69.

With respect to his criminal history, Dowdell requested a departure to criminal history category V under Application Note 4 to §2E1.1, because the drug quantities involved in his three prior crack cocaine convictions had contributed to the total amount of crack for which he was being held accountable under §2D1.1. DA:71-72. Dowdell did not contend, however, that removing those drug quantities would have lowered the total amount for which he was accountable below 28 grams, and thus changed his offense level. DA:71-72. Dowdell requested a below-guidelines sentence. DA:66.

The government argued that the guideline calculations in the PSR were correct and requested a sentence within the resulting guidelines range. DA:74-81.

### 4. Sentencing

At the outset of Dowdell's sentencing on October 2, 2020, the district court explained that it had reviewed the PSR, the plea agreement, the parties' submissions, and the sentencing factors under 18 U.S.C. §3553(a). DA:83. The court noted that defense counsel had made a number of objections to the PSR and noted further that the court "had [defense counsel's] arguments," as well as the government's arguments in reply. DA:83. Defense counsel declined the opportunity to be heard further on those issues and relied on his submissions. DA:83. In response, the government

also relied on its submissions, but emphasized that testimony at Hopper's trial refuted Dowdell's factual challenges to the application of the guidelines. DA:84. The district court noted that the legal challenges to the guidelines calculation had been "argued, discussed, and briefed numerous times," and the court was prepared to rule on the factual and legal issues, DA:84. The court then stated: "I do adopt the factual information and guideline applications as they are contained in [the PSR]." DA:84. Accordingly, the court found that Dowdell's total offense level was 25, his criminal history category was VI, and the guidelines imprisonment range was 110 to 137 months. DA:84. Defense counsel did not object to the district court's adoption of the factual statements and guidelines calculations in the PSR on the procedural ground that the court failed to address his objections to the PSR or rule on the matters he disputed. Nor did defense counsel object to the district court ruling on factual issues without an evidentiary hearing. DA:84.

Defense counsel addressed the court, and noted initially that he had requested a downward departure in Dowdell's criminal history based on Application Note 4. Defense counsel argued that a sentence of 70 to 87 months (the range resulting if his challenges to the offense level calculations and departure request were granted) was appropriate in light of the §3553(a) factors. DA:85-87. After hearing from Dowdell and the government, A:87-89, the district court sentenced Dowdell principally

to a 120-month term of imprisonment, to be followed by a three-year term of supervised release.

## B. Discussion

### 1. The district court satisfied its obligations under Fed. R. Crim. P. 32(i)(3)(B).

The district court satisfied its obligations under Fed. R. Crim. P. 32(i)(3)(B) to rule on disputed issues in the PSR. As this Court has explained, a district court "satisfies its obligation to make the requisite specific factual findings when it explicitly adopts the factual findings set forth in the [PSR] ... at the sentencing hearing or in the written judgment it files later." *United States v. Requena*, 980 F.3d 30, 52 (2d Cir. 2020). Where, as here, a defendant fails to object to a district court's alleged failure to comply with the provisions of Rule 32(i)(3)(B), review of the claim on appeal is for plain error only. *United States v. Wagner-Dano*, 679 F.3d 83, 88 (2d Cir. 2012). This is so, notwithstanding that the defendant objected to factual information contained in the PSR in a sentencing memorandum and mentioned the objection at the time of sentencing. *Id.* at 90. Defense counsel never alerted the district court to its supposed failure to resolve Dowdell's claims, and thus did not preserve his claim of noncompliance with Rule 32(i)(3)(B).

Dowdell fails to establish plain error. By adopting the factual statements and guidelines calculations in the PSR, the district court necessarily rejected Dowdell's claims that (1) there was an insufficient basis in the record to hold him accountable for the August 9, 2014 retaliatory shooting; and (2) the two-level increase for possession of weapon under U.S.S.G. §2D1.1(b)(1) was wrongly applied. Moreover, the court's adoption of the criminal history category determined in the PSR, A:84, necessarily rejected Dowdell's request for a criminal history departure, and the district court was not required to provide reasons for rejecting that request. *See United States v. Scott*, 387 F.3d 139, 143 (2d Cir. 2004) (noting that district court "is not obliged to give reasons for refusing to depart" and affirming sentence where counsel had moved for departure at sentencing, government responded, then court sentenced defendant without explicitly addressing the motion). Dowdell does not suggest that the district court overlooked the claims he raised on appeal. Indeed, he acknowledges (Dowdell Br. at 9) that the district court was aware of these disputed issues, noted that it had received and reviewed briefing on the factual and legal issues, and concluded that it was "prepared to rule" on those issues. A:84. Defense counsel's failure to object to the district court's supposed noncompliance with Rule 32(i)(3)(B) suggests that counsel understood the district court to have ruled on the contested issues. Under these circumstances, Dowdell

cannot show a clear or obvious error, or harm to his substantial rights.

## 2. The district court committed plain error in calculating Dowdell's offense level under §2E1.1.

For the reasons described above, *see supra* Point V.C.2, the government concedes that, as in Kinsey's case, the district court committed plain error by treating the August 9, 2014 retaliatory shooting as a pseudo-count under §2E1.1 because it categorized that conduct as aggravated assault, which does not qualify as "racketeering activity" under that guideline.[41] The erroneous inclusion of

---

[41] Although Dowdell did not raise this claim on appeal, the Court nevertheless should consider it in his case, given that the issue is raised by his co-appellant Kinsey in this consolidated appeal, the issue is fully briefed, and the claim concerns a question of guidelines application that is not dependent on the specific facts of Dowdell's case. *See United States v. Babwah*, 972 F.2d 30, 35 (2d Cir. 1992) (noting that a Court of Appeals has discretion to overlook failure to present issue on appeal), *citing, e.g.*, *United States v. Gray*, 626 F.2d 494, 497 (5th Cir. 1980) (considering issue raised by one appellant, where same error affected other appellants who failed to adopt claim); *see generally* 16AA Wright & Miller, *Federal Practice and Procedure Juris.* § 3974.5 (5th ed.) (noting that where "the other appellant has fully argued the

this pseudo-count had the effect of raising Dowdell's offense level by two under §3D1.4. PSR ¶65. A remand is necessary to permit the district court to consider the effect of the conceded guideline error on Dowdell's sentence.

### 3. The district court can consider the retaliatory shooting as relevant conduct in resentencing Dowdell.

In determining the appropriate sentence on remand, the district court nevertheless may consider Dowdell's role in the August 9, 2014 retaliatory shooting as relevant conduct. Contrary to Dowdell's claim on appeal, the evidence in the record established his accountability for this shooting by a preponderance of the evidence.

As summarized in the PSR, the testimony at Hopper's trial showed that the retaliatory shooting was reasonably foreseeable to Dowdell and, in fact, he urged the shooting to take place. PSR ¶42. According to trial testimony of a cooperating witness, I.J., Dowdell (known as "Cannon") was

_____

issue in its principal brief, and the appellee has responded to that argument in its brief, and the issue applies equally to both appellants, the court may be willing to overlook the appellant's failure to state in its opening brief its intent to adopt the argument").

present at the August 8th meeting at which 110 Gang members planned to retaliate against a rival gang for a shooting in 110 Gang territory. PSR ¶42; Tr.892-93. As discussed above, that plan came to fruition the next day, when Hopper and R.C. shot and injured two rival gang members. At trial, both R.C. and I.J. testified that Dowdell was on the phone with R.C. and Hopper at the time of the shooting. Tr. 539, 895-96. According to R.C., Dowdell told R.C. immediately before the shooting "let me hear something," which R.C. understood to mean that Dowdell wanted to "hear shots fired." Tr. at 539. This evidence provides a sufficient basis to hold Dowdell accountable for the shooting. Moreover, Dowdell admitted that members of the 110 Gang routinely engaged in acts of violence and carried firearms to retaliate against rival gang members and protect gang territory. A:57, 59. This admission is also sufficient to render the August 9th shooting foreseeable to him as conduct in furtherance of the conspiracy, and thus part of Dowdell's relevant conduct under U.S.S.G. §1B1.3(a)(1)(B). At the very least, Dowdell does not carry his burden to show that the conduct was not foreseeable to him as part of his admitted participation in the RICO conspiracy. *Martinez-Rios*, 143 F.3d at 677.

Moreover, contrary to Dowdell's claim, the district court was not required to hold an evidentiary hearing to determine the "credibility" or "weight" to afford the trial testimony concerning the retaliatory shooting and Dowdell's role in that

shooting. "A criminal defendant has no right to demand an evidentiary hearing to present his own witnesses at sentencing." *United States v. Morrison*, 153 F.3d 34, 54 (2d Cir. 1998). Here, the district court heard the trial testimony of the witnesses that was recounted in the PSR. *See* PSR ¶42; PSR Addendum, at 38. The district court also considered Dowdell's arguments about the supposed inconsistencies in that testimony. DA:69-70. The district court was therefore in a position to credit the testimony that placed Dowdell at the planning meeting on August 8th, and that established that he encouraged the shooting as it occurred on August 9th. This Court should make clear that, on remand, the district court is not required to reopen those factual issues in order to consider Dowdell accountable for the August 9th shooting as relevant conduct.

### 4. The district court did not clearly err in applying the dangerous weapon enhancement under U.S.S.G. §2D1.1(b)(1).

Dowdell fails to establish error in the district court's application of a two-level sentencing enhancement, pursuant to U.S.S.G. §2D1.1(b)(1), for possessing a dangerous weapon in connection with a narcotics offense, when determining the offense level under §2E1.1. PSR ¶57. Because the underlying racketeering activity was identified as a drug trafficking conspiracy in violation of 21 U.S.C. §846, the relevant inquiry is whether

Dowdell could reasonably foresee co-conspirators possessing a dangerous weapon in furtherance of the conspiracy. *See United States v. Soto*, 959 F.2d 1181, 1186 (2d Cir. 1992). Dowdell's admissions establish the applicability of the enhancement. He admitted that "110 Gang members routinely arm themselves with firearms in order to protect their territory, *to protect their drug trade*, to project a violent attitude to rival gang members, and to retaliate against any rival gangs who committed acts of violence against fellow gang members." DA:59 (emphasis added). Dowdell further admitted that many of the firearms used by 110 Gang members were "community guns" that circulated among the members. DA:59; *see also* PSR ¶16. Dowdell also admitted that if non-110 Gang members attempted to sell drugs within 110 Gang territory, they were likely to be confronted and attacked by 110 Gang members. A:58. Moreover, as discussed above, the record showed that Dowdell was involved in at least one retaliatory shooting of rival gang members. PSR ¶20. Dowdell's admissions and factual information in the PSR establish that the possession of firearms by Dowdell's co-conspirators was in furtherance of the drug trafficking conspiracy, and that such possession was, at the very least, reasonably foreseeable to him.[42]

---

[42] The indictment lists numerous overt acts involving the possession and use of firearms and other dangerous weapons by 110 Gang members during the course of the RICO conspiracy, and

Dowdell's challenge to the application of the enhancement is based on a misinterpretation of the relevant case law and commentary. While the defendant's possession of a firearm or the presence of a weapon with narcotics is sufficient to support application of the enhancement, possession or presence is a not a necessary condition for the enhancement to apply. The commentary to §2D1.1(b)(1) states only that "the enhancement should be applied if the weapon was present," but does not state that a defendant's possession or the firearm's proximity to drugs is a requirement. U.S.S.G. §2D1.1 cmt. n.11. Accordingly, this Court has explained that "although a physical nexus between the defendant and the firearm is often useful in determining possession, such a nexus is by no means required in order for a court to impose the enhancement." *United States v. Batista*, 684 F.3d 333, 343 (2d Cir. 2012); *see also United States v. Stevens*, 985 F.2d 1175, 1188 (2d Cir. 1993) (noting that "[t]he defendant need not have had personal possession, or even actual knowledge of the weapon's presence"). The enhancement requires only that the defendant could reasonably foresee the possession of firearms by co-conspirators in furtherance of the conspiracy. *See, e.g.*, *Batista*, 684 F.3d at 343 (defendant knew general "size and shape" of drug ring, and "could

---

many of those incidents were recounted in the PSR. *See* PSR ¶¶18-29, 32 (listing Overt Acts 1, 2, 7-8, 11, 16, 18, 19, 21, 23, 24, 25, 27, 31).

easily have foreseen that someone would possess a firearm in relation to the illegal activities of the ring"); *United States v. Sanchez*, 419 F. App'x 27, 32 (2d Cir. 2011) (upholding application of enhancement where defendant could foresee that co-conspirator, "who provided 'muscle' for the conspiracy" would possess a firearm during the conspiracy). Given Dowdell's admissions, there was no clear error in the application of the enhancement.

**5. The district court did not abuse its discretion by denying Dowdell's motion for a criminal history departure.**

Dowdell appears to contend that the district court abused its discretion by failing to grant his motion for a criminal history departure, based on Application Note 4 of §2E1.1. Dowdell Br. at 19. This claim should be rejected. A district court's decision not to depart downward from the guidelines is "within the court's broad discretion and rarely reviewed on appeal," absent a showing by defendant that the district court violated the law, misapplied the guidelines, or misapprehended the scope of its departure authority. *United States v. Young*, 811 F.3d 592, 599 (2d Cir. 2016). Although Dowdell suggests that that the district court misapplied Application Note 4, and was required to depart downward in his criminal history category to avoid "double counting," he fails to establish error.

Dowdell misreads Application Note 4. Where a conviction that forms part of the "pattern of racketeering activity" occurs prior to the last overt act of a RICO conspiracy, Application Note 4 requires district courts to treat these convictions as a "prior sentence" under U.S.S.G. §4A1.2(a)(1), and "not as part of the instant offense." U.S.S.G. §2E1.1 cmt. n.4. In other words, a district court is required to treat qualifying prior convictions as part of a defendant's criminal history and score those convictions appropriately – which is what the district court did here. Application Note 4 further authorizes (but does not require) a departure *if* counting qualifying prior convictions "produces an anomalous result." *Id*. The commentary does not explain what constitutes an "anomalous result," and thus leaves that determination to the district court's discretion.

Dowdell does not show any "anomalous result" here. He fails to establish that counting his three crack cocaine convictions (identified at PSR ¶¶77, 78, and 80) towards his criminal history score resulted in "double counting." Two of these convictions involved non-distribution offenses – misdemeanor possession of small amounts of crack cocaine by Dowdell, that were not charged as overt acts in the conspiracy. PSR ¶¶77-78. As discussed above, *see supra* Pt.V.C.3, it is not obvious from the record that this type of offense qualifies as relevant conduct. But even assuming that *all* these prior convictions were in furtherance of the RICO

conspiracy, the total amount of crack cocaine involved in these offenses was small. *See* PSR ¶¶77 (no quantity specified), 78 (1.1 grams), 80 (2.3 grams). Nothing in the record shows that these amounts contributed to the stipulated quantity of crack cocaine, 28 to 112 grams, for which Dowdell was accountable. DA:33. More importantly, Dowdell does not contend, much less establish, that removing these quantities would have lowered the total amount for which he was accountable below 28 grams and therefore changed his offense level. *See* U.S.S.G. §2D1.1(c)(8) (drug quantity table). As noted previously, one of Dowdell's co-conspirators in this case pleaded guilty to distributing more than 28 grams by himself, as part of his involvement in the 110 Gang, GA:40-41, and such drug dealing was a foreseeable part of the 110 Gang enterprise, as Dowdell admitted, DA:31, 33. This establishes that the exclusion of the small quantity of crack cocaine involved in Dowdell's prior convictions would not have altered his offense level, and therefore the inclusion of these amounts did not result in "double counting" or create an "anomalous result." The district court did not abuse its discretion by denying Dowdell's departure request.

**POINT VII:** **Although Smith's Sentences for His RICO Offense and Violation of Supervised Release Should be Vacated and Remanded in Light of Plain Errors in the Calculation of his Guidelines Range and Imposition of the Risk Condition Invalidated in *Boles*, This Court Should Make Clear That the District Court Did Not Abuse Its Discretion by Imposing a Consecutive Sentence.**

## A. Background

### 1. Smith's Plea to the Present RICO Conspiracy

Smith pleaded guilty, pursuant to a plea agreement, to the RICO conspiracy charged in the original indictment in this case. SA:222-42, 259; PSR ¶1.[43] Smith admitted his membership in the 110 Gang enterprise from at least 2012 through October 2018, and his knowledge of, and agreement to, its activities, including drug trafficking and acts of violence against rival gangs. SA:255-259. Smith also admitted that he actively participated in a pattern of racketeering activity in furtherance of the 110 Gang, including

---

[43] References in this section are to Smith's 2020 PSR, unless otherwise specified.

distribution of crack cocaine supplied by other 110 Gang members from at least January 2017 until May 2017. SA:258. Smith further admitted that on December 10, 2017, he was with other 110 Gang members at a Syracuse restaurant, got into a fight with another patron at the restaurant, and stabbed him. SA:258.

The plea agreement contained sentencing stipulations between the parties, including that Smith was personally accountable for at least 28 grams but less than 128 grams of crack cocaine base, through his participation in the charged RICO conspiracy. The parties further stipulated that Smith's offense level for the December 10, 2017 assault was 23 under the aggravated assault guideline, U.S.S.G. §2A2.2(b)(3)(B). SA:227. The government also stated its intent to argue that Smith was responsible for a separate attempted stabbing of a rival gang member on July 4, 2017, at a Syracuse shopping mall, that this conduct should be treated as a pseudo-count under §2E1.1, and would result in an offense level of 17, under §2A2.2. SA:227-28. Smith reserved his right to dispute his responsibility for the July 4, 2017 attempted assault. SA:228. The plea agreement also contained a waiver of Smith's right to appeal or collaterally attack, *inter alia*, any sentence to a term of imprisonment of 78 months or less. SA:229.

### 2. Smith's Prior RICO Conviction and Sentence

This was Smith's second conviction for RICO conspiracy involving the 110 Gang. On July 21, 2010, Smith pleaded guilty in the NDNY, before the same district court judge, to an indictment charging him and 11 others with conspiracy to violate 18 U.S.C. §1962(c) through a pattern of racketeering activity consisting of multiple acts of murder, robbery, and drug trafficking involving, *inter alia*, distribution of crack cocaine. SA:99-113, 139. Smith pleaded guilty pursuant to a plea agreement, SA:114-26, and admitted to agreeing to participate in a pattern of racketeering activity that included crack cocaine trafficking and various acts of violence. SA:117. He further admitted two overt acts: the armed theft of a vehicle from a rival gang member and engaging in a shoot-out with rival gang members in the parking lot of a Syracuse convenience store. SA:109-110, 118. Smith also admitted that his relevant conduct involved the distribution of between 50 to 150 grams of crack cocaine. SA:118, 120.

At his sentencing on March 3, 2011, Smith expressed remorse for his conduct and for the actions of the 110 Gang, which Smith "denounce[ed] … as being a destructive force" in his community. SA:148. Smith renounced his membership in the 110 Gang "under oath," described himself as an "ex-gang member," and assured the court that he would become "a

productive and positive member" of his community." SA:148-49. He explained that the indictment "opened [his] eyes to the destruction that was being caused and it also brought about a different outlook on gang life by me." SA:149. Although the PSR calculated his total offense level as 27, and his criminal history category as V, yielding a guidelines range of 120 to 150 months' imprisonment, *see* 2011 PSR ¶103, the district court granted Smith's request for a two-level departure, found his total offense level to be 25 and his guidelines range to be 110 to 125 months, SA:155. The district court sentenced Smith principally to a term of imprisonment 100 months and a five-year term of supervised release. SA:156. The court explained that it had selected a term of imprisonment at the low end of the guidelines range in light of Smith's expressions of remorse and intent to turn his life around. SA:155. Smith emphasized again that he "really changed [his] life," and promised he would not be part of the gang "anymore …. I'm done with it all." SA:156.

### 3. Smith's Conduct on Supervised Release and His State Assault Conviction

On May 18, 2015, the district court reduced Smith's sentence to time served as of November 1, 2015, based on retroactive guideline amendments that lowered the applicable guidelines range. SA:167. Smith began his five-year term of supervised release on October 30, 2015. A:168.

Less than three months later, on January 13, 2016, Smith was arrested for tampering with physical evidence and criminal possession of a controlled substance, arising from his attempt to sell drugs in Oswego, NY. A:169. On February 22, 2017, the Probation Office was advised by local police that witnesses placed Smith in the backseat of a vehicle during a drive-by shooting and homicide, although he was not the actual shooter. SA:169. Although Smith denied being in the car at the time of the shooting, on April 21, 2017, the district court granted the Probation Office's petition to modify the conditions of his supervision to impose a 90-day curfew. The Probation Office warned Smith against associating with members of the 110 Gang. SA:169-70, 182, 185. As Smith later admitted, during this same period, from January 2017 to May 2017, he was supplied with crack cocaine by other 110 Gang members and distributed it in 110 Gang territory. SA:258.

In addition to selling drugs for the 110 Gang, Smith also engaged in acts of retaliatory violence. As detailed in Smith's 2020 PSR, witnesses and video surveillance footage established that, on July 4, 2017, Smith attempted to stab a rival gang member at a Syracuse mall. PSR ¶27. Smith was with other 110 gang members at the time. PSR ¶27. Witnesses reported that Smith and his associates approached the rival gang member, Rodney Hill, and brandished a knife. A fight ensued, during which one of the rival gang members stabbed Smith in the back several times

after Smith fell while chasing Hill with a knife. PSR ¶27. Notably, on July 4, 2001, Hill had shot and killed a well-known 110 Gang member, Darrone Scott, and 110 Gang members have commemorated Scott's death by hosting parties every July 4th since, and producing rap songs that praise Scott, and promise revenge for his killing. PSR ¶¶27, 35, 37.

On December 10, 2017, Smith was with other 110 Gang members at a Syracuse pizza restaurant in the early hours of the morning and became involved in a fight with other patrons. PSR ¶29. Smith stabbed three people during the fight. One of the victims sustained a stab wound in his buttocks and abdominal area; the second victim sustained a single stab wound to the back of his neck; and the third victim was stabbed in the side of his neck. One of these victims required surgery and was listed in critical but stable condition. PSR ¶29.

On December 18, 2017, Smith was charged in state court with criminal possession of a weapon and assault for the December 10th stabbings. PSR ¶29. Smith later was indicted in Onondaga County Court for assault in the second degree, and accused of repeatedly stabbing one of the victims with a knife. SA:188.

On December 19, 2017, the Probation Office filed a petition to revoke Smith's supervised release from his prior RICO conviction, based on

the stabbings. SA:186. The petition specified that this was a Grade A violation of supervised release. SA:186. The revocation petition was later amended on December 1, 2020, to include a second alleged violation, arising from Smith's earlier arrest on January 13, 2016, on charges related to drug dealing. A:512.

After Smith was indicted on the RICO conspiracy charge in the present case in October 2017, he was found guilty in June 2019 of second-degree assault in state court, following a jury trial. SA:307. As noted, Smith pleaded guilty on August 15, 2019, to the present RICO conspiracy. On February 6, 2020, while awaiting sentencing in this case, Smith was sentenced in state court for the assault conviction. The state court imposed the maximum sentence of a seven-year determinate term of imprisonment, to be followed by five years of post-release supervision. SA:330.

### 4. Federal Sentencing Proceedings

In Smith's PSR, the Probation Office calculated his offense level under U.S.S.G. §2E1.1 by creating two pseudo-counts – one for drug trafficking conspiracy, and the other for attempted aggravated assault.[44] PSR ¶¶52-64. The effect of

---

[44] Pursuant to Application Note 4 of §2E1.1, the Probation Office did not include the December 10, 2017 stabbing as the basis for a third pseudo-count, given that Smith's conviction and sentence

including the attempted aggravated assault pseudo-count was to increase Smith's offense level by 1, as a result of the multi-count adjustment under §3D1.4. PSR ¶¶65-67. After a three-level reduction for early acceptance of responsibility, Smith's total offense level was 22. PSR ¶72.

The PSR detailed Smith's troubled childhood, including the murder of his older brother by members of a different gang in Syracuse when Smith was 12, PSR ¶102, and his parents' struggles with drug addition, PSR ¶103. The PSR also recounted Smith's criminal history, which started when he was fifteen years old (Smith was 35 at the time of sentencing), and included a state conviction for second-degree rape involving a 12-year-old victim when Smith was 18, PSR ¶79; his prior RICO conviction arising from his past involvement with the 110 Gang, PSR ¶83; and his second-degree assault conviction in state court, PSR ¶85. Because Smith committed the present offense while on supervised release for the prior RICO offense, the Probation Office added two criminal history points pursuant to U.S.S.G. §4A1.1(d). These additional points, however, did not change Smith's criminal history category, which was IV. PSR ¶88. With a total offense level of 22, Smith's guidelines imprisonment range was 63 to 78 months. PSR ¶126. Smith faced a

---

for that offense was counted towards his criminal history score. PSR ¶44.

maximum sentence of 20 years under 18 U.S.C. §1963(a). PSR ¶125.

In Smith's sentencing submission, defense counsel did *not* contend that attempted aggravated assault could not be the basis for a pseudo-count under §2E1.1, but argued against the application of the multi-count adjustment under §3D1.4 on a different ground. SA:481-82. Defense counsel also sought a departure pursuant to §5G1.3, based on his contention that Smith had spent 10 months in a local jail on a federal detainer (after posting bail on his state assault charge), but did not receive credit towards his state sentence for that time. SA:484. Smith also requested that his federal sentence run concurrently with his state sentence pursuant to U.S.S.G. §5G1.3(b), because the state assault conviction involved "relevant conduct" for his federal offense. SA:484. In further support of a concurrent sentence, defense counsel noted that all of Smith's co-defendants who had been sentenced thus far and who had related state convictions, had received concurrent sentences. SA:491. Defense counsel requested a below-guidelines sentence. SA:491.

The government agreed with the guidelines calculations in the PSR, and argued for a within-guidelines sentence. The government disagreed that §5G1.3(b) required Smith's sentence on the RICO offense to run concurrently with this state assault sentence. The government noted that, by operation of Application Note 4 to §2E1.1, the state

assault did not count towards Smith's offense level, and thus his RICO term of imprisonment had not "resulted" from the assault conduct under §5G1.3(b). SA:496-97. Instead, the government urged the court exercise its discretion to run Smith's federal term of imprisonment for the RICO offense consecutively to the seven-year term for his state assault conviction. SA:500. The government also requested a sentence at the top of the applicable guideline range for the RICO offense, to reflect the seriousness of Smith's conduct and his status as a twice-convicted RICO conspirator. SA:499-500. Finally, the government asked the court to run any sentence for Smith's yet-to-be-determined violations of supervised release consecutively to his sentence for the present RICO conspiracy. SA:497, 500.

Smith was sentenced on December 3, 2020. As relevant here, the district court adopted the guidelines calculations and factual information in the PSR. SSA:5, 7-8. The district court rejected defense counsel's argument that Smith was the victim, not the aggressor, in the July 4, 2017, attempted assault incident in the Syracuse mall, and agreed that Smith's conduct qualified as a pseudo-count under §2E1.1. SSA:7. Defense counsel again urged the court not to run Smith's federal sentence consecutively to his state sentence for the December 10, 2017 assault. SSA:10. Smith addressed the court and expressed remorse for his participation in the 110 Gang, but explained that he had a difficult time adjusting to a lifestyle away

from the gang. SSA:11-12. The government, in turn, emphasized that Smith had expressed remorse when he was sentenced in 2011 on his original RICO offense, but noted that he quickly returned to criminal activity and involvement in the 110 Gang after being released from that sentence. SSA:12-13. The government reiterated its view that the guidelines did not require Smith's sentence to run concurrently because the conduct underlying Smith's conviction for the December 10, 2017, assault was not counted towards Smith's offense level for his RICO offense. SSA:13. The government argued that imposing consecutive sentences for the RICO offense and supervised release violation was warranted, to provide for appropriate incremental punishment for separate offenses. SSA:14-15.

The district court pronounced sentence, first stating that Smith's recidivism was a "great disappointment" to the court, especially after Smith's impassioned speech at his 2011 sentencing. SSA:15. The district court imposed a term of 78 months' imprisonment, at the top of the calculated guidelines range. SSA:16. The court did not specify whether it intended the sentence to run consecutively or concurrently with Smith's state court sentence for the December 10, 2017, assault. SSA:16.

The court next turned to the alleged violations of supervised release. Smith admitted the violation arising from the December 10, 2017 assault, and

the court found that the recommended range under the guidelines policy statement in Chapter 7 was 37 to 46 months. SSA:17, 19-20. The district court imposed a sentence of 13 months' imprisonment, to be served consecutively to the term of imprisonment imposed for the RICO offense. SSA:21. Defense counsel did not seek further explanation or otherwise object to the district court's sentencing explanation. SSA:21.

## B. Discussion

### 1. The district court committed plain error in calculating Smith's offense level and imposing an invalid condition of supervised release.

For the reasons described above, *see supra* Pt.V.C.2, the government concedes that district court plainly erred when it used attempted aggravated assault as a pseudo-count to calculate Smith's offense level under U.S.S.G. §2E1.1. This error added one level to Smith's total offense level. PSR ¶67; SSA:8. Given that the court imposed a sentence at the top of the erroneous guidelines range, SSA:16, the error harmed Smith's substantial rights and satisfies the plain error standard. *Rosales-Mireles*, 138 S. Ct. at 1908. Although Smith's appeal waiver in his plea agreement would otherwise preclude a challenge to the district court's guidelines calculations, the government elects, under the circumstances of this case, not to enforce the appeal waiver as to the

court's error in treating attempted aggravated assault as a pseudo-count under §2E1.1.[45] The issue is squarely before the Court in this consolidated appeal, and the guidelines error is plain.

The Court should remand this matter for resentencing to permit the district court to consider the effect of the guidelines error on Smith's sentence. In addition, at resentencing, the district court will be able to issue a new judgment that includes the revised "risk" condition – correcting the plain error under *Boles*, 914 F.3d at 112, that Smith raises on appeal.

> **2. The district court also committed plain error in the calculation of the recommended imprisonment range for Smith's violation of supervised release.**

The government also concedes that Smith's sentence for his revocation of supervised release must be vacated and remanded for further consideration because the recommended sentencing range for his violation of supervised release was calculated incorrectly, and this qualifies as "plain error." As Smith observes, he was sentenced for the underlying offense – the 2009 RICO conspiracy charge – on March 3, 2011,

---

[45] The government reserves its right to enforce the appeal waiver in other respects.

which is *after* the effective date of the Fair Sentencing Act of 2010, Pub. L. 111-220 (effective Aug. 3, 2010). One effect of the Fair Sentencing Act was to lower the maximum sentence applicable to Smith's underlying racketeering activity – namely, his drug trafficking conspiracy which involved between 50 to 150 grams of crack cocaine – from life imprisonment to 40 years.[46] *See* 21 U.S.C. §841(b)(1)(B)(iii) (2011) (setting statutory maximum of 40 years for offense involving between 28 and 280 grams of crack cocaine). Under 18 U.S.C. §1963(a), a RICO violation carries a 20-year maximum sentence *unless* that violation is based on racketeering activity for which the maximum penalty includes life imprisonment. Accordingly, Smith's RICO offense was a Class C felony under 18 U.S.C. §3559(a)(1), and not, as his 2011 PSR incorrectly states, a Class A felony. 2011 PSR ¶102; *see also United States v. Campbell*, No. 20-4112, 2021 WL 6140303, at *1 (2d Cir. Dec. 29, 2021) (finding that Fair Sentencing Act changed classification of underlying felony).

The district court appears to have wrongly assumed that Smith's 2009 RICO charge was a

---

[46] The other underlying racketeering activity used as a pseudo-count in the 2011 PSR was robbery of a motor vehicle ("carjacking"). 2011 PSR ¶¶43-49. Under 18 U.S.C. §2119(a)(1), that offense carries a maximum of 15 years' imprisonment where, as here, no serious bodily injury occurred. 2011 PSR ¶23.

Class A felony, because it concluded that the recommended imprisonment range for his Grade A supervised release violation was 37 to 46 months, given his criminal history category of IV. *See* U.S.S.G. §7B1.4 (revocation table). Where the underlying conviction was not for a Class A felony, however, the recommended imprisonment range for a defendant with a criminal history category of IV is 24 to 30 months. *Id.*

Moreover, as Smith correctly argues, the maximum term of imprisonment for Smith's violation of supervised release was two years pursuant to 18 U.S.C. §3583(e)(3), because his underlying RICO offense was a Class C felony. This made the recommended range of imprisonment for this violation of supervised release 24 months, pursuant to U.S.S.G. §7B1.4(b)(1). Because there is no unambiguous indication in the record that the district court would have imposed the same 13-month term of imprisonment for Smith's violation of supervised release, had it known that the correct range was 24 months, Smith has established a plain guidelines error that warrants remand. *See, e.g., United States v. Gist,* 488 F. App'x 536, 537 (2d Cir. 2012) (remanding under similar circumstances).

**3. The district court did not abuse its discretion by denying Smith's request that his RICO sentence run concurrently with his state sentence for second degree assault.**

Although a remand for resentencing is necessary, this Court should make clear that the district court did not abuse its discretion by denying Smith's request to have his federal sentence for the present RICO conspiracy run concurrently with his state sentence for the stabbing on December 10, 2017. PSR ¶29. On appeal, Smith does not contend (as he did below) that the guidelines recommend a concurrent sentence in his case, under U.S.S.G. §5G1.3(b). This likely reflects Smith's recognition that for §5G1.3(b) to apply, "the prior offense must have been actually accounted for by the district court in calculating the defendant's offense level." *United States v. Williams*, 260 F.3d 160, 167 (2d Cir. 2001). It is not enough that the "prior offense conduct might technically qualify as 'relevant conduct' in a federal prosecution.'" *Id*. The December 10, 2017, stabbing did not affect Smith's offense level under §2E1.1, and thus §5G1.3(b) did not apply. In any event, because the guidelines are not advisory, "the district court would have the discretion not to follow § 5G1.3(b) even where applicable." *United States v. Coppola*, 671 F.3d 220, 253 n.30 (2d Cir. 2012). Accordingly, Smith now contends that the district court's decision to impose a consecutive sentence in his case was

substantively unreasonable. This claim should be rejected.

Federal law recognizes a presumption in favor of consecutive sentences where "[m]ultiple terms of imprisonment are imposed at different times." 18 U.S.C. §3584. Moreover, "[j]udges have long been understood to have discretion to select whether the sentences they impose will run concurrently or consecutively with respect to other sentences … that have been imposed in other proceedings, including state proceedings." *Setser v. United States*, 566 U.S. 231, 236 (2012); *see also United States v. Greenland*, 790 F. App'x 234, 237 (2d Cir. 2019) (noting that "courts have broad discretion to decide whether to impose a sentence to run concurrently, partially concurrently, or consecutively").

Here, the district court heard Smith's arguments in favor of a concurrent sentence, SA:484; SSA:10, but rejected them without comment, relying on the default rule in favor of consecutive sentences under 18 U.S.C. §3584. This decision was well within the court's discretion. As the court noted when explaining its sentence, this was Smith's *second* conviction for a RICO conspiracy arising from his involvement in the 110 Gang. SA:15. Although Smith notes that other defendants in this case received concurrent sentences, he fails to acknowledge that he is the *only* defendant in this case who had a prior RICO conviction for the same conduct. Despite the

leniency shown to him at his first RICO sentencing
– where he received a downward departure and a
bottom-of-the-guidelines term of imprisonment
based, in part, on his renunciation of the 110 Gang,
SA:155 – Smith returned to the gang shortly after
his release from prison and engaged in drug
trafficking and acts of violence in furtherance of
the gang's activities. PSR ¶41. His willingness to
do so, despite having served a 100-month term of
imprisonment for the same conduct, warranted a
greater measure of deterrence and incapacitation
in his case than others. The court achieved this
needed deterrence by denying Smith's request for
a concurrent sentence, and this decision was not
substantively unreasonable. *See, e.g.*, *United
States v. Legree*, 836 F. App'x 54, 59 (2d Cir. 2020)
(rejecting substantive reasonableness challenge to
consecutive sentences, given defendant's "lengthy
criminal history, his repeated recidivism, and his
perceived danger to the public"); *United States v.
Samuel*, 653 F. App'x 37, 40 (2d Cir. 2016)
(upholding imposition of federal sentence
consecutive to undischarged term of state sentence
based on, *inter alia*, defendant's repeated
conviction for the same federal crime).

**POINT VIII: Long's Sentence Should Be
Affirmed.**

## A. Background

On August 29, 2019, Long pleaded guilty to the
RICO conspiracy charged in the superseding

indictment, pursuant to a plea agreement that included an appeal waiver in which Long waived his right to appeal or collaterally attack any sentence of imprisonment of 240 months or less. LA:30. Long admitted his involvement in the 110 Gang enterprise, and that he actively participated in a pattern of racketeering activity. Long specifically admitted that he distributed crack cocaine in and around 110 Gang territory, and further admitted facts concerning his involvement in the Sistrunk homicide, but denied his knowledge of facts concerning the motive for the homicide. LA:28-29. In the plea agreement, the parties stipulated that Long's base offense level was 38 pursuant to U.S.S.G. §2A1.2(a) – the guideline applicable to second degree murder. LA:29.

In Long's PSR, the Probation Office determined that the "underlying racketeering activity" for purposes of §2E1.1 was second degree murder, in violation of 18 U.S.C. §1111.[47] PSR ¶56. After credit for acceptance of responsibility, Long's total

---

[47] The Probation Office further determined that the offense level computations for Long's less serious offenses of drug trafficking (Overt Acts 22 & 29) and attempted aggravated assault (Overt Acts 18 & 48) did not result in an increase in the total offense level under the multi-count adjustment, U.S.S.G. §3D1.4. It therefore did not score this other conduct as pseudo-counts.

offense level was 35. With a criminal history category of V, PSR ¶77,[48] his initial guidelines imprisonment range was 262 to 327 months, PSR ¶119. The Probation Office determined, however, that the applicable statutory maximum sentence was 20 years' imprisonment, pursuant to 18 U.S.C. §1963(a), resulting in a guidelines range of 240 months' imprisonment pursuant to U.S.S.G. §5G1.1(a).[49] PSR ¶119.

Long's criminal history score included three points for his state felony conviction on April 30, 2018, for criminal possession of a controlled substance in the third degree. PSR ¶74. Long was stopped for a traffic violation in 110 Gang territory on February 26, 2018, and found to possess 12.8 grams of crack cocaine, ten bags of heroin, nine rounds of .40 caliber ammunition, and two cell phones – one of which contained text messages indicative of drug dealing. PSR ¶74. Long was

---

[48] References in this section are to Long's PSR.

[49] Section 1963(a) of Title 18 authorizes a maximum life sentence where the RICO violation is based on a racketeering activity for which the maximum penalty includes a life term of imprisonment. Even though 18 U.S.C. §1111 authorizes a life maximum term for second degree murder, a jury did not find Long guilty of the Sistrunk homicide, unlike Hopper, and Long did not admit his intent to commit murder in his plea agreement.

sentenced to a three-year term of imprisonment for this offense. PSR ¶74. Long was serving this state sentence and in state custody when he was produced on a federal writ of habeas corpus ad prosequendum to make his initial appearance in this case on November 2, 2018. PSR ¶9; LA:3; Dkt. #31. Long was ordered detained by a United States Magistrate Judge. PSR ¶9. The PSR noted that on January 13, 2020, pursuant to Long's request, the federal writ was rescinded, and he was returned to state custody to continue serving his state sentence. PSR ¶9.

As relevant to Long's appeal, defense counsel argued in response to the PSR that Long's state drug trafficking conviction described above should not be counted towards his criminal history score because the conviction occurred after the last overt act committed by Long, and he had "withdrawn" from the conspiracy once he was arrested on that charge. LA:74-75. At the same time, he contended that his guideline range should be reduced by 36 months, to reflect that Long was serving a three-year term of imprisonment for the state drug trafficking conviction, which was charged as an overt act in the present RICO conspiracy. LA:75; *see also* PSR ¶33 (Overt Act 33). The government opposed these claims in its sentencing submissions. LA:66-67, 87-88.

At sentencing on December 2, 2020, the district court heard further argument on Long's claims concerning his state drug trafficking conviction.

LA:94-96. The court ruled that this conviction was appropriately counted towards Long's criminal history, pursuant to Application Note 4 to §2E1.1. LA:96. The court also denied Long's claim that he had withdrawn from the conspiracy. LA:99. And the court agreed with the government that Long was not entitled to a sentence adjustment under U.S.S.G. §5G1.3(b), because, under §2E1.1, his drug trafficking offense did not contribute to his offense level. LA:100. In discussing this issue, the government noted, without objection, that Long had "never been in federal custody" prior to his sentencing.[50] LA:100.

The district court adopted the factual information and guidelines calculations in the PSR, LA:104, and sentenced Long principally to a below-guidelines term of 210 months' imprisonment, LA:111-12. The court noted it was giving Long "a break on that," and ordered that his term of imprisonment "begin today and run concurrently with the remainder of his state sentence."[51] A:112.

---

[50] It appears from Long's BOP records, that BOP has given him credit towards his federal sentence for two periods of time in federal custody that predated the indictment in this case. GA:270.

[51] Only BOP has the authority to determine the precise date upon which a federal sentence commences. *See United States v. Labeille-Soto*, 163

## B. Discussion

In his *pro se* brief, Long wrongly contends that the district court erred by failing to credit him for time he allegedly spent in "federal custody" prior to his sentencing in federal court on the present RICO offense. Long Br. at 2. As an initial matter, Long remained in primary state custody after he was produced on a writ for his initial appearance in federal court. LA:3 (Dkt. #31); *see United States v. Fermin*, 252 F.3d 102, 108 n.10 (2d Cir. 2001) ("a defendant held at a federal detention facility is not 'in custody' ... when he is produced through a writ of habeas corpus ad prosequendum"); *Lugo v. Hudson*, 785 F.3d 852, 854-55 (2d Cir. 2015) ("If a prisoner is serving a state sentence when he is produced for a federal prosecution, the writ temporarily transfers him to federal custody for prosecution but the state retains primary custody for the purpose of calculating his state sentence."). Because Long remained in primary state custody, his time in federal pretrial detention was counted towards his state sentence, and Long cannot receive credit towards his federal sentence on that basis. 18 U.S.C. §3585(b) (permitting federal credit for time spent in official detention "that has not been credited against another sentence").

---

F.3d 93, 99 (2d Cir. 1998); *United States v. April*, 854 F. App'x 410, 415 (2d Cir. 2021).

More importantly, even if Long was entitled to credit for the time spent in federal custody prior to the imposition of sentence, the district court lacked the authority to grant that credit. Credit for time spent in prior custody is granted by the Attorney General through the BOP after a defendant is sentenced. *See United States v. Montez-Gaviria*, 163 F.3d 697, 700-01 (2d Cir. 1998) ("The Bureau of Prisons, and not the courts, determines when a defendant's sentence starts and whether the defendant should receive credit for any prior time spent in custody."); *Werber v. United States*, 149 F.3d 172, 179 (2d Cir. 1998) (same); *see also Wilson*, 503 U.S. 329, 334 (1992) ("We conclude that §3585(b) does not authorize a district court to compute the credit at sentencing."). Accordingly, the court had no authority to grant a credit because that authority belonged to the Attorney General.

Although Long seeks to challenge the calculation of his criminal history score, Long Br. at 3-4, this claim is precluded by his appeal waiver, and should not be considered by the Court. In any event, there was no error here.[52] In compliance with Application Note 4 to §2E1.1, the district

---

[52] Unlike Smith, Long's offense level under §2E1.1 was not affected by the error raised in Kinsey's appeal, concerning the use of aggravated assault as a "racketeering activity." *See* PSR ¶55 (explaining that the multi-count adjustment under §3D1.4 had no impact on Long's offense level).

court properly counted Long's drug trafficking offense (which was charged as an overt act) towards his criminal history score, rather than his offense level. U.S.S.G. §2E1.1 cmt. n.4.

## CONCLUSION

This Court should affirm Hopper's conviction and Long's sentence in all respects, but vacate the sentences imposed on Kinsey, Dowdell, and Smith, and remand for resentencing.

Dated: Syracuse, New York
　　　　January 28, 2021

　　　　　　　Respectfully submitted,

　　　　　　　CARLA B. FREEDMAN
　　　　　　　*United States Attorney*
　　　　　　　*Northern District of New York*
　　　　　　　*Attorney for Appellee*

　　　　　　　s/ *Rajit S. Dosanjh*
　　　By:　RAJIT S. DOSANJH
　　　　　　　*Assistant United States Attorney*

NICOLAS COMMANDEUR
*Assistant United States Attorney*
　　*of Counsel*

# CERTIFICATE OF COMPLIANCE

This brief does not comply with the type volume limitation of Rule 32(a)(7)(B) and Local Rule 32.1. As measured by the word-processing system used to prepare this brief, there are approximately 31,111 words in the brief. The government has filed a motion with the Court for leave to file this oversized brief.

CARLA B. FREEDMAN
*United States Attorney*
*Northern District of New York*

s/ *Rajit S. Dosanjh*
By:  RAJIT S. DOSANJH
*Assistant United States Attorney*

**CERTIFICATE OF SERVICE
BY NEXTGEN CM/ECF**

UNITED STATES OF AMERICA
v.
DOWDELL (HOPPER)

Docket Nos. 19-3087 (L), 20-3415 (con),
20-3501 (con), 20-3700 (con), 20-4149 (con),
20-4150 (con), 20-4190 (con)

The undersigned hereby certifies that she is an employee of the Office of the United States Attorney for the Northern District of New York, and is a person of such age and discretion as to be competent to serve papers.

She further certifies that on January 28, 2022, she served a copy of the appellee's Brief and Government Appendix on the United States Court of Appeals for the Second Circuit and counsel for appellants, Jeffrey R. Parry, Esq., Kenneth M. Moynihan, Esq., Michelle Anderson Barth, Esq., Gwen M. Schoenfeld, Esq., and Malvina Nathanson, Esq., by uploading to the Second Circuit's ECF system a Portable Document Format (PDF) version of the Brief.

s/ *Deanna Lieberman*
Deanna Lieberman